UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————x

DR. RUPERT GREEN,

                              Plaintiff        DOCKET NO. 18-CV-10817 (AT)(GWG)

        -against-

THE DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK; CARMEN FARINA, Former Chancellor,
Sued Individually and Officially,

                              Defendants

————————————————————x


# PLAINTIFF'S OPPOSITION TO DEFENDANT'S
# MOTION TO DISMISS



4-11-19

Dr. Rupert Green
Plaintiff Pro Se
205-26 113th Avenue
St. Albans, N.Y. 11412

917-601-6425

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................2

PRELIMINARY STATEMENT.........................................................5

STATEMENT OF FACTS................................................................7

ARGUMENT................................................................................13

    POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE
        DOCTRINES OF COLLATERAL ESTOPPEL OR RES
        JUDICATA.........................................................13

    POINT II: THE FIRST AMENDMENT RETALIATION CLAIM
        IS VALID...........................................................21.

    POINT III: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS
        MUST CONTINUE................................................27

    POINT IV: THE DEPARTMENT OF EDUCATION AND FORMER
        CHANCELLOR CARMEN FARINA ARE "PERSONS"
        UNDER §1983 AND ARE SUABLE.............................31

    POINT V: THE COURT SHOULD EXERCISE SUPPLEMENTAL
        JURISDICTION...............................................32

    POINT VI: THE NEW YORK CIVIL SERVICE LAW §75-B CLAIM
        SHOULD NOT BE DISMISSED................................33

CONCLUSION............................................................................33

# TABLE OF AUTHORITIES

Aetna Ins. Co. v. Kennedy, 301 U. S. 389, 393 (1937) ........................................18

Benedict v. Town of Newburgh, 95 F. Supp. 2d 136, 143 (S.D.N.Y. 2000)................26

Breithaupt v. Abram, 352 U.S. 432,435 (1957)...............................................30

Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d.

Cir. 2005)..................................................................................................22

Cardinale v NYC Department of Education, Index No. 85165/2017 (March, 2018).........7

Carnley v. Cochran, 369 U. S. 506 (1962)........................................................18

Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d 158, 164.................................... 27

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985].......................19

Connick v. Meyers, 461 U.S. 138, 147-148 (1983)...........................................9

Cty. of Sacramento v. Lewis, 523 U.S. 833, 847  (1998)..................................27

Davis v. Goord, 320 F.3d 346, 354 (2d Cir.2003)..........................................26

*Dwares v. The City of New York*, 985 F.2d 94, 100 (2d Cir. 1992)......................22

Education Law §2590-h................................................................................5

Education Law§§§ 3012, 3012- a..................................................................19

Education Law §3020-a(2)(a).....................................................................5, 19

42 U.S.C. §1983......................................................................................28

Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008)...................................29

Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009)....................................... 27

Faulks v. City of Hartford. 2010 WL 259076.(2010)......................................29

Fierro v. New York City Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014)  .29

Garcetti v. Ceballos, 547 U.S. 41O (2006)..............................................10, 24

Gentile v. Nulty. 769 F. Supp. 2d 573, 583 (S.D.N.Y. 2011).............................. . 29

Green v. N.Y.C. Bd./Dept. of Educ., Index 102017/2016................................. 17

Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d 274,654 N.E.2d 95 [1995]............................................................. 18

Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981].......... 19

Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011)............................................... 25

Johnson v. Zerbst, 304 U. S. 458, 464 (1938).................................................18

Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001)..........30

Kamholtz v. Yates County, 350 Fed.Appx. 589, 591 (2d Cir.2009)..........................29

Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999).........................................25

Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003)..............................27

Massaro v. New York City Dep't of Educ., 2012 U.S. App. LEXIS 10911 (2d. Cir. May 31, 2012)......................................................................................................................................23

Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450.....19

Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446..............19

Matter of Schumer v. Holtzman, 60 N.Y. 2d 46,51................................................ 21

Matthews v. City of New York, 488 Fed Appx. 532, 533 (2nd Cir. 2012)....................26

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-692 (1978)..........21

Moore v. County of Suffolk, 851 F.Supp.2d 447,458 (E.D.N.Y. 2012)................. 32

Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999)..............................................27

Mosdos Chofetz Chaim. Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697 (S.D.N.Y. 2011).............................................................................................................29

Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014)........................30

New York Civil Service Law§ 75-b...............................................................................32

New York State Open Meetings Law Section 105..................................................13

Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U. S. 292, 307 (1937)....................18

Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968)....9

Plyler v. Doe, 457 U.S. 202, 216 (1982).................................................................29

Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999)..........................27

Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014 WL 3547374..............................................................................................................................25

Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001)....................27

Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012).................................................23

Rusk v. New York State Thruway Authority, 2014 WL 3891624, (W.D.N.Y. 2014)......33

Shekhem' El-Bey v. City of New York. 419 F.Supp.2d 546, 552 (S.D.N.Y.2006)..............26

Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008)...................................25

Sloup v. Loeffler, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. 2008)...........................29

Smith v. City of N.Y., No. 15-cv-4493 (RJS)........................................................22

Sousa v. Roque, 578 F.3d 164, 170 (2d. Cir. 2009)……………………………………24

Tucker v. City of New York, _F.Supp.2d_, 2011 WL 2893077……………………………25

U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003)……………………………………15

Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013)………29

Weintraub v. Bd. of Educ., 593 F. 3d 196,202 (2nd Cir. 2010)………………………………24

Woodlock v. Orange Ulster B. 0. C.E.S., 281 F. App 'x 66, 68 (2d. Cir. 2008)……………..22

## PRELIMINARY STATEMENT

Plaintiff Dr. Rupert Green commenced this action to correct an injustice of constitutional proportion when, as a STEM teacher, UFT leader, and proponent of vocational education, he uncovered and reported via emails, telephone calls and complaints the misconduct occurring within his public school the "COOP TECH" staff, and then he was charged with nine Specifications of misconduct and brought to a 3020-a termination arbitration. The gravamen of these charges basically stem from emails Plaintiff sent from 2014-2016 about the education issues he believed important as well as reporting on the improper relationship of two of COOP TECH'S employees. He spoke out as a private citizen on matters of legitimate public concern. (See Second Amended Verified Petition "SAVP" EX. G.)

His 3020-a hearing started in May 2016, at the same time that he received a letter from the United States Department of Education Office of Civil Rights telling him that they would be investigating his complaint. The Arbitrator, Attorney Leah Murphy, was clearly biased against him, an outspoken African American male teacher and UFT leader. She fired Plaintiff in a decision dated December 9, 2016 for no legitimate reason, thus denying him any credit for his 15 years of excellent service to the Department and children of New York City, ignoring his right to speak as a private citizen on a matter of public concern pursuant to the First and Fourteenth Amendment of the U.S. Constitution, and doing all this damage

without proper procedures finding probable cause pursuant to Education Law §3020-a(2)(a).

At the same time that Plaintiff started his 3020-a, in May 2016 a video and statement by

Defendant former Chancellor Carmen Farina with a transcript was posted online on a blog

called NYC Rubber Room Reporter:

**"The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE**
**Partnership of Harm For Charged DOE Employees**
https://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html

The article was created May 28, 2016 by Betsy Combier, Editor of the blog and also part of

Plaintiff's team helping him at his 3020-a hearing. In the transcript and on the video former

Chancellor Carmen Farina states openly that the arbitrators and attorneys for NYSUT and the

Department of Education are "her army", that speed should be the most important criteria, not

rights, and that she is the person who is the chief administrator/boss of these teacher discipline

hearings. (See transcript of the Statements made in the video, EXHIBIT M).

Plaintiff Appealed the decision of Arbitrator Murphy to the New York State Supreme Court

immediately after the decision to terminate his employment was received. His Article 75

focused only on the decision of Murphy which labelled his emails "offensive" and for his

alleged inability to silence himself. No Constitutional issues of free speech, public concern,

racism, discrimination, disparate treatment or staff misconduct were discussed by Murphy.

Judge Engoron denied the Article 75 without addressing the First or Fourteenth

Amendments nor the facts upon which Plaintiff's emails were based, namely violations of

the Conflict of Interest Board (COIB) and misallocation of public funds, the lack of

resources going to vocational education, and discrimination.

Before his 3020-a Arbitration began, Plaintiff timely submitted an AFFIDAVIT (EXHIBIT

A) and a Motion To Dismiss For Lack of Subject Matter Jurisdiction (EX C) citing his never

signing a waiver for giving written notice of his approval for not going through with an

Executive Session on the charges. The PEP never held the Executive Session and never

voted on his charges. Arbitrator Murphy, Judge Engoron, and the Defendants' Motion To

Dismiss the Complaint all denied him the right to an Executive Session of the PEP and a

vote on the charges, and they all agreed to base the charging upon another Law, Education

Law §2590-h which gives the Chancellor the right to delegate to any Superintendent or

principal the right to find probable cause. Plaintiff disagrees and states that nowhere in Ed.

Law 2590-f is the phrase "probable cause" mentioned. Defendants made this up to

strengthen their Motion. (Motion, p. 23). Preferring/initiating charges is not the same as

determining probable cause.

On March 29, 2018, Richmond County Judge Desmond Green ruled in the case of Rosalie

Cardinale v New York City Department of Education (Index No. 85165/2017) that the lack

of proper procedures in filing the charges pursuant to Education Law §3020-a(2)(a) did,

indeed, deny Ms. Cardinale her Constitutional rights to due process, and he vacated her

termination. Defendants do not mention the Cardinale decision in their Motion To Dismiss,

and therefore cannot oppose Plaintiff's claim to a lack of due process at his 3020-a hearing

and a lack of subject matter jurisdiction for Arbitrator Murphy.

Plaintiff filed the Complaint reviewed herein to address his Constitutional right to speak on

matters of education, segregation, and wrongdoing within the Department, as well as the

denial of his rights by the Defendants pursuant to the decision of Judge Green in the

Cardinale case.

## BACKGROUND FACTS

Specifically, Plaintiff not only reported the inappropriate conduct of two teachers at the

school who were living together and benefiting financially by giving per session benefits to each other when these lucrative opportunities should have been fairly allocated among the staff at the school site, (see Complaint, p. 6) but also commented on the sorry state of vocational education funding and public education discrimination against young African American and/or minority students (see Piller article on Segregation, EX. K and Second Amended Verified Petition "SAVP" Ex. G) as well as against Black male teachers, like him. Plaintiff wrote about the fact that the two staff members were living together, and he was also accurate in his assessment of the lack of funding and resources for vocational education and the rampant segregation and discrimination inside the NYC Department of Education. He was not making false accusations.  However the administration changed his facts and charged him with their false version about a lesbian relationship and that his emails allegedly offended people, which was not intended by Plaintiff because he never cited the false information passed around by the Department. And, the so-called "harm" to staff as a result of his actions was never more than a baseless claim and no proof was given.

In 2015 Plaintiff officially complained about the issues he saw at COOP TECH and the irregular appointment of Cory Prober as Principal, to Carmen Farina, the former Chancellor, to Courtenaye Jackson-Chase, former General Counsel of the Department of Education, and to the Director of the Office of Special Investigations, Jaclyn Vargo.

In February 2016 Plaintiff received a response from the Office of Equal Opportunity that they were looking into the problems. On May 2, 2016, Plaintiff received a letter from the U.S. Department of Education Office of Civil Rights telling him they were investigating his claim. This letter was sent to Arbitrator Murphy about two weeks later by Plaintiff's Attorney Jonathan Behrins (EX. B) asking for an adjournment, but Murphy would not

adjourn the hearing. Clearly, no one at COOP TECH or the Department cared that Plaintiff was accurate with the facts of what he was saying, but many in the Department and in the COOP TECH administration resented his speaking and emailing about these issues. They retaliated and charged him with reporting false facts and defined his emails as "offensive" and "upsetting". Of course Plaintiff knew that his information was not going to be received with great happiness, but he was speaking as a private citizen on a matter of public concern and he believed that he had the protection of the U.S. Constitution behind him.

A well-known 3020-a arbitration decision on sending emails and disrupting a school was made two years before Arbitrator Murphy made her decision in Plaintiff's 3020-a. The charges brought against STEM teacher Francesco Portelos were decided on April 30, 2014 by Arbitrator Felice Busto, and her decision is attached in EX.F. Arbitrator Busto cited the First Amendment rights of Mr. Portelos many times, and does not rule on any Constitutional protections Portelos had, but rather wrote that Portelos was a private citizen speaking and sending emails as a matter of public concern. (See Opinion and Award, pp. 28, 30, 31, 44, 55, 95-99, 103, 104).

Busto wrote:

"He defends his speech at the CEC regarding the video on the grounds that it was a matter of public concern….. The Department maintains that his speech was disruptive to the Department's operations and outweighs any right to First Amendment protection under the balancing test in Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968).

In Pickering and its progeny, the U.S. Supreme Court articulated a two-part balancing standard to determine whether speech by a public employee is accorded constitutional protection. The first question is whether the employee spoke as a citizen about a matter of public concern rather than as a function of his employment duties. Whether speech addresses a matter of public concern depends upon the "content, form, and context of a given statement." Connick v. Meyers, 461 U.S. 138, 147-148 (1983).

If an employee speaks as a citizen with respect to a matter of public concern, the inquiry turns to whether the government's interest as the employer outweighs any First Amendment

protection afforded to the speech. See <u>Pickering</u>, supra, 391 U.S. 598 (1968); <u>Garcetti v. Ceballos,</u> 547 U.S. 41O (2006).  In other words, "[t]o be protected, the speech must be on a matter of public concern and the employee's interest of expressing [himself] on this matter must not be outweighed by any injury the speech could cause to the 'interest of the state, as an employer, in promoting the efficiency of the public services it performs, through its employees'." <u>Connick v. Meyers</u>, 461 U.S. 138(1983).....There is no bright line in applying this two-prong standard and each case turns  on its facts."( Busto, pp. 96-99)

Portelos was fined $10,000 and sent back to teaching. Mr. Portelos is white.

In contrast, Plaintiff is a Black man, a Union member and leader as well as a senior teacher. He was fired by Murphy at his 3020-a and he was condemned, given a "no hire" problem code on his file, and forever banned from teaching for sending factual information and opinions in a dropbox with no malicious intent. By all accounts, Plaintiff was an excellent teacher and students benefitted from his service.

In the case presented here, the administrators at the Department retaliated against Plaintiff, removed him from his teaching, blocked his NYC DOE emails, and charged him with nine (9) Specifications (EXHIBIT L). In Specification 1, there are 114 emails, all allegedly "offensive" and "harmful", sent from January 10, 2014 to March 23, 2016. Plaintiff received charges on or about April 22, 2016. His 3020-a compulsory arbitration hearing began on May 16, 2016, and ended with Murphy's decision to terminate Plaintiff on December 9, 2016.

Shockingly, at the start of the hearing, Arbitrator Leah Murphy, Esq. would not give Plaintiff access to all of his emails which, Plaintiff argued, would show the good work he was doing as the STEM Director. She also did not see any value to Plaintiff's remedy for putting his opinions into a dropbox which, Plaintiff testified, anyone with an issue could trash, and not read. (Opinion and Award, p. 122). She omitted from her decision any comments about how people could decide not to read the emails and Plaintiff did not force

anyone to read them.

Murphy terminated Plaintiff for his alleged "arrogant and oppositional refusal" to stop sending the emails even though he placed the so-called "thoughts on education" emails in a separate dropbox. The issues of First Amendment rights, NYC vocational education, racism, disparate treatment and the Fourteenth Amendment were never litigated or even discussed. Indeed, Murphy had no authority to rule on any of these issues.

Plaintiff felt it was his duty as a private citizen to report on matters of public concern, namely the unlawful sharing of benefits by the couple - the husband-wife team of Alicia Konzie, Secretary to the Principal, and Carlos Caraballos, teacher - who gave favors to each other, yet had not requested a waiver from the Conflict of Interest Board (COIB) and were violating Chancellor's Regulations C-110, Section IV.

Plaintiff was also keenly aware of his "outsider" status as an African-American male teacher at the Department in a vocational high school filled with mostly minority kids who could not, or did not, succeed in a regular degree-based high school, and were over-age and under-credited. (SAVP, pp. 3-4; EXHIBIT G). He knew that the Department of Education had a very negative view of minority children and staff, particularly men of color of all ages. Plaintiff, an African American male, taught computer technology at COOP TECH, an alternative site attached to John Adams High School in Queens.

In finding that Petitioner's emails were inappropriate and offensive, the Hearing Officer wrongfully credited the subjective opinions of some COOP TECH staff members who testified that they took offense to Petitioner's emails without providing a reasonable, legitimate basis for offense.

Before the hearing started, Plaintiff submitted an AFFIDAVIT stating that he never waived

his right to a hearing that complied with Education Law §3020-a(2)(a) which requires the school board – which in New York City is the Panel For Educational Policy (PEP; EX. D) – to hold a vote on probable cause in an Executive Session before he is served any charges. This did not take place. Plaintiff followed up on his AFFIDAVIT (EX. B) with a Motion To Dismiss For Lack of Subject Matter Jurisdiction (EX. C). Arbitrator Murphy denied the Motion saying that the Chancellor had been given all the duties and responsibilities of the school board (PEP) and she, former Chancellor Carmen Farina, could delegate the determination of probable cause to Superintendents.  (Bylaws of the Panel For Educational Policy EX. D; Notice of Determination of Probable Cause Pursuant to Education Law 3020-a, EX. E; Second Amended Verified Petition EX. G; Plaintiff's Memorandum of Law in Opposition To Respondent's Cross-Motion, "Motion", EX. H).Plaintiff argues that he was never given any notice that Ed. Law §2590 rather than §3020-a(2)(a) was controlling his hearing, but he never waived his right to have a hearing in compliance with the Education Law 3020-a(2)(a) which was clearly cited in his charging papers. (EX. E).

Another point Plaintiff wants the Court to take Notice of is that the PEP Bylaws (EX.D) do not give the Chancellor the right to vote on any issue, therefore he/she never can grab this authority and then delegate it to anyone.

Education Law §2590-f(t) states:

 "(t) **notwithstanding any provisions of law to the contrary**, to exercise all of the duties and responsibilities of the employing board as set forth in section three thousand twenty-a of this chapter pursuant to a delegation of the chancellor under section twenty-five hundred ninety-h of this article……"

Education Law §2590-h states:

"The office of chancellor of the city district is hereby continued. Such chancellor shall serve at the pleasure of and be employed by the mayor of the city of New York by contract. The length of such contract shall not exceed by more than two years the term of office of the mayor authorizing such contract. The chancellor shall receive a salary to be fixed by the mayor within

the budgetary allocation therefor. **He or she shall exercise all his or her powers and duties in a manner not inconsistent with the city-wide educational policies of the city board. ..."**

Thus all the talk about the Chancellor taking all the duties of the employing board is not true, at least for a vote on probable cause in an Executive Session. The intent of the NY State legislature was clear: keep a third eye on these procedures, and keep the Chancellor from managing the entire process of teacher discipline by him/herself. This is the point that Defendants want this Court to ignore, but Judge Green in the Cardinale case did notice this defect in the Department's omission of a date for an Executive Session in Plaintiff's charging papers. (EX E) The Defendants' Motion To Dismiss must be denied.

And finally, even if the NYC Chancellor could be given all the duties of the PEP, he/she would still have to hold an Executive Session, and meet with at least one other person as part of an open public meeting. (New York State Open Meetings Law Section 105). This is the key to the failure of the Defendants' Motion To Dismiss presented here. Education Law §3020-a(2)(a), the Tenure Law, protects educators by giving the determination of probable cause to a group rather than to a single person. If a principal signs off on the determination of probable cause, charges a teacher in his/her school, then testifies at the hearing on the charges for which he/she found probable cause and created, Plaintiff argues that there is no tenure protections given to him.

ARGUMENT

POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE
DOCTRINES OF COLLATERAL ESTOPPEL OR RES
JUDICATA

Defendants argue that Plaintiff's claims presented to this Court are barred by Collateral Estoppel and Res Judicata and that Plaintiff's claims must be dismissed. This argument fails due to the fact that none of Plaintiff's claims to First Amendment speech, due process pursuant to the

Cardinale decision, or protection under the Fourteenth Amendment have been litigated or even discussed by Murphy, Engoron, or Defendants in any prior forum in the termination of Plaintiff. Res Judicata is defined as: "the doctrine of res judicata bars claims that have either been litigated or that could have been litigated from being litigated again"(LawShelf)

Collateral Estoppel means that any issues that have been litigated cannot be litigated again. The doctrines of res judicata and collateral estoppel often come into play when a subsequent case, similar to a case already adjudicated, is filed. The rationale behind the doctrines is that an issue or cause of action fully litigated should not be litigated again. Res judicata is often referred to as "claim preclusion". Collateral estoppel is often referred to as "issue preclusion".

Res judicata is raised when a party thinks that a particular claim was already, or could have been, litigated and therefore, should not be litigated again. When addressing a res judicata argument, a court will usually look at three factors. First, the court will consider whether there was previous litigation in which identical claims were raised, or in which identical claims could have been raised. The second factor to be considered is that the parties must be the same parties as those who litigated the original action. The third factor is that the original action must have received final judgment on the merits.

Final judgment does not occur when the case is settled by the parties on their own, or where the judge decides a motion or makes some other determination that does not resolve the case based on the facts and evidence of the case. This means that the final judgment must concern the actual facts giving rise to the claim. Dismissal of a case because the court does not have subject matter jurisdiction, because the service of process was improper, because the venue was improper or because a necessary party has not been joined, for example, are not judgments on the merits. Grants of these types of motions to dismiss really have nothing to do with the facts, except that

14

the litigation is precluded by a technicality. As such, subsequent litigation as to whether the defendant is liable would not be barred.

Collateral estoppel arises when the claim (cause of action) at the bar has not been litigated, but the exact issue that is now before the court has been raised and litigated in an earlier action or proceeding. Collateral estoppel is a bit different than res judicata, although the rationale is the same – it is a tool to prevent re-litigation of issues already litigated. See U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003):

"The collateral estoppel doctrine provides that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'

The requirements that must be satisfied before the doctrine of collateral estoppel is applied are similar to those for res judicata, but there are differences. First, the issues in the first and second litigation must be identical and must have been before a court. Second, the issue must have been actually litigated. Third, a final judgment must have been rendered, ultimately deciding the issue in question.

The first factor is that the issues in the previous and subsequent litigation must be identical. Using the transaction or occurrence test would be too broad for collateral estoppel in most cases. Rather, the court will require that the issues be identical or very similar. When considering the doctrine of collateral estoppel, it is important to note that the subject matter of the subsequent litigation does not need to be the same as the subject matter of the previous litigation for the doctrine to apply. As long as the issue was already litigated, collateral estoppel can apply.

15

The second factor is whether the issue was actually litigated during the first case. Unlike with res judicata, if the issue could have been raised, but wasn't, the defendant will not be collaterally estopped from raising the issue in subsequent litigation.

The third factor is that the issue must have necessarily been decided on the merits. There are two requirements for this factor. First, the issue must be implicated in the judgment. If an issue is raised in the previous litigation, but the issue is not decided or has no connection to the judgment, then the issue cannot be the target of collateral estoppel. Along these lines is a jury's finding that is not one of the reasons for the judgment. For example, if the plaintiff brought a negligence action with a two count complaint, with both counts sounding in negligence, but the jury simply finds that the defendant was negligent, the doctrine of collateral estoppel probably cannot be invoked, since it is not clear which issue was the subject of the final adjudication. Second, like res judicata, the issue must have been decided on the merits and not based on a technicality.

It must be noted that 3020-a Arbitration is not a Court, there is no Judge or jury, and rules of evidence and hearsay are relaxed to the point of being almost nonexistent. Arbitrator Murphy was chosen for Plaintiff's case by the Department of Education, thus there was no wheel to turn for the appointment. Plaintiff had no say in choosing the arbitrator and was not given his due process because Murphy did not have subject matter jurisdiction to decide any issue brought to her attention in the Specifications, and certainly not the Constitutional issues raised here.

Defendants argue in their Motion that:

"The State court in <u>Green</u> actually and necessarily considered and decided the

aforementioned issues and found them lacking merit. See Green v. N.Y.C. Bd./Dept. of Educ.,
Index 102017/2016, (N.Y. Sup. Ct. Engoron, J., decided Feb. 20 2018), annexed to the Wood
Decl. as Exhibit "1." (Motion, p. 6)

This statement is blatantly false.

Also astonishingly false is any finality as to the subject matter jurisdiction question of Murphy,
brought to this lawsuit pursuant to the March 29, 2018 decision in Cardinale by Richmond
County Judge Desmond Green.

Plaintiff argues that Arbitrator Leah Murphy never had subject matter jurisdiction to terminate
him at the compulsory 3020-a arbitration hearing because of procedural violations of law which
impaired his tenure rights to due process as cited in Education Law 3020-a. Plaintiff did not, at
any time, waive his rights to a hearing on §3020-a charges that must be presented to the Panel
For Educational Policy (PEP) for a vote in Executive Session in compliance with Education Law
3020-a (2)(a).

In those proceedings, which are compulsory, no Arbitrator can deny or dismiss Plaintiff's
notarized AFFIDAVIT which clearly states his opposition to the procedural errors upon which
his case was charged. AFFIDAVIT is attached in EX A.

In the papers with the title "Notice of Determination of Probable Cause on Education Law
§3020-a Charges" served on Plaintiff (EX E), the date of the Executive Session is missing and
there is no information on a vote by the employing board on probable cause. An Executive
Session is mandated by law and cannot be omitted by fiat of the Chancellor, or by any other law,
rule or agreement. At no time did Plaintiff waive his rights to the process as stated in the
charging papers to determine probable cause on his 3020-a charges, with an Executive Session

17

held by the Panel For Educational Policy ("PEP") before being served the charges. (EX D) Here, there was no Executive Session and the Defendants did not comply with Education Law 3020-a. Therefore, the Arbitrator had no subject matter jurisdiction to proceed with the case against Plaintiff. She should have immediately withdrawn all charges. Alternatively, the Arbitrator should have adjourned the hearing until there had been a vote in an Executive Session by the school board and a proper determination of probable cause. Murphy did not do that.

Plaintiff argued that the hearing could not proceed due to the un-waived procedural defect cited in his AFFIDAVIT. (see, Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d 274,654 N.E.2d 95 [1995]). Upon information and belief, the Department placed Arbitrators on the 3020-a panels without explaining the procedural defect, however this does not cure the problem of subject matter jurisdiction. Arbitrators cannot grab subject matter jurisdiction out of thin air.

Fraudulent concealment of a secret waiver of the rights of tenured employees to the tenure law Education Law 3020-a(2)(a) by the NYC Department of Education cannot be sanctioned.

The United States Supreme Court has defined waiver as "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U. S. 458, 464 (1938). Courts should "indulge every reasonable presumption against waiver, Aetna Ins. Co. v. Kennedy, 301 U. S. 389, 393 (1937), and they should "not presume acquiescence in the loss of fundamental rights," Ohio Bell Tel. Co. v. Public Utilities Comm'n,301 U. S. 292, 307 (1937).

In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." Id., at 516. Additionally, a

18

waiver of a teacher's tenure rights must be knowingly and freely given (Matter of Gould v. Bd. of

Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446; Matter of Abramovich v. Bd. of Educ. of

the Three Villages CSD No. 1, 46 NY2d 450).

Tenured teachers have a property and liberty right to their jobs, and therefore when there is any

penalty that reduces the benefits of these rights, there must be Just Cause. Plaintiff argues here

that there was no Just Cause to proceed with the 3020-a arbitration.

Judge Desmond Green in the Richmond County Supreme Court  ruled on March 29, 2018 in

the case of Rosalie Cardinale that:

"New York State created the public school tenure system guaranteeing continued
employment to tenured teachers by statute and therefore created a property right in a tenured
teacher's continued employment. *(See Education Law§§§ 3012, 3012- a, 3020, Holt v. Board
of Educ. Of Webutuck Cent. School Dist.,* 52 NY2d 625 [1981], *Matter of Abromvich v.
Board of Educ. of Cent. School Dist. No. I of Towns of Brookhaven & Smithtown,* 46 NY2d
450 [1979]).* Where a property right in continued employment exists, such as New York's
tenure system, the recipient of such a right may not be deprived without due process. *See
Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 [1985].*

New York State guarantees a tenured teacher's due process rights to continued employment
by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a
term of employment except for just cause and in accordance with the procedures specified in
section three thousand twenty-a of this article or in accordance with alternate disciplinary
procedures contained in a collective bargaining agreement ... " *Education Law § 3020.*

The statutory procedural process afforded to teachers with tenure under *Education Law*
§3020-a requires:
The filing of charges "in writing and filed with the clerk or secretary for the school district or
employing board during the period between the actual opening and closing of the school
year for which the employed is normally required to serve. *Education Law§3020-a(l)*

"Within five days after receipt of charges, the employing board, in executive session, shall
determine, by a vote of a majority of all the members of such board, whether probable cause
exists to bring a disciplinary proceeding against the employee pursuant to this section."
*Education Law § 3020-a(2).*

Where an employing board determines probable cause exists for discipline the tenured teacher
shall receive: "a written statement specifying (i) the charges in detail, (ii) the maximum penalty
which will be imposed by the board if the employee does not request a hearing or that will be
sought by the board if the employee is found guilty of the charges after a hearing and (iii) the

19

employee's rights under this section, shall be immediately forwarded to the accused employee."
Id.

Green summarized his conclusion that there was a procedural error of law:

"Hearing Officer Lendino conducted the *Education Law* § 3020-a hearing based on
unproven assumptions that the delegations of duties and responsibilities from the office of
the Chancellor to subordinate administrators occurred in compliance with the relevant
statutory authority."

It is clear that a decision of an Arbitrator who proceeds without getting a signed waiver from

the charged employee shows bias against the employee and an excess of authority that is not

sanctioned by any statutory authority.  The requirements of NYS Education Law §3020-a,

under which tenured personnel may be disciplined for "just cause" are absolute and require that

before charges can be brought against a tenured educator, the school board[1] [PEP] must:

a.   Determine that there is "probable cause" for the proceeding with charges by a
     majority vote by the Board.

b.   Make this determination within 5 days of the charges being filed with the
     Board.

c.   Ensure that the decision to proceed with the charges is not frivolous, arbitrary,
     capricious or discriminatory.

The legislative intent is to provide pedagogues protection from vindictive principals who may

want to remove senior teachers from their positions for random, arbitrary or capricious reasons.

Thus, Education Law 3020-a(2)(a) is an important part of the efforts of legislators to maintain a

check and balance of power in NY State governance and policy.

Moreover, because the Chancellor has no vote as a member of the Panel for Educational Policy,

he/she lacks the authority to grant any individual the authority to make a probable cause

---

[1] In the City of New York, the Panel for Educational Policy ("PEP") serves as the "school board".

determination.  Even if the Chancellor had been given the duties of the school board, this would still mandate a vote in an Executive Session before any charges were served on Plaintiff. This did not happen. The charging papers had no date for the Executive Session taking place at any time and the Plaintiff has never waived his right to a hearing pursuant to the Education Law 3020-a 2(a).

The statutory procedures for filing charges against Plaintiff were completely disregarded and his tenure rights were not protected. Compliance with Education Law 3020-a(2)(a) is a jurisdictional condition precedent to a §3020-a disciplinary hearing. Without it, the hearing should not have moved forward. Prohibition is the appropriate procedural remedy for the assertion of Plaintiff's claim where prohibition is available "to prevent a body or officer from proceeding or threatening to proceed without or in excess of its jurisdiction." See: Matter of Schumer v. Holtzman, 60 N.Y. 2d 46,51.

The Motion To Dismiss presented here by Defendants cannot be granted.


### POINT II: THE FIRST AMENDMENT RETALIATION CLAIM IS VALID

Defendants argue that Plaintiffs First Amendment Retaliation claim is legally insufficient because "The Complaint in this matter fails to plead any facts plausibly suggesting that any of the rights to which Plaintiff is entitled under the 1st, 4th, 5th or 14th Amendments to the United States Constitution were violated in any manner, let alone violated pursuant to an official policy, practice or custom." (Motion, p.8). Defendants argue that "A municipal entity, such as Defendant DOE, can only be liable under § 1983 if the alleged unconstitutional action was the result of an official policy, practice or custom. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-692 (1978). "The mere assertion, however, that a municipality has such a custom or

21

policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Dwares v. The City of New York, 985 F.2d 94, 100 (2d Cir. 1992). Further, a plaintiff cannot use a single instance of a constitutional violation, including his own isolated experience, to prove a Monell violation. Smith v. City of N.Y., No. 15-cv-4493 (RJS), 2016 U.S. Dist. LEXIS 118281, at *15-17 (S.D.N.Y. Sep. 1, 2016)."

In order to prevail on a First Amendment retaliation claim, a Plaintiff must demonstrate that he engaged in speech protected by the First Amendment, that he suffered an adverse employment action, and that a causal connection between the two existed, "in that the speech was a substantial or motivating factor for the adverse employment action." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d. Cir. 2005). The threshold inquiry in any First Amendment retaliation case is whether the employee was speaking as a citizen on a matter of public concern. Woodlock v. Orange Ulster B. 0. C.E.S., 281 F. App 'x 66, 68 (2d. Cir. 2008) (quoting Garcetti v Ceballos, 547 U.S. 410, 418 (2006)).

The inquiry into whether an individual was speaking as a citizen "is a practical one." Garcetti, 547 U.S. at 424-25. Speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." Id. At 423. Factors that have been considered by courts, but none of which are dispositive, are whether the speech occurred in the workplace; whether the speech concerns the subject matter of the employee's job; the plaintiffs job description; the person to whom the speech was directed; and whether the speech resulted from special knowledge gained through the Plaintiff's employment. See Garcetti, 547 U.S. at 420-21.

Plaintiffs speech was not of the type normally made as part of a teacher's official duty. Nowhere in his job description was he required to raise concerns about the school's budget, or investigate

budgetary misconduct and inappropriate actions by the school's administration. Nor have the Defendants pointed to any specific duties of Plaintiff as an employee of the DOE necessary to engage in such behavior. Plaintiff's speech involved matters affecting his entire school and community.

Plaintiff's speech did not concern issues for which "there is no relevant citizen analogue," but rather was motivated by his concerns as a member of the community and by information available to the public. Massaro v. New York City Dep 't of Educ., 2012 U.S. App. LEXIS 10911 (2d. Cir. May 31, 2012) (Plaintiff's complaints concerned internal safety and medical absence-related forms, "for which there is no relevant citizen analogue." Further, her complaints concerned her ability to properly execute her duties as a teacher). Neither was Plaintiffs speech "part and parcel" of his official duties as a teacher, as a teacher's duties clearly do not encompass reporting on budgetary irregularities. Matthews v. Lynch, 2012 U.S. LEXIS 10463 (2d. Cir. May 24, 2012) (holding that when a Connecticut State Police officer, whose official duties as part of the Internal Affairs Unit included investigating police misconduct, subsequently learned of departmental misconduct in the course of performing his investigations and reported this to the state's Attorney General, he was acting within the scope of his duties as a public employee); Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012) (holding that the duties of a payroll clerk-typist for a school district who reported financial malfeasance plainly included reporting pay irregularities to a supervisor). Plaintiff was not speaking generally as an advocate for his students, nor as an employee as part of his duties, but as a citizen concerned about budgetary irregularities and potential misconduct affecting not just his classroom or school, but the entire community.

A speaker's motive is not dispositive in determining whether his speech addresses a matter of

public concern. Rather, whether or not the speech addresses a matter of public concern must be determined by the "content, form and context of a given statement, as revealed by the whole record." Sousa v. Roque, 578 F.3d 164, 170 (2d. Cir. 2009). Clearly, Plaintiffs speech involved a matter of public concern. The content of the speech was misconduct of the school's budget, paid by taxpayer money and public funds, matters which clearly affect the entire community.

Based on the above, sufficient facts clearly have been alleged under the applicable case law to withstand Defendants' motion to dismiss and to warrant further factual pretrial discovery. Any review of teacher discipline hearings for the past 18 years clearly shows that the NYC Department of Education, former and current Chancellors, and the Teacher Tenure Unit in Albany inside the New York State Education Department, guide and manage 3020-a arbitration hearings for New York City and New York State. EX. M shows former Chancellor and Defendant Carmen Farina describing the procedures she has in place for the teacher discipline hearings - this is her policy statement as well as the policy of the NYC Department of Education. Since 2002, there has been deficits to the procedures used in 3020-a arbitration as cited in the Green decision in the Cardinale case (EX. J), Plaintiff's AFFIDAVIT (EX. A), and his Motion To Dismiss For Lack of Subject Matter Jurisdiction (EX C).

Therefore Plaintiff has the necessary and sufficient facts to support his claims that the Defendants have a policy and practice of speeding up 3020-a hearings at the expense of tenure rights, and, that the Mayoral control of the NYC DOE obliterated necessary and mandated procedural due process rights pursuant to law which he did not waive.

Whether an employee's speech was made pursuant to his "'official duties is 'a practical one,' Weintraub v. Bd. of Educ., 593 F. 3d 196,202 (2nd Cir. 2010) quoting Garcetti v. Ceballos, 547 U.S. 410,424, 126 S. Ct. 1951, 164 L.Ed.2d 689 (2006), focusing on whether the speech " was

24

part-and-parcel of his concerns about his ability to properly execute his duties.". However, the

inquiry of whether the employee is speaking pursuant to his official duties is not susceptible to a

bright line rule. Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012). Courts must examine the nature

of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the

two; and consider other contextual factors, including whether the complaint was conveyed to the

public.

Whether an employee's speech addresses a matter of public concern is a question of law to be

determined based on the "content, form and context of a given statement, as revealed by the

whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999) citing Connick v. Myers, 461

U.S. 138, 147-48 (1983), n. 7. An "[e]mployee's expression is not a matter of public concern

when it 'cannot be fairly considered as relating to any matter of political, social, or other concern

to the community'." Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008) quoting

Connick, 461 U.S. at 146. However, criminal conduct relating to public education is generally

recognized as a matter of public concern. See Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d

158, 164 (holding, in part that criminal activity in schools is of "social" or "other" concern

to communities); Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014

WL 3547374) *11 (E.D.N.Y.)(denying defendant's motion to dismiss finding that school

employee reporting unlawful and illegal inflation of student grades to procure county and state

funding constituted speech that touched on a matter of public concern); see also Tucker v. City

of New York, _F.Supp.2d_, 2011 WL 2893077, *5 (S.D.N.Y.) (holding that allegations of

corruption and misuse of public funds by supervisors and coworkers are matters of public

concern); see generally, Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011) (holding that speech

pertaining to police misconduct is a matter of public concern).

Plaintiff felt strongly that the segregation and discrimination he observed in COOP TECH as well as throughout the NYC Department of Education was a matter of public concern. He also believed then and now that when employees unfairly and illegally misuse school funds, this is also a matter of public concern. He acted on these beliefs as a private citizen. See also Benedict v. Town of Newburgh, 95 F. Supp. 2d 136, 143 (S.D.N.Y. 2000) (holding that "testifying truthfully is constitutionally protected from retaliation, and that it is a right existing wholly apart from the First Amendment protection of speech generally, and without the need to sow that the testimony relates to a matter of public concern").

Plaintiffs speech in his emails and letter complaints encompassed actions that are not within Plaintiff's primary duties as a STEM teacher. Hence, at this early stage in the case, accepting Plaintiffs averments as true, it cannot be said as a matter of law that citing improper actions of staff who are illegally using school and Department funds were part and parcel of his primary duties.

Moreover, since there is no bright line rule relating to what speech constitutes matters within the primary duties of a public employee's duties, discovery needs to occur to learn exactly what was the nature of the Plaintiff's job responsibilities, the nature of the speech and the relationship between the two before a Court can be decided whether the plaintiff can continue to pursue his First Amendment retaliation claim. Matthews v. City of New York, 488 Fed Appx. 532, 533 (2nd Cir. 2012) (summary order).

In order to establish a causal connection at the pleading stage, the "allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.'" Davis v. Goord, 320 F.3d 346, 354 (2d Cir.2003); see also Shekhem' El-Bey v. City of New York. 419 F.Supp.2d 546, 552 (S.D.N.Y.2006). The Second Circuit has no bright line for how close in time

26

the adverse employment action must follow the protected activity in order to sustain the causation element. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F. 3d 158, 167-68 (2nd Cir. 2006) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999). On a motion to dismiss, a reasonable inference of a causal connection is all that is required. See Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999) ("[T]he plaintiffs pleading need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect."); Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001). This "can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). A court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of [each] particular case [ ]," Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009). Where a plaintiff asserts enough direct evidence of retaliatory animus to create a triable question of fact on the issue of a causal connection as here, a longer lapse between the protected speech and the adverse employment action does not necessarily "conclusively establish lack of causation." See Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003).

Here, Plaintiff's speech is directly related to his charges and his termination. The relationship between his speech and his termination can clearly be seen from the fact though he possessed a temporary NYS administrative license, he was denied an interview in 20 of the 21 times he applied for Assistant Principal positions. So grievous was the discriminatory process that when an AP position opened up at CoOp Tech, where Plaintiff taught, neither he nor another qualified Black teacher, Donald Ferguson- who testified on Plaintiff's behalf - was invited for an

interview. That position was announced on the NYC Department of Education's website, as required by policy, because Plaintiff wrote an email explaining how Jernee, a White teacher, was made AP without the required C-30 process. Because of his email, Principal Widlund stated no one was given the AP position, he announced the position was not filled, and invited Plaintiff and Donald Ferguson to the interview. However, Jernee was given the position and consequently retaliated by writing up Plaintiff. Plaintiff was denied access to emails which could have assisted him in his 3020-a hearing as he revealed many instances of discriminatory opportunities which were denied to Black and Latino educators seeking administrative positions See EXHIBIT N for the Complaint filed with the Defendants 12/13/15.

POINT III: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS MUST SURVIVE THE
MOTION TO DISMISS

Plaintiff has sufficiently alleged an Equal Protection cause of action.  EX. F, the Opinion and Award in 2014 of Arbitrator Felice Busto in the case of the emails and computer shenanigans of Francesco Portelos, found that Mr. Portelos had committed serious misconduct, but was an excellent teacher and deserved to go back to his teaching. Portelos is white. Plaintiff, for being charged with much less serious acts of sending emails on the lack of resources in vocational education, the widespread discrimination, segregation, and improper – even unlawful – acts of a few staff members at COOP TECH, was fired. Plaintiff also sent emails on the harassment of other Black employees at the school, as well as the low status of Black students who are pushed into alternative education such as District 79, vocational education. Plaintiff is Black. Clearly Plaintiff was treated differently with malicious retaliatory animus than similarly situated other District employees, including those who committed the illegal acts reported by Plaintiff, with the express illegal intent to punish whistleblowers. Thus, Plaintiff has successfully alleged belonging

to a class that consists of more than one individual. The Equal Protection Clause requires only that the classification drawn by the statute be rationally related to a legitimate state interest.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated  should be treated alike. Plyler v. Doe, 457 U.S. 202, 216 (1982).Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection.  The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.

Additionally, Plaintiff has successfully alleged an equal protection cause of action under a selective enforcement theory of liability. The courts within the Second Circuit are divided whether such a selective enforcement is permitted in the wake of the United States Supreme Court in Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008), (held that "class of one" claims no longer exist in a public employment setting); Gentile v. Nulty. 769 F. Supp. 2d 573, 583 (S.D.N.Y. 2011); citing Kamholtz v. Yates County, 350 Fed.Appx. 589, 591 (2d Cir.2009), Faulks v. City of Hartford. 2010 WL 259076, at *7 (D.Conn. 2010), Sloup v. Loeffler, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. 2008).

The elements of a selective enforcement cause of action are "(1) that [s]he was treated differently from others similarly situated, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Fierro v. New York City

Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014), appeal dismissed (Apr. 9, 2014). quoting Gentile, 769 F.Supp.2d at 578.

It is without a doubt that the Plaintiff has successfully alleged the necessary elements of a selective enforcement of the Education Law processes behind teacher discipline outcomes. With regard to the first element, similarly situated individuals, a plaintiff need not provide evidence of similarly situated individuals at the motion to dismiss stage, so long as the facts as alleged to permit a jury to conclude that they are similarly situated. Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013), citing Mosdos Chofetz Chaim. Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697 (S.D.N.Y. 2011).

As to the second element of the selective enforcement cause of action, it is without a doubt that Plaintiff has successfully alleged that the differing treatment by the Defendants was in order to punish the Plaintiff for exercising his First Amendment rights as a whistleblower and was done maliciously and with the bad faith intent to harm him. Thus, it is clear that Plaintiff has successfully alleged a selective enforcement cause of action that must survive as a matter of law. Plaintiff has also sufficiently alleged a Due Process cause of action, as he, a tenured teacher, has a constitutionally protected property interest in his employment. Plaintiff also has a constitutional property interest in his educational licenses, which were effectively taken away through the Defendants' campaign to blacklist the Plaintiff in the field of public education. Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014). In Mudge, the plaintiff, a substitute teacher, alleged termination of at-will employment in connection with a calculated effort to prevent the plaintiff from obtaining employment and using his licenses when the defendants, including investigators from the State Education Department were spreading untruths to potential employers. Id. The court held that discovery was necessary to ascertain the

30

Defendants' exact roles to establish whether the defendants were low level government officials and whether the actions alleged were random or specifically designed to deprive the plaintiff of his constitutional rights. Id.

In the instant action, Plaintiff has clearly alleged that the Defendants have engaged in a systematic campaign to blacklist him with the intention of preventing him from finding employment in the field of education. The inability to find work within the field of public education also implicates the loss of his constitutional property right in his educational licenses. Thus, Plaintiff's due process property claims must survive as a matter of law.

In order to successfully allege a claim for a substantive due process violation, it must be alleged that the government action being challenged was "arbitrary, conscience shocking, or oppressive in a constitutional sense. Substantive due process does not protect against government action that is incorrect or ill-advised. While there is no clear standard for what actions are deemed conscience shocking,  it has been held that it stems from actions that are "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Such acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001), citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 847  (1998), Breithaupt v. Abram, 352 U.S. 432,435 (1957).

The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a substantive due process claim. The very idea that a person's livelihood through tenure, which is supposed to be determined through a fair evaluation of an educator's job performance, is denied in open and blatant retaliation for reporting illegalities and improprieties within public education

absolutely offends the notations of fair play and shocks the conscience. There is no reasonable interpretation of the actions alleged within the Complaint that would result in the malicious targeting of a whistleblower as being merely "incorrect or ill advised." Even if such a definition is up for debate, it is inapplicable in a motion to dismiss stage and a simple reading of the Complaint amply demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of action to continue through to discovery as a matter of law.

## POINT VI: THE DEPARTMENT OF EDUCATION AND FORMER CHANCELLOR CARMEN FARINA ARE "PERSONS" UNDER §1983 AND ARE SUABLE

The Supreme Court has consistently held that a local municipality, such as a Board of Education, is an appropriate party along with its members acting in their official capacity for damages under 42 U.S.C. §1983. Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 129 S.Ct. 788, 797, 172 L.Ed.2d 582 (2009) (citation omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658,691, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978) (holding the same as to a school board); Beattie v. Madison County Sch. Dist., 254 F.3d 595,600 n. 2 (5th Cir.2001) ("Under§ 1983, [Plaintiff] may sue a local governing body, such as the school district, or the school board as policymaker for the district, for monetary, declaratory, or injunctive relief if the challenged action implements or executes a policy officially adopted by the body's officers."). This principle of law can be traced backed to the 1871 legislative history of the predecessor statute to 42 U.S.C. §1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, supra at 688-89.

Plaintiff is entitled to all reasonable inferences from the facts alleged in the Complaint and

documents incorporated pursuant to Rule 12(c) (See EX. A-M) that clearly establish a

prima facie constitutional violation of Plaintiff's rights.

### POINT IV: THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION

The court has the authority to exercise pendent jurisdiction over state law claims that stem

from a "common nucleus of operative fact".  Moore v. County of Suffolk, 851 F.Supp.2d

447,458 (E.D.N.Y. 2012). Constitutional claims are sufficient to support jurisdiction over

pendent state law claims when the constitutional claim are not wholly insubstantial or

obviously frivolous. Id. Here, the Plaintiff's constitutional causes of action are sufficiently

alleged within the Complaint to allow for continued survival of the state law claims. Since

the court has original jurisdiction to hear the federal claims asserted by Plaintiff, it should

also exercise its right to supplemental jurisdiction to hear the state claims.

### POINT V: THE NEW YORK CIVIL SERVICE LAW § 75-B CLAIM SHOULD NOT BE DISMISSED

To state a claim under New York Civil Service Law§ 75-b, the Plaintiff must allege: (1) that

he disclosed information to a governmental body regarding what he reasonably believed to

be improper governmental action; (2) an adverse personnel action was taken against him;

and (3)

there is a causal connection between the disclosure and the adverse personnel action. Rusk

v. New York State Thruway Authority, 2014 WL 3891624, *6 (W.D.N.Y. 2014). The

Plaintiff acknowledges that a§ 75-b claim may not be asserted against individual defendants,

however, it may nevertheless be asserted against the New York City Department of

Education.. The Complaint more than adequately alleges a cause of action under Civil

Service Law § 75-b Plaintiff uncovered and reported improper actions of staff at COOP

33

TECH, and misuse of public funds which by any standard could be construed as improper governmental action (not to mention criminal conduct). Plaintiff was terminated from his employment with the Defendants in direct retaliation for his whistleblowing activities. As Plaintiff has plead all essential elements of a§ 75-b claim, the Defendants' motion to dismiss should be denied.

CONCLUSION

For the reasons set forth above, Defendants Motion to Dismiss should be denied in all respects and the Court should grant any other, further and different relief that it deems just and appropriate.

Dated: April   2019

Dr. Rupert Green

205-26 113 Ave.
St. Albans, N.Y. 11412
917-601-6425

34

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

EA
2/20/18
FE

**PRESENT:** _ENGORON_            **PART** _37_
                        *Justice*

_GREEN, RUPERT_            **INDEX NO.** _102017/16_

                -v-            **MOTION DATE** _1-31-17_

                        **MOTION SEQ. NO.** _001_

_NYC BOARD/DEPT. OF EDUCATION_

The following papers, numbered 1 to _5_ , were read on this motion to/for _petition to vacate award._

Notice of X-Motion +  Petition
Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _1_
Amended Petition + Second Amend Petition _____ | No(s). _2,3_
Answering Affidavits — Exhibits _____ | No(s). _4_

Replying Affidavits _____ | No(s). _5_

Upon the foregoing papers, it is ordered that this ~~motion is~~

Petition is decided in accordance with

accompanying memorandum decision.

RECEIVED
FEB 2 0 2018
NY SUPREME COURT - CIVIL
CENTRAL CLERK'S OFFICE

**FILED**

FEB 2 0 2018

COUNTY CLERK'S OFFICE
NEW YORK

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Dated: _2/20/18_            _____, J.S.C.

                        **ARTHUR F. ENGORON**
                        **J.S.C.**

1. CHECK ONE: .................................................... ☑ CASE DISPOSED    ☐ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: .........................MOTION IS: ☐ GRANTED  ☑ DENIED  ☐ GRANTED IN PART  ☐ OTHER
3. CHECK IF APPROPRIATE: ................................. ☐ SETTLE ORDER    ☐ SUBMIT ORDER
                        ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 37
------------------------------------------------------------------------x

In the Matter of the Application of
RUPERT GREEN,

                                          Petitioner,

                    -against-

THE NEW YORK CITY BOARD/DEPARTMENT OF
EDUCATION,

                                          Respondent.
------------------------------------------------------------------------x

Index Number: 102017/2016

Sequence Number: 001

Decision and Order

**FILED**

FEB 2 0 2018

COUNTY CLERK'S OFFICE
NEW YORK

Arthur F. Engoron, Justice

In compliance with CPLR 2219(a), this Court states that the following papers, numbered 1 to 5, were used on (1) the instant petition, pursuant to New York Education Law § 3020-a(5) and CPLR 7511, seeking to vacate Hearing Officer Leah L. Murphy, Esq.'s Award, dated December 9, 2016, and (2) respondent's cross-motion, pursuant to CPLR 3211(a)(7), to dismiss:

                                                                                    Papers Numbered:

Notice of Petition - Affirmation - Exhibits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
Notice of Amended Petition - Affirmation - Affidavit - Exhibits  . . . . . . . . . . . . . . . . . . . . . . .  2
Notice of Second Amended Petition - Affirmation - Affidavit - Exhibits  . . . . . . . . . . . . . . . . .  3
Notice of Cross-Motion + Affirmation in Opposition - Exhibits . . . . . . . . . . . . . . . . . . . . . . . . .  4
Reply Affirmation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Upon the foregoing papers, the petition is denied, the cross-motion is granted, and the proceeding is dismissed.

**Background**
Petitioner, Rupert Green, was employed by respondent, The New York City Board/Department of Education ("DOE"), from February 2001 through April 2016, specializing in teaching computer technology and career technical education. Throughout the entirety of his employment with the DOE, petitioner taught for The School of Cooperative Technical Education ("School").

On November 5, 2015, the School's assistant principal, Audrey Mangan, filed a complaint with the DOE's Special Commissioner of Investigation ("SCI") alleging that petitioner violated the DOE's email and internet use policy ("Internet Policy"). The Internet Policy states in relevant part, "Internet access and emails provided by the [DOE] are intended for educational use, instruction, research, and the facilitation of communication, collaboration, and other department-related purposes." The Internet Policy also enumerates certain prohibited activities, which include, but are not limited to: (1) "Using, posting or distributing profane, lewd, vulgar, threatening or abusive language in email messages"; (2) "accessing, posting or distributing harassing, discriminatory, inflammatory or hateful material, or making damaging or false statements about others"; and (3) "Using the [DOE's] Internet System in a manner that interferes with the education of the user or others or the job duties of the user or others." Petitioner alleges he was not informed of the outcome of Mangan's complaint until a February 9, 2016 meeting he had with Corey Prober, a new principal at the School, wherein Prober shared the results of the SCI investigation and provided him with another copy of the School handbook containing the Internet Policy.

On January 28, 2016, Prober filed a second complaint with the SCI alleging the same misconduct. Prober claims on March 2, 2016, he hand-delivered petitioner's disciplinary letter to him. SCI then launched a second investigation, and a SCI-assigned investigator, Christopher Minoque, ultimately drafted a final report substantiating the two complaints brought against petitioner. Thereafter, the DOE formally issued the following charges against petitioner: (1) between January 2014 and March 2016, he repeatedly used his DOE email account to send personal emails to staff members,

specifically, 116 emails, which constituted as violations of the Internet Policy during the charge period ("Specification 1"); (2) between January 2014 and March 2016, he engaged in the misconduct during, inter alia, his instructional periods ("Specification 2"); (3) between April 2015 and June 2015, he failed to adhere to Principal John Widlund's email directing staff members to refrain from sending unprofessional and/or hurtful and/or intimidating emails to other staff members ("Specification 3"); (4) between August 2015 and March 2016, he failed to adhere to Principal Anda McGowan and/or Assistant Principal Audrey Mangan's September 8, 2015 staff meeting directing staff members to use their DOE emails for DOE use only and/or to refrain from sending personal emails ("Specification 4"); (5) between February 2016 and March 2016, he sent inappropriate and/or derogatory and/or personal emails to staff members after a February 9, 2016 disciplinary meeting with Prober directing and/or instructing him to stop sending such emails ("Specification 5"); (6) between January 2014 and March 2016, by engaging in misconduct, he neglected his duties and caused staff members to feel uncomfortable and/or upset ("Specification 6"); (7) during the 2014-2015 school year, he was absent from work 12 days ("Specification 7"); (8) during the 2015-2016 school year, he was absent from work 11 days ("Specification 8"); and (9) on or about April 2016, he failed to follow the procedure of informing the appropriate human resources office that he was not going to work that day ("Specification 9").

In accordance with Education Law § 3020-a, Hearing Officer Leah L. Murphy, Esq. was assigned as an arbitrator for petitioner's disciplinary proceedings. Murphy presided over the pre-hearing conference, the full evidentiary hearing, and the parties' closing arguments. During the administrative hearing ("Hearing"), which took place over the course of 12 days in 2016, both parties were represented by counsel, presented arguments and witnesses, and had the opportunity to conduct direct- and cross-examinations of witnesses. The entire record of the Hearing includes, inter alia, the testimony of 17 witnesses and the review of 42 documentary exhibits.

At the Hearing, petitioner argued that a review of his emails in the record show that they all concern instruction, teaching, researching, the facilitation of communication and collaboration among staff, and the general functions and concerns of the School and the DOE. Petitioner alleges that the emails containing metaphorical language was not designed to insult a reasonable reader. Respondent, on the other hand, argues that the aforementioned emails were inappropriate because they, inter alia: (1) questioned his colleagues' ability to perform as teachers; (2) harassed and criticized administrators and used provocative and offensive language; (3) referred to some staff members as "whores"; (4) identified staff members by their physical appearance and sarcastically referred to a supervisor as "the supreme one"; and (5) were sent over many years, which created a tense and divisive environment at School.

Also at the Hearing, all 116 of petitioner's emails were produced, and each was discussed by the parties and reviewed by Murphy in full. The Court will not belabor the details of each email, as they have been thoroughly quoted and discussed on the record. Please refer to the Hearing Officer's Decision and Award dated December 9, 2016 ("Award"), attached to the Second Amended Petition as Exhibit A, and the emails themselves, attached to the Second Amended Petition as Exhibit F, for a full summary and discussion of petitioner's emails. However, in an attempt to provide some context as to the nature and tone of petitioner's emails, the Court will discuss in detail a few of the aforementioned emails, and the DOE witnesses' testimonies at the Hearing about these emails. On March 19, 2015, petitioner sent a mass email to discuss the replacement of John Biardi, a teacher at the School, as the union chapter chair. In his email, petitioner implied that Biardi was unqualified to serve as the union's chair, inferring that Biardi did not know how to use a computer and failed to hold union meetings. Petitioner further criticized the chapter leader election process, stating that "a nefarious process eliminated teachers' participation and the chapter chairs nominated themselves, voted for themselves, and declared themselves winners," implying that there was some form of corruption in the election process. In another email dated November 4, 2015, petitioner responded to a new timekeeping policy that the new principal at the time, Ms. McGowan, proposed, colorfully remarking that it was hard to oppose a "husband and wife tag team." Petitioner alleges that this remark was in reference to the payroll secretary, Ms. Konze, who emailed the new policy to teachers and was in a relationship with another teacher, Mr. Caraballo. Respondent, on the other hand, alleges that it believed the remark to be in reference to Ms. Konze and Ms. McGowan being in a secret relationship, which started a series of rumors. Lastly, on March 15, 2016, petitioner sent a mass email, in which he publicly addressed an email Mr. Downing, another teacher at the School, sent to the email chain, asking petitioner to remove him because he believed they were affecting the post-traumatic stress disorder he suffered as a result of his time in the army during the Vietnam War. Petitioner's email stated that Mr. Downing "self-admitted that he has some war related syndrome that could cause him to go off the deep and if he reads emails of an onstruce [sic] nature. Is there a danger when such individuals work

with children? ... We old timers remember Duguid (Do good) and how he vile [sic] treated his students." At the Hearing, Mr. Downing testified that he received" hundreds" of emails from petitioner, describing them as "highly offensive," stating that the emails had "racial overtones" or were "blatantly racist."

Pursuant to the Award, Murphy concluded that the DOE had proved by a preponderance of the evidence Specifications 1 through 6, but found that the DOE failed to prove Specifications 7 through 9.  Based upon the finding of petitioner's guilt on six out of nine specifications proffered against him, Murphy found that the appropriate penalty was termination.  In finding just cause, Murphy reasoned that (1) petitioner had clear notice of the Internet Policy and the potential consequences of his misconduct; (2) petitioner's use of his DOE email disrupted the efficient administration of the School; (3) a fair and objective investigation was conducted into the circumstances; (4) petitioner was given pre-penalty leeway to correct the alleged misconduct; (5) termination was a reasonable penalty given the seriousness of the offense; and (6) remediation was not possible for the alleged misconduct.

**The Instant Proceeding**
Petitioner commenced the instant proceeding, pursuant to Education Law § 3020-a and CPLR 7511, seeking to vacate the Award, arguing that the Award was arbitrary and capricious.  On December 19, 2016, petitioner filed an Amended Petition, and on March 30, 2017, he filed a Second Amended Petition.  Respondents now cross-move, pursuant to CPLR 3211(a)(7), to dismiss the proceeding, for failure to state a cause of action.

**Discussion**
Education Law § 3020-a(5) provides petitioner an opportunity to apply to this Court, pursuant to CPLR 7511, to vacate or modify a hearing officer's decision about one of its employees if there is some showing of misconduct, bias, excess of power, or procedural defects.  See Lackow v Department of Educ. (or "Board") of City of New York, 51 AD3d 563, 567 ("Education Law § 3020-a(5) provides that judicial review of a hearing officer's findings must be conducted pursuant to CPLR 7511.  Under such review an award may only be vacated on a showing of 'misconduct, bias, excess of power or procedural defects'"); see also Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co., 89 NY2d 214, 223 (1996) ("An arbitration award made after all parties have participated, however, will not be overturned merely because the arbitrator committed an error of fact or of law ... [However, to] be upheld, an award in a compulsory arbitration proceeding must have evidentiary support and cannot be arbitrary and capricious").  Pursuant to CPLR 7511(b)(1)(iii), an arbitrator's award shall be vacated on the application of a party who participated in the arbitration or was served with a notice of intention to arbitrate if the Court finds the rights of that party were prejudiced by the arbitrator making an award that "exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made."  Dismissal pursuant to CPLR 3211(a)(7) is only warranted if, accepting the facts alleged as true and according plaintiff the benefit of every possible favorable inference, the court determines that the allegations do not fit within any cognizable legal theory.  See Leon v Martinez, 84 NY2d 83, 87-88 (1994); Morone v Morone, 50 NY2d 481, 484 (1989).  The court's inquiry is limited to whether plaintiff has stated a cause of action and not whether it may ultimately be successful on the merits.  See Stukuls v State of New York, 42 NY2d 272, 275 (1977); EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 (2005) ("[w]hether a plaintiff can ultimately establish its allegations is not part of the calculus" in determining a motion to dismiss for failure to state a cause of action).

Petitioner has failed to establish that the Award was arbitrary or capricious, or otherwise improper.  The Award is based on overwhelming evidentiary support.  See Davis v New York City Bd., 137 AD3d 716, 717 (1st Dept 2016) ("The court properly found that the award was not arbitrary and capricious and was well supported by the evidence.  The Hearing Officer engaged in a [thorough] analysis of the facts and circumstances, evaluated witnesses' credibility, and arrived at a reasoned conclusion").  In Murphy's owns words, "[S]o much of what [petitioner wrote] was interspersed with inappropriate rumor, innuendo and derogatory statements that a finding that the [DOE's] internet use policy was violated was not at all borderline.  [Petitioner] should not have been using his professional email account to espouse his personal views or make inappropriate comments about his colleagues."  Furthermore, petitioner's argument – that Murphy's conclusion that the DOE's witnesses were credible proves her bias – is unavailing; the Court will not second-guess a hearing officer's finding on a witness's credibility.  See Asch v New York City Bd./Dept. of Educ., 104 AD3d 415, 420 (1st Dept 2013) ("A hearing officer's determinations of credibility are largely unreviewable because the hearing officer observed the witnesses and was able to perceive the inflections, the pauses, the glances and gestures–all the nuances of speech and manner that combine to form an impression of either candor or deception") (internal citations omitted); see

also Douglas v New York City Bd./Dept. of Educ., 87 AD3d 856, 857 (1st Dept 2011) (The Hearing Officer, who heard the actual testimony from the witnesses, was entitled to weigh the testimony and make independent findings"). In the instant case, Murphy found that the DOE's witnesses were credible, and it is not in the Court's province to disagree or second-guess her determination, as Murphy was privy, and the Court was not, to the Hearing's in-person testimony.

Petitioner's argument that his emails all concerned appropriate topics under the Internet Policy is also unavailing. Murphy already thoroughly considered whether each and every one of the 116 email violations petitioner was charged with were in fact inappropriate and concluded that petitioner's denial of using email inappropriately was not at all persuasive. Murphy states in the Award, "[Petitioner] clearly was aware of and seemed to enjoy the provocative nature of his emails and the reactions he got from the school staff. [Petitioner] was not at all disturbed by the disruption his email habit had upon the school community." The Court will not disturb Murphy's determination.

Petitioner's argument that the disciplinary charges were brought against him in an effort to retaliate against him for "exposing corruption and racism within the School," and that he should be afforded "whistleblower" status, is equally unavailing. Murphy already duly considered this argument during the Hearing and found it unpersuasive. Murphy states in the Award, "The [DOE] conducted a fair and objective investigation into the circumstances surrounding [petitioner's] inappropriate [emails] and [petitioner] was not retaliated against or treated differently from his peers and if anything, was given great leeway to pre-disciplinary correction of his conduct." Murphy further points out that petitioner "was familiar with the process for filing charges of racial discrimination" and that instead of "using the proper method to investigate racial discrimination, [petitioner] used the public and self-aggrandizing venue of the [DOE] email to espouse his views." Murphy does not stop there; she goes on to state that petitioner "seems incapable of understanding that any animus he may have experience[d] could be based upon his actions or arrogance and not because of his race, or his education or his insights or exposure of corruption. ... Regardless of [petitioner's] views, fancied or real, the email system is explicitly prohibited from being used for this purpose and he was rightly disciplined." The Court will not disturb Murphy's determination. See Saunders v Rockland Bd. of Co-op Educ. Servs., 62 AD3d 1012, 1012 (2d Dept 2009) ("When reviewing compulsory arbitrations in education proceedings such as this, the court should accept the arbitrators' ... determinations, even where there is conflicting evidence and room for choice exists").

Petitioner has failed to establish that Murphy issued the Award in an arbitrary or capricious manner. The record contains ample evidence establishing that Murphy's determination – that "it is the sheer number of emails which contain negative, proselytizing and critical comments about staff and administration which so clearly disrupted the school community. [Petitioner] was provided with ample opportunities to cease using his email as a soap box, but as a review of all the emails demonstrate, he simply failed to do so" – was rationally based on the evidence and witness testimony presented to her throughout petitioner's disciplinary proceedings. Thus, the Court adheres to the Award, which found, based on substantial evidence, that petitioner violated the Internet Policy. As Murphy states, "[D]ue to [petitioner's] arrogant and oppositional refusal to comply with the [Internet Policy], the seriously offensive, disruptive and irresponsible nature of many of the emails, and [petitioner's] dogged refusal to take any correction measures or follow the clear directives of his supervisors, the [DOE] has just cause to terminate [him]." See Cipollaro v New York City Dept. of Educ., 83 AD3d 543, 544 (1st Dept 2011) ("Considering petitioner's lack of remorse and failure to take responsibility for her actions, as well as the harm caused by petitioner's actions, the penalty of dismissal, even if there was an otherwise adequate performance record, cannot be said to shock the conscience"). Additionally, petitioner's argument that Specifications 4-6 should be vacated because there is no evidence that he was insubordinate is unavailing; Murphy concluded that petitioner was guilty of insubordination because he continued to send inappropriate emails despite being warned of his misconduct on multiple occasions. See Matter of Malone v Board of Educ. of E. Meadow Union Free Sch. Dist., 93 AD3d 849, 850 ("2d Dept 2012) ("The testimony of both the petitioner and the school principal that the petitioner continued to distribute leaflets after being directed to ceased this activity established the charge of insubordination by adequate evidence, and the findings with respect to both charges were not arbitrary and capricious"). Therefore, the record supports the Award and the penalty of termination is not excessive. See generally Matter of Chaplin v New York City Dept. of Educ., 48 AD3d 226, 226 (1st Dept 2008) ("Acts of moral turpitude committed in the course of public employment are an appropriate ground for termination of even long-standing employees with good work histories").

The Court has considered petitioner's other arguments and finds them to be unavailing and/or non-dispositive.

As it was based on substantial evidence, the Award is proper and appropriate, and is hereby confirmed. Accordingly, the petition is denied, the cross-motion is granted, and the proceeding is dismissed.

**Conclusion**
Petition denied; cross-motion granted.  The Court hereby directs the clerk to enter judgment denying the petition, granting the cross-motion to dismiss, and dismissing the proceeding.

Dated:   February 20, 2018

_____
Arthur F. Engoron, J.S.C.

**F I L E D**

FEB 2 0 2018

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND
------------------------------------------------------------------X   DCM PART 3

In the Matter of the Application of
ROSALIE CARDINALE,                                                    Present:
                                        Petitioner,
                                                                      Hon. Desmond Green, J.S.C.

       -against-
                                                                      DECISION AND ORDER

THE NEW YORK CITY DEPARTMENT OF                                       Index No. 85165/2017
EDUCATION
                                        Respondent.                   Motion No. 3228-001
                                                                                 4596-002

------------------------------------------------------------------X

The following papers numbered 1 to 6 were marked fully submitted on February 21, 2018:

|  | Numbered |
|---|---|
| Notice of Petition and Verified Petition and Exhibits (dated August 9, 2017)…………………………………………………. | 1 |
| Notice of Cross-Motion to Dismiss made by Respondent (dated November 8, 2017)…………………………………………….... | 2 |
| Affidavit of Ms. Laura C. Williams (admission pending) in Support of Respondent's Cross-Motion to Dismiss with Exhibits Attached (dated November 8, 2017) ……………………………………………….. | 3 |
| Memorandum of Law in Support of Respondent's Cross-Motion to Dismiss (dated November 8, 2017) ……………………………………………. | 4 |
| Combined Affidavit and Memorandum of Law in Opposition (dated November 29, 2017) ……………………………………………... | 5 |
| Reply Affidavit of Ms. Laura C. Williams (admission pending) in Support of Respondent's Cross-Motion to Dismiss (dated December 4, 2017) ……………………………………………... | 6 |

       Upon the foregoing papers, the Verified Petition (001) seeking the modification of the

Arbitrator's Opinion and Award to, *inter alia*, restore Petitioner to her position within the

Department of Education is granted. This Court denies the cross-motion made by Respondent,

Department of Education (hereinafter "DOE") seeking the dismissal of Rosalie Cardinale's verified petition.

## FACTS

The DOE employed Petitioner, Rosalie Cardinale as a special education teacher for 17 years. Petitioner spent the last 15 years of her employment with the DOE at Public School 55 The Henry M. Boehm School (hereinafter "P.S. 55"). Cardinale received satisfactory observations up to the 2013-2014 school year when the DOE adopted the Advance System which uses the Danielson Framework for Teaching. The DOE issued Charges and Specifications (hereinafter "Specifications") pursuant to Education Law § 3020-a for misconduct during the school years 2013-2014, 2014-2015, 2015-2016, and 2016-2017 through Howard Friedman, General Counsel to the Department of Education by Jessica Wolff-Fordham on February 27, 2017.[1] The caption referenced Rosalie Cardinale, but the body of the Specifications detailed the DOE's allegations against "Jane Smith."

The Specifications alleged Petitioner: 1) failed to properly, adequately, and/or effectively plan and/or execute separate lessons, as observed by school administrators on thirteen observation dates, 2) showed a lack of professionalism and poor judgment, 3) neglected her duties, and 4) failed to implement directives and recommendations for improvement.

Petitioner's counsel sought dismissal of the charges against Cardinale arguing the DOE failed to abide by the statutory framework for the removal of a tenured teacher for cause. Petitioner

---

[1] The Introduction to the "Specifications" reads as follows: "The Board of Education of the City of New York, also known as the New York City Department of Education, brings this action pursuant to Education Law § 3020-a against **Jane Smith** for her failures in the nature of incompetent and inefficient services, misconduct, neglect of duty, and unwillingness and/or inability to follow procedures and carry out normal duties during the 2013-2014, 2014-2015, 2015-2016, and 2016-2017 school years." (emphasis added)

2

argued the DOE failed to conduct an executive meeting of the employing board to find probable cause to conduct a hearing before issuing the Specifications against Petitioner. Hearing Officer Michael A. Lendino rejected Petitioner's motion to dismiss the Section 3020-a Education Law Proceeding. Hearing Office Lendino provided reasoning for his denial in the Opinion and Award where he found the Board of Education Chancellor in the City School District of New York may delegate the authority to conduct an executive meeting by the employing board on probable cause to District Superintendents who may then delegate the same authority to local school principals. Hearing Officer Lendino determined further, without citation to any evidence, that Chancellor Carmen Farina delegated her authority to the District Superintendents who in turn delegated it to local principals.[2]

This Court reviews a record which remains unclear concerning whether the local principal or district superintendent determined probable cause existed justifying the allegations levied against Petitioner to warrant an Education Law § 3020-a hearing. The record, however, makes clear an Education Law § 3020-a proceeding took place on the following dates: April 25 and 26, and May 18, 23, 24, and 31, 2017 before Hearing Officer Lendino.

Hearing Officer Lendino considered testimony given by Petitioner, Principal Sharon Fishman (hereinafter "Fishman"), the principal of P.S. 55, and Assistant Principal Paul Giordano (hereinafter "Giordano"), also from P.S. 55 when he rendered his Opinion and Award. The

---

[2]      HO Lendino cited *Pina-Pena v. New York City Dept. of Educ.*, 2014 N.Y. Misc. LEXIS 1630, 2014 NY Slip Op 30893 (U), NY Sup. Ct., Apr. 9, 2014, to demonstrate the delegation of authority from the Chancellor to subordinate employees. The facts of *Pina-Pena*, however, concern a 3020-a Education Law Proceeding taking place in September and November 2012 under former Chancellor Dennis Wolcott not Chancellor Carmen Farina.

3

testimony given by Fishman and Giordano received additional support from ten informal

observation reports and three formal observation reports.[3]

Hearing Officer Lendino issued an Opinion and Award on July 27, 2017. The Opinion and

Award contained the following findings relating to Specifications 1 and 4:

**Specification 1**: During the 2013-2014, 2014-2015, 2015-2016 and
2016-2017 school years, [Petitioner] failed to properly, adequately
and/or effectively plan and/or execute separate lesson[s] as observed
on or about each of the following dates:

a.   April 10, 2014;
b.   May 29, 2014;
c.   November 10, 2014;
d.   January 20, 2015
e.   February 25, 2015;
f.   May 18, 2015;
g.   October 8, 2015;
h.   May 11, 2016;
i.   May 26, 2016;
j.   June 1, 2016;
k.   September 27, 2016;
l.   November 16, 2016; and/or
m.   January 17, 2017

**Specification 4**: [Petitioner] failed during the 2013-2014, 2014-
2015, 2015-2016 school years to fully and/or consistently
implement directives and/or recommendations for pedagogical
improvement and professional development provided in observation
conferences with administrators and/or outside observers;
instructional meetings; teacher improvement plans; one-on-one
meetings with administrators, school-based coaches, and/or outside
observers; as well as school-wide professional development with
regard to:

a.   Proper planning, pacing, and/or execution of lessons;

---

[3]      The combined number of observation minutes over the four school years at issue yielded
362 minutes (6.03 hours) of observation. Of the total 362 minutes observed during four school
years, 110 minutes or 1 hour and 40 minutes came through formal observations. The observation
report indicates a formal observation involved either Fishman or Giordano observing a full class
period. The formal observation reports, however, indicate three different "full period" times of 30
minutes, 35 minutes, and 45 minutes. The formal observation reports also fail to document what
constitutes a "period" for students taught by Cardinale in kindergarten through second grade.

    b. Using appropriate methods and/or techniques during lessons;
    c. Designing coherent instruction;
    d. Using assessment in instruction; and/or
    e. Using appropriate questioning and discussion techniques.

Hearing Officer Lendino's Opinion and Award found Cardinale's dismissal from service was an appropriate penalty.

Cardinale commenced this Article 75 proceeding challenging the Opinion and Award dismissing her from service arguing, *inter alia*, significant procedural and substantive deficiencies existed in the hearing process which interferes with the public policy concerning the protection of teachers tenure. Petitioner argues the procedural violations require this Court to restore her status as a DOE employee at P.S. 55.

The DOE cross-moves to dismiss Cardinale's verified petition arguing that it fails to state a cause of action and to confirm the arbitration award under CPLR § 7511(e).

## DISCUSSION

I.    *Petitioner Demonstrates Procedural Deficiencies Exist Requiring This Court to Vacate The Arbitration Award for Violation of Strong Public Policy and the Opinion and Award Was Irrational On Its Face*

A court shall vacate an arbitration award when it finds either (1) corruption, fraud, or misconduct, (2) the partiality of an arbitrator, or (3) an award which is made in excess of the arbitrator's enumerated powers prejudiced a party's rights (*see* CPLR 7511 [b] [i]-[iii], *Matter of Meehan v. Nassau Community College*, 242 AD2d 155, 157 (2d Dept 1998). Court of Appeals case law provides an arbitration award may also be vacated where it is irrational or violative of strong public policy (*see, Town of Callicoon v. Civil Serv. Emples. Ass'n, Inc.*, 70 NY2d 907 [1987], *Matter of United Fedn. Of Teachers, Local 2, AFT, AFL-CIO v Board of Educ. Of City School Dist., of City of N.Y.*, 1 NY3d 72 [2003]).

A. *The Opinion and Award Stripping Petitioner of Tenure and Terminating Her Employment Is Irrational*

The Supreme Court of the United States held the Constitution does not create property rights, "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 [1972]. New York State created the public school tenure system guaranteeing continued employment to tenured teachers by statute and therefore created a property right in a tenured teacher's continued employment. (*See Education Law* §§§ 3012, 3012-a, 3020, *Holt v. Board of Educ. of Webutuck Cent. School Dist.*, 52 NY2d 625 [1981], *Matter of Abromvich v. Board of Educ. of Cent. School Dist. No. 1 of Towns of Brookhaven & Smithtown*, 46 NY2d 450 [1979]). Where a property right in continued employment exists, such as New York's tenure system, the recipient of such a right may not be deprived without due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] … shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement…" *Education Law* § 3020.

The statutory procedural process afforded to teachers with tenure under *Education Law* § 3020-a requires:

- The filing of charges "in writing and filed with the clerk or secretary for the school district or employing board during the period between the actual opening and closing of the school year for which the employed is normally required to serve. *Education Law* § 3020-a(1)

INDEX NO. 85103/2017
Case 1:18-cv-10817-AT-GWG   Document 22   Filed 04/11/19   Page 47 of 104 RECEIVED NYSCEF: 04/03/2018

- "Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against the employee pursuant to this section." *Education Law* § 3020-a(2).

- Where an employing board determines probable cause exists for discipline the tenured teacher shall receive: "a written statement specifying (i) the charges in detail, (ii) the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and (iii) the employee's rights under this section, shall be immediately forwarded to the accused employee…." *Id.*

Here, Petitioner's counsel sought dismissal of the charges against Petitioner at the outset of the hearing. Counsel argued before Hearing Officer Lendino, and now before this Court, that the DOE's failure to submit the charges against Petitioner to the employing board to determine whether probable cause existed constitutes a procedure defect depriving Hearing Officer Lendino of jurisdiction to consider the charges. Hearing Officer Lendino rejected Petitioner's argument, but this Court does not.

The argument raised by the DOE opposing Petitioner's original motion before Hearing Officer Lendino, and again before this Court, insisting the statutory framework does not require probable cause determination by the employing board before an Education Law § 3020-a hearing is unavailing. The DOE reasons the Chancellor wields the statutory power to "exercise all the duties and responsibilities of the employing board… [and] shall exercise all such duties and responsibilities for all community districts or may delegate the exercise of all such duties and

7

responsibilities to all of the community superintendents..." *Education Law* § 2590-h[38].[4]  In turn, the community superintendents may delegate any powers and duties conferred upon them to any subordinates, in this case, local principals.  (*See Education Law* § 2590-f[1][b]).  The DOE, however, fails to provide this Court with evidence demonstrating the office of the Chancellor delegated any of its duties and responsibilities to the community superintendents.  Similarly, the DOE fails to provide any evidence showing a delegation of duties and responsibilities from the community superintendents to the local principals.

The cases cited by the DOE demonstrate a court's analysis begins with considering evidence indicating the office of the Chancellor transferred responsibilities and duties to subordinate administrators.  *See Pina-Pena v. New York City Dept. of Educ.*, 2014 NY Slip Op 30893(U), Sup Ct. NY Cty, Apr. 9, 2014, (finding "the Chancellor [Wolcott] delegated the relevant authority to the District Superintendent who, in turn, delegated her authority to local school principals"); *Matter of Haas v. New York City Bd./Dept. of Educ.*, 35 Misc3d 1207(A), Sup Ct. NY Cty, Apr. 4, 2012 (finding "[o]n August 19, 2002, the chancellor [Klein] delegated 'to the community school district superintendents the authority to prefer charges against tenured pedagogical employees pursuant to Education [Law] section 3020-1... On August 27, 2007 ... the community superintendent of community school district 29...delegated to each principal of a school within the district the power to '[i]nitiate and resolve charges against teaching ... staff members in your school who have completed probation'"); *Matter of Roberts v. Department of Educ. of the City of New York*, 3 NYS3d 287, Sup Ct. NY Cty, Oct. 8, 2014 (finding "On April 19, 2011, Chancellor Dennis M. Walcott delegated...the power to initiate and resolve disciplinary

---

[4]       *Education Law* § 2590-h(19) provides additional authority allowing the Chancellor to "[d]elegate any of his or her powers and duties to such subordinate officers or employees as he or she deems appropriate and to modify or rescind any power and duty so delegated."

charges against teaching and supervisory staff members to community school district superintendents"). There exists no evidence in the record before this Court supporting the transfer of any duties and responsibilities from the office of the Chancellor to any subordinate administrator.[5]

Absent a demonstration by the DOE that the Office of the Chancellor delegated powers to subordinate administrators to unilaterally commence a hearing under *Education Law* § 3020-a Hearing Officer Lendino had any authority to consider the charges levied against Petitioner. Hearing Officer Lendino conducted the *Education Law* § 3020-a hearing based on unproven assumptions that the delegations of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred in compliance with the relevant statutory authority.

Indeed, Respondent fails to counter arguments raised in this Petition and provide evidence, administrative rules, or executive orders, or similar pronouncement of the exercise of executive authority, indicating Chancellor Farina delegated her duties and responsibilities to subordinate administrators. Notwithstanding the low standard needed to demonstrate the rationality of an Opinion and Award, the fact that the Hearing Officer failed to consider a basic jurisdictional predicate before conducting the hearing renders the entire decision irrational because his authority to conduct the hearing is suspect.

B. *The Opinion and Award Violates New York's Strong Public Policy Protecting Teacher's Tenure*

The Court of Appeals speaking on the necessity of teacher's tenure stated:

---

[5]      This Court also notes that while the office of the Chancellor may exercise the power of the employing board and delegate the same to subordinate administration officials, it does not appear obligatory. *See Matter of Norgrove v. Board of Educ. of City School Dist. of City of N.Y.*, 23 Misc3d 684, Sup. Ct. NY Cty., Jan. 13, 2009 [finding in 2007 the Board of Education and not the office of the Chancellor, or its designee, issued a "Notice of Determination of Probable Causes on Charges Brought Against Tenured School District Employee"]

9

[tenure] is a legislative expression of a firm public policy determination that the interests of the public in the education of our youth can best be served by a system designed to foster academic freedom in our schools and to protect competent teachers from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors. In order to effectuate these convergent purposes, **it is necessary to construe the tenure system broadly in favor of the teacher, and to strictly police procedures which might result in the corruption of that system** by the manipulation of the requirements for tenure...

*Ricca v. Board of Education*, 47 NY2d 385, 391 (1979) (emphasis added). This Court reasons the same strict policing applied to the procedure granting tenure to teachers apply equally to the procedures applied when a school district seeks the removal of a teacher's tenure. (*See Holt v. Board of Ed. of Webutuck Central School Dist.*, 52 NY2d 625, 632 [1981] [finding "[t]he purpose of the statute [*Education Law* § 3020-a] is to protect teachers from arbitrary imposition of formal discipline"])

Petitioner argues, correctly, the Education Law requires a finding "whether probable cause exists to bring a disciplinary proceeding against an employee" (*Education Law* § 3020-a[2]). There exists no statutory language indicating the statutes permitting the delegation of duties and responsibilities from the employing board to the office of the Chancellor eliminated the precondition of a finding of "probable cause" before subjecting a tenured teacher to the disciplinary hearing anticipated under *Education Law* § 3020-a. Indeed if the DOE properly demonstrated the office of the Chancellor delegated its duties and responsibilities to subordinate administrators, there exists no evidence showing a determination that probable cause existed supporting the allegations against Petitioner.

The DOE's failure to make a finding of probable cause and adhere to the procedural protections guaranteed to Petitioner in *Education Law* § 3020-a violates Petitioner's due process rights and violates New York's strong public policy protecting the integrity of the tenure system.

10

The hearing conducted before Hearing Officer Lendino, therefore, is a nullity. (*See Sanders v. Board of Educ. of City School Dist. of City of New York*, 17 AD3d 682 [2d Dept 2005], *Morgan v. Board of Educ. of City of New York*, 201 AD2d 482 [2d Dept 1994]).

## CONCLUSION

Petitioner demonstrates the Opinion and Award rendered by Hearing Officer Lendino was both irrational and violative of New York's strong public policy protecting the property rights of tenured teachers. The DOE may not abridge the due process protections afforded to tenured teachers for any reason. The DOE's analysis of the law, undeniably, dispenses with the various layers of checks and balances protecting a tenured teacher's Constitutionally protected property right in continued employment and places the decision concerning whether a disciplinary hearing is necessary into the hands of a single administrator. The DOE's suggested framework ignores the various levels of administrative oversight put in place by the legislature to protect tenured teachers. This Court finds such a construction suspect on its face. The DOE, however, failed completely to present evidence or other controlling authority indicating the statutory delegation of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred.

This Court finds the DOE's interpretation of the statutory framework, even had they presented evidence permitting such delegations, runs afoul of the clear legislative intent. The concentration of all disciplinary authority into the hands of a single local administrator creates the very "arbitrary imposition of formal discipline" the legislature sought to prevent when it enacted *Education Law* § 3020-a (*Holt v. Board of Ed. of Webutuck Central School Dist.*, 52 NY2d 625, 632 [1981]).

This Court finds the DOE's interpretation of the statutory framework, even had they presented evidence permitting such delegations, runs afoul of the clear legislative intent contained

11

in *Education Law* § 3020-a requiring different levels of the education administration apparatus to take part in the decision to discipline a tenured teacher. New York State public policy requires strict compliance with the procedural safeguards afforded to tenured teachers. The DOE's failure to conduct a probable cause analysis deprived Petitioner of her due process rights, thus violating New York's strongly held policy supporting the tenure system.

Accordingly, it is hereby:

ORDERED, that Rosalie Cardinale's Petition is granted in its entirety; it is further

ORDERED, that the Award and Opinion dated July 27, 2017 is vacated; it is further

ORDERED, that Rosalie Cardinale shall be reinstated effective immediately and entitled to full back pay from the date of termination; it is further

ORDERED, that Respondent's cross-motion is denied in its entirety; and it is further

ORDERED, that Petitioner shall settle judgment.


ENTER,

_____

Hon. Desmond Green, J.S.C.


DATED: March 29, 2018

# I'm a New York City school administrator. Here's how segregation lives on.

Many Americans believe school segregation is a thing of the past. But it still shapes the school I co-founded — and many others.

By Amy Piller  Feb 16, 2016, 8:00am EST

https://www.vox.com/2016/2/16/10980856/new-york-city-schools-segregation

The doors opened to our homemade banners and smiling faces. It was the first day of school ever for the **Urban Assembly Unison Middle School** in Clinton Hill, Brooklyn. It was my first day ever as a leader in the school I co-founded. I was 27 years old.

The racial demographics of the 85 students arriving: 74 percent African American, 15 percent Hispanic, 9 percent Asian, and one white student. At the beginning of sixth grade these students, on average, read at a second-grade reading level. Nearly 40 percent of them had special needs, 35 percent had been left back once or twice, 10 percent lived in temporary housing, 10 percent lived in foster care, and 92 percent lived in families whose aggregate family income fell below the federal poverty line.

My colleagues and I started this school in 2012 because we wanted to bring a progressive curriculum called **Learning Cultures** — which promotes collaboration and creativity and all the qualities that middle-class families want in their children's education — to a population of students that normally gets stuck with rigid, test-prep-oriented teaching. I'd seen Learning Cultures work at a school with both well-to-do and less well-off kids in downtown Manhattan. I wanted to see it work in a full-on high-poverty Brooklyn school, too.

We've had tremendous success in our three years as a school: Test scores are improving, and our students are getting better and better at reading. But our school, like so many others in New York City, remains segregated: By Christmas

our first year, our one white student transferred out. Last year, white children made up just 2 percent of our student body.

My time in the New York City public school system —     first as a student, then as a teacher, and now as an administrator —     has shown me that segregation is unacceptable. No amount of curriculum magic, or experienced teachers, or school choice, can overcome the fact that to overcome educational inequality, white students need to be in school with minority students.

## American schools are resegregating

Stories of resegregation in America's public schools are popping up everywhere, from **Missouri** to **Alabama** to **New York City**. Nationally, racial segregation in schools has **returned to levels** not seen since 1968.

# Percent black students at majorit

## ACLU / NATIONAL CENTER FOR EDUCATION STATISTICS,



**New York City** is among the worst offenders. Among the city's 1.1 million public school students — the largest school system in the nation — children of color have an **80 percent chance** of attending a school where the student body consists of fewer than 10 percent white children. Fifty percent of white students attending New York City public schools are **concentrated in 7 percent of the schools**.

Statewide, African-American and Latino students **typically attend** schools where 70 percent of the students are low-income, whereas white students typically attend schools where 30 percent of the students are low-income.

Bad as this appears from the outside, on the inside it's even worse. Teachers try to make separate equal. And policies push schools to make it more separate.

## I've spent almost my entire life in New York City schools

I've spent 22 of my 30 years in the New York City public school system. In 1990, I started kindergarten at PS 321 in Park Slope, Brooklyn, the borough's best elementary school, because my family lied. My parents told the school that I lived in a family friend's house within the zone that guaranteed enrollment in this school. They taught me to memorize her address and phone number at age 4, and saved the money to move into the neighborhood a year later.

In summer 2007, I had just graduated from Brown University with a degree in poetry. I began six weeks of training with the New York City Teaching Fellows that promised to prepare me to teach "at risk" students middle school English. As I began, a warning from my undergraduate mentor replayed ominously in my head: "The New York City Teaching Fellows Program is like putting a resident in for complex brain surgery."

Though admitted to the Teaching Fellows, I still needed to apply to get hired to work at a particular school, so I attended a hiring fair. As I entered the ballroom, I saw a maze of tables in a sea of balloons. A sign indicated that balloon height specified the grade level of jobs available and balloon color, the subject area. I had crossed my first threshold into the bureaucracy of the New York City Department of Education.

I waited in line at table after table. High-performing schools took one look at my résumé and wished me well. Schools with poor families and low test scores scheduled me to come in to give a demonstration lesson. One interviewer asked me, "What are you going to do when someone calls you a dumb white bitch?" I began to see the glaring paradox firsthand: Though I was the least qualified, I was only viable at the schools with the most needy students.

I eventually got hired at **M 301**, a high-poverty, segregated middle school on the Lower East Side. My lack of training quickly rubbed up against a high-risk population that needed an experienced neurosurgeon.

The majority of the students at the school lived in households that made **less than $25,000 per year**. Many of the children I taught lived with their families in shelters, or had become separated from their families because of crime or substance abuse. Research shows that lumping together kids with such extreme needs **dramatically hampers their academic achievement**. Regardless, these students sat before me.

There were no dictionaries in classrooms, limited basic office supplies (forget a class set of pencils), and few books. The school did not have the budget for these basic necessities. To make up for these deficits, I wrote grants through Donors Choose, a nonprofit that allows teachers to try to fix problems themselves. At first I raised funds to buy my students dictionaries and books, and later classroom laptops. But these wins were far from sufficient to overcome the deeper challenges my students faced.

I spent one class period tending to a student who wrote an essay about her father killing himself with a knife in her presence, another with a student who wrote about her family's recent move to a shelter where the showers didn't work. As story after story poured out, I naively hoped that the number of tragedies would be finite. After all the stories were told, we would be able to focus on the much-needed literacy instruction.

I was wrong. There was only one guidance counselor in the building, and I continued listening.On some days I would sit for an hour at the end of the school day, staring at the wall and trying to make sense of what had happened that day.

For disadvantaged students, unprepared teachers are typical and non-accidental. The school segregation machine begins when students attend local community schools across the nation because of **how schools receive funding**.

# Most school funding comes from state

## NATIONAL CENTER FOR EDUCATION STATISTICS, 2012

| STATE | LOCAL |
|---|---|
| **45.1%** | **44.8%** |

Nationwide, on average, states **provide 45 percent** of school funding by allocating money to schools based on the number of students attending and those students' needs. Local budgets, collected from property taxes, contribute an average of 44.8 percent of school budgets, but this percentage varies substantially.

The local contribution varies because districts set their own school budgets. Well-off districts can set these school budgets as high as they wish. In poorer districts, property values and incomes are too low to create the revenue to significantly increase the school budget.

This inequity is longstanding. For the 13 years before I became a teacher, a group of New York City parents had advocated to close this gap through an organization called **Campaign for Fiscal Equity**. Their campaign was based on the idea that the New York state school funding formula was unconstitutional, and they won the lawsuit saying so. As a result, by 2006 the state guaranteed "foundation aid," or adjusted per pupil funding, to even the playing field by guaranteeing equitable school funding in poor districts. But it didn't last long: When tax revenues went down during the Great Recession, the state stopped guaranteeing such equitable funding.

Mentors who had weathered the Department of Education for years encouraged me not to despair. They told me that New York City has it better than many poorer, more rural districts because it operates as one big district with a wider

socioeconomic range than most small districts. Even if state funding was inequitable, constituents, rich or poor across the city, are part of the same district. The logic: Per-student funding, though insufficient, should at least be equal.

I quickly learned that this too was not the case. When schools received insufficient state funds, local dollars had to first go to the basics: academic subject area teachers and tables. Indirect needs — tagged as arts programming and support services — took a back seat.

How, then, did some schools seem to be better off? The parent-teacher association!



PTA fundraising does not appear on state and federal books, making real comparisons impossible, but it is pivotal in the highly unequal districts of New

York City. Parent-teacher associations in higher-income areas can raise millions of dollars per year for arts and enrichment programs, and even basic supplies, libraries, and support services. Schools like mine have PTAs that struggle to raise more than a thousand dollars over the course of a given year.

My job was to teach with the resources I had. After weeks of barely getting their attention for long enough to utter a phrase, a turning point: Rather than yelling I simply wrote, "I believe in you," on the board and pointed at it. For 25 minutes students shouted "shut up" at one another, until they quieted and I had their attention. Before I could teach them anything, I needed them to believe that despite any prior school challenges, they could learn.

Encountering their hopeful faces each day, I tried new pedagogical methods as fast as I could learn them in hopes that something would catch. However haphazard my initial attempts, I strove for improved literacy, which I knew would be evaluated by state exams come the end of the school year. I believed in the idea of standardized testing to evaluate my students' progress in literacy because of its **support from civil rights activist organizations**. If the tests could help identify problem trends to justify needed changes in systems, structures, and curriculum, then they would be worthwhile.

While their scores improved, I knew my students still couldn't truly read, and I felt unsure of how much to trust state test results. Inconsistencies in test design were troubling — in my first year, the listening passage titled "Lydia's Lasso" left many urban teachers hopelessly gesturing the rodeo motion. The next year's passage on basketball, however, was much more universally accessible. Then-President Bush's federal education legislation No Child Left Behind had linked increased state test scores with federal funding, and in turn states were almost certainly **making tests easier** to get it.

I knew enough to recognize that the tests were too easy, but I still did not know how to catch students up. I got little professional development or feedback at school. To get my official teacher's certificate, my nights were consumed by my master's program in English education, where I had to argue about Foucault, not practice pedagogy. By the end of my second year teaching, I found myself in need of more support, unsure where to turn, and on the precipice of quitting.

I was not alone in this predicament. The **most challenging jobs** in teaching are the least competitive. Those jobs begin with a task that is **near insurmountable**, offer the same pay as an easier school, with fewer resources and less support, and thus create a high likelihood of failure and burnout.

*[**Editor's note:** Deputy Press Secretary Toya Holness of the New York City Department of Education says: "All students deserve an equitable and excellent education. Recruiting and training high-quality teachers for all our neighborhoods is a top priority for the Department of Education and we provide a range of recruitment tools focused on cultivating interest in opportunities that are in harder to staff schools."]*

Often the national conversation on improving education focuses on firing bad teachers. But for segregated schools, hiring is just as pivotal and often more challenging. Segregated schools are usually forced to settle on hiring teachers who have been subtly pushed out of jobs at other schools, or hiring inexperienced teachers like myself from feeder programs like Teach for America and New York City Teaching Fellows.

While almost two-thirds of Teach for America members continue to teach after two years, **fewer than 25 percent stay** in their original, low-income school beyond three years. Nationally, teacher turnover is **50 percent higher** in high-poverty schools. Worse still, teacher turnover has a **directly negative impact** on student achievement in English and math.

I knew I was not learning the craft of teaching at the speed I needed to, and that I needed access to more experienced and successful teachers to do so. I was managing to stay afloat, but was nowhere near the cutting edge of innovation I knew my students needed. After two years I decided to leave for a different teaching job where I could better hone my skills. I agonized over this decision. My students, of course, did not have the option of coming with me. In one sad goodbye note, a student wrote: "I'm gonna miss you :( But when you're doin' so good the only place to go is up." In transferring schools, I became part of the pattern of teachers who leave segregated schools.

## Switching schools showed me the power of a great curriculum

For the next three years I taught at a K-8 district public school in Chinatown: the Jacob Riis School, PS 126. Located in a cluster of housing projects, it was racially diverse, with Chinese students from the surrounding tenements, Black and Latino families from the projects, and white families from Tribeca. At first I was a deer in headlights, immediately struck by how calm, compliant, and high-performing my students were in comparison to students at my former school.

The school developed a competitive sports program and piloted Learning Cultures, the progressive curriculum we now use at my new school. These

initiatives, along with the promise of an honors program, enticed wealthier families and created an unlikely melting pot. This mirrored a trend across the city, known as the choice movement, in which more and more families choose to send their children to schools outside of their local zip codes. Then-Mayor Michael Bloomberg supported policies for the expansion of such choice.



Students reading in unison. (The Urban Assembly Unison School)

I knew the color of my new students' skin or the wealth of their families could not be the sole cause of their good behavior. The reasons were more complex. Students whose families had chosen PS 126 for middle school had attended elementary schools with ample funding, giving them access to teachers who had better resources and working conditions, which meant the teachers were happier, stayed longer, developed better curricula, and became more qualified. My new students were not simply whiter and wealthier; they had more often been engaged in meaningful learning.

This strong foundation meant my students were able to approach assignments with remarkable creativity and enthusiasm. In my writing class, a sixth-grader wrote a beautiful story about his ideal fantasy world. Not only did Jake meet state standards by explaining technical aspects of his world in great detail,      he also appointed classmates as gods of his universe and included statistics from a poll he took of his peers asking who would want to visit. Never in my wildest dreams would I have thought of approaching the assignment this way, but it emerged from a community of students trying to imagine growing up together. To my delight, other students began creating their own realms and worlds. Together they could imagine a universe they wanted to live in. Lines from other students' "worlds" included:

*"Starting with plants and animals, everyone's potential is displayed."*

*"It rains simply seventy-degree rain, over only oceans and riverbeds so everyone can bathe."*

*"A child chemist who lives on a nearby sun invented a serum to bring things back to life. This does not mean anyone starts nuclear war, but whatever gets destroyed you can return like new."*

This was not a Hollywood movie. This was a heterogeneous group of students in a well-funded school, with qualified teachers receiving professional development, imagining their futures.

As data from the curriculum began to show success, educators and administrators from across the country came to see Learning Cultures in action. Some swooned in delight, excited to take the practices back to their schools and classrooms. Others asked questions: Was this working for both the students who came in performing at high levels and those who came in needing remediation? To this question we could boast that our students who came in at the top third of

their class outpaced the growth of their peers nationally, as did the students who entered in the lowest third.

I also remember the skeptical visitors who said things along the lines of, "It must be nice working here," or, "If my students were like this, I'm sure this would be great too." *Like what?* I wanted to retort defensively.

Working at PS 126 was so wonderful that at times it felt as if I had solved the problems of public education. Yet worries crept in. I found myself wondering: If I returned to my Teaching Fellows school armed with these new pedagogical tools, would I have greater success? I didn't like admitting it to myself, but on some level I knew that simply changing the pedagogy would not fix everything.

With every additional day at PS 126, the dissonance grew. I felt both more fulfilled by my current teaching assignment and more concerned with the high percentage of at-risk students who needed access to experiences like this beyond the school's walls.

The challenge began to take form in my mind. Research indicates that students need time **to collaborate on complex challenges** to prepare them for the 21st-century economy. Intensely segregated schools face a two-pronged challenge in attempting this. First, their students have weaker skills and knowledge. Second, their teachers are less prepared to teach and less satisfied in their jobs.

Every day I prepared for this challenge, hoping I'd be up to it when the time came.

### How our new school went from dream to reality

As PS 126 test scores improved, visitors — including the Urban Assembly, a network of district public schools working to support poor students — came to see classrooms in action. When they expressed interest in proposing a new school around Learning Cultures, I immediately joined the planning team.

I wanted to return to challenges I'd faced in my first teaching assignment, challenges that still faced schools citywide.



On Monday nights, over several months, our new **school planning** team reported to the Office of New Schools. We were presented a challenge and given a set amount of time to come up with a mock plan and present back to a mock staff, who then evaluated our solutions, collaboration, and communications. Each week, some teams got voted off the island. The magnitude of the task before us first hit me during what I like to call the "New School" *Survivor.* The challenge I best remember gave us 20 minutes to plan for a rare but highly important situation: having just learned a gunman was on the third floor of the building.

*[Editor's Note: The Office of New Schools does not oversee school safety. The office of safety and youth development generates safety plans for each school and works with the NYPD in certain cases. While the DOE did not rule out the possibility of such an assignment taking place in the Office of New Schools, it was deemed uncharacteristic.]*

We survived, and the Department of Education quietly informed us of our school's location on the border of Clinton Hill and Bedford Stuyvesant the summer before it opened. These historically black neighborhoods, with brownstone-lined blocks, were undergoing rapid gentrification. From political backchannels, I also knew the Department of Education had all but officially decided that our school would phase in as the middle school on the second floor phased out. The elementary school on the first floor would remain intact. When we had a sixth grade, the middle school in this same building would be reduced to having only a seventh and eighth; when we had a sixth and seventh they would only have an eighth, and so on.

Parents from the old middle school, unaware of the likelihood of the decision, argued in vain at a hearing to keep their current community school open. My colleagues and I were the only white people who attended this deceptive ritual of a school closing hearing in the auditorium of what would come to be our school. It was presented to community members as an opportunity to support or protest the closing of the school; members did not know the decision had already been effectively made by the powers that be.

*[Editor's note: The New York City Department of Education has confirmed the basic facts of the phaseout, but says that the hearing in question was not deceptive. Rather, the Department of Education says such hearings are designed to engage parents and other community members as well as solicit their feedback. The Department says the decision to replace the old school with Unison was not finalized until after this meeting.]*



I watched the hearing in horror. As family after family got up to speak out in protest, I watched boys from the failing school squirm in discomfort, trying to seem tough. The girls tried to laugh it off. Would we be able to do any better for those students' younger siblings, or had our new school just become a part of the problem? Were we just going to be another set of gentrifiers? Department of Education representatives blared negative statistics over the microphone.

The representatives didn't mention this: that the district had 14 public middle schools, 12 of which now had admissions tests. This school received students who were rejected from the other 12 schools or whose families failed to partake in the application process. Essentially, "choice" led to a highly disproportionate number of at-risk students at this school. It was one of the two remaining middle schools to receive failure ratings.

**It begins**



Opening day at the Unison School, 2013. *Joe Posner*

Over the spring we had the task of filling the seats for our first class. According to Mayor Bloomberg, school choice would create a virtuous circle of competition that could help us get a diverse set of students.

"**Tens of thousands of students** – across all grade levels, throughout five boroughs, including both our most accomplished students and those who have struggled –     are thriving today in schools that didn't exist in 2002," Bloomberg

said in 2009. "These new schools give families more choices and create competition that makes all schools better."

But as I see it, what the city described as competition turned into a segregation filter: Choice was only an option for those with the time, literacy, and determination to navigate a complex and nonstandardized admissions system. These are major hurdles for the most vulnerable families. The burden of their failure to navigate such a system hurt no one more than their children, who no rational person would argue should be able to manipulate this complexity at the age of 11.

People who work with low-income communities make a distinction between "organized" and "disorganized" families. Predominantly poor black and Latino families who do not advocate for their children to attend a particular school, but rather passively receive an assignment from the city that designates their kids to a highly segregated school, are considered "disorganized."

"Organized" families, on the other hand, move mountains to have their children attend schools in districts with great PTAs. "Organized" families can pay rent or buy property in the most desirable zip codes so that their children can attend the highest-performing public schools with the most qualified teaching staff. (Public housing is minimal in high-performing zip codes.) Organized families know how to navigate charter school lotteries.

Worse yet, students whose families lacked privilege now faced schools' "fear of failure" filter. Schools that once played the support system for students whose families struggled felt pressure to reject their applications, since schools where students didn't show achievement and growth on state exams risked closure.

School choice advocates often argue that making growth a factor should make all schools want to accept needier students, as they have the most room to grow. But for these students, growth takes time and special care –   which requires more teacher attention per student, which requires more funding. In District 13 (Unison's School's district), 25 of the 27 publicly funded schools (including charter schools) require participation in an application process.

We felt it was wrong to filter out the neediest children, but we needed to attract higher-performing students as well. So we traveled from one PTA meeting to the next, showing videos of our curriculum, promising that we would bring great academic growth and achievement. We visited the homes of many incoming

sixth-graders as assigned to us on the initial list. We worked tooth and nail for parents to choose Unison.

Come fall, only 30 students from our initial roster appeared, 30 did not, and a different 50 students did, through what's called "over the counter" entry. This is a euphemism for students whose families did not participate at the appropriate times in the application process, or were unsatisfied with their initial assignment.

After our first-day enthusiasm, the challenge before us became clear. When surveyed, most first-year Unison students had rarely worked in groups before – a setback for our collaborative curriculum. They had spent the majority of their elementary careers in rows completing worksheets every 10 minutes to prepare them for state exams, a strategy that initially helped them pass. Once tests got harder, they failed –     even though many of them had done everything their teachers had asked of them. At best, they arrived at Unison with limited trust in the school system; at worst, they arrived angry.

In a writing class in September of our first year, a student wrote:

Living in the streets of Bed-Stuy scares the heart of a young 11 year old girl. She wakes up every night to either a gunshot, a cry for help, or to stupid people just doing stupid things. She wonders how she can get out of such a place she thinks she can't survive. This girl has a voice but she feels as if no one is listening. Every time she has the chance to speak up she gets shut out by all of the world's greatest demons. When she puts her trust, love, and life in someone's hands she always gets let down. The fear in her eyes are completely noticeable but it's as if no one ever wants to see. [...] The young girl looks up in distress with her eyes full of tears. Finally, she falls into the deep river drowning her life away. She falls slowly to the bottom as a heavy anchor. Her eyes are wide open still seeing the world through shattered glass. She dies slowly saying good-bye to the world, through the eyes of a child.

Brilliant though the children were, writing like this carried warning signs that could make our progressive curriculum fail. We instituted breakfast, partnered with Citizen Schools to extend the school day to 6 pm, and tried to make our environment a safe haven for our beloved students from broken homes or no home at all.

Still, disputes crept close and sometimes entered the building. Some days fights broke out before school even started over seemingly silly social media disputes.

Or a new foster home placement had gang-affiliated siblings and felt compelled to turn to his/her families for support.

To this combustible mix, we soon received our first wave of charter school runoff students. Many mornings, children accompanied by their parents would arrive at the main office — they'd been asked to leave the charter school they attended from the beginning of the school year. Such students did not seem to represent a random sample. More often than not, these students had special needs. Only **20 percent** of special education students at New York City charter schools stay in their schools for three years, more than double the average attrition rate for special education students in district schools.

Unison receives students who leave charter schools twice per year. The first handful arrives just after Halloween. They typically display significant behavioral challenges and take a lot of resources to successfully integrate. If, in their first week, these students land in an argument instead of a fistfight, I consider it a win. While I cannot prove causation, the timing correlates with October 31, the date by which schools receive per-student funding for the year. Though these students become ours shortly after Halloween, we do not receive funding associated with them. Instead, the school from which they came does. Many of the schools they came from used a "no excuses" approach to behavior, popular with successful charters. Students whose behavior did not change would disrupt the charter school environment. In traditional public schools like ours, counseling students out is not an option.

We meet our second wave of charter school students in April, roughly a week before the state exams. These students do not have behavioral challenges but perform poorly on tests. Perhaps they did badly on a preparation tests and were then asked to leave. I have found no city data on these dismissals by charter schools.

This phenomenon is not Unison-specific, as the number of charter schools expanded significantly statewide. Following the 2009 recession, to qualify for **Race to the Top** and receive significant federal dollars, New York state agreed to lift the charter cap from 200 schools to 460. Using lotteries as a filter, charter schools inherently attract more privileged families regardless of whether counseling-out practices take place in their schools.

The question of whether charter schools are more effective than district public schools remains unanswered. At best, Unison and other public schools could learn from innovations that charter schools pilot. But the major innovations

(especially in **discipline** and **expectations** policies) I can see target a different demographic. I believe that the continued practice of hyping the very best charter school test results has contributed to fearmongered test preparation becoming the prescription for district public schools, not innovation. Combined with counseling-out practices, I believe the expansion of charter schools has fostered a two-tier system hurting the most vulnerable students.



After one year, Unison's founding principal resigned, and a first-year principal took her place. While the new principal worked valiantly alongside many dedicated new teachers to shift student achievement, it became an all-too-public joke that for our logo we used Sisyphus, onto whom the boulder rolled down and crushed.

In our second year, 2013, federal pressure finally led to the realignment of state exams to the national Common Core state learning standards. Increasing standards benefits students all across the nation, but New York state made

a **calamitous** mistake: Schools were **not provided** curriculum materials about the new standards they would be tested on first.

However painful that was for us as teachers to scramble and guess how to best prepare students, it was more painful for the students. Multiple Unison students vomited during testing, and many more students succumbed to tears, fearing they would have to repeat a grade for failing a test their teachers were not prepared for.



And on the basis of these same test scores, the education department closed schools, like it had closed Unison's own precursor. The state couldn't leave back two-thirds of all students, so it **chose to send** the lowest 10 percent to summer school instead. In New York state, passing rates fell roughly from two-thirds of students across the city **to one-third**. Then-State Education Commissioner and

future Acting Secretary of Education John King explained the change in scores in this way to the public: "These proficiency scores do not reflect a drop in performance, but rather a raising of standards to reflect college- and career-readiness in the 21st century." That line did not go over well with my scores of students failing for the first time.

Wealthier areas of New York state started sitting out of high-stakes testing due to parent conscientious objection. The rate is now **20 percent statewide**, but not for my kids. Their parents do not know to attempt this strategy, and we do not encourage it: I am loath to jeopardize my students' already limited ability to get into high performing high schools.

As our school grew by one grade level each year, and hired a teaching staff for the additional grade, whom could we attract but new teachers? It's a hard sell to convince teachers to take on the challenge of working with students who begin multiple grade levels behind in reading and who bring the challenges of poverty with them to school. I found myself hiring bright-eyed teachers whom I recognized immediately as the ill-prepared Teaching Fellow getting ushered too quickly into complex brain surgery. Having attended graduate schools steeped in the culture of No Child Left Behind, they came in also prepared with their worksheets and militaristic pedagogy aimed at preventing the hemorrhagic state test scores, nowhere close to teaching students how to learn and collaborate.

**What does this mean for the future of integration?**



Eighth-graders graduating from the Unison School, June 2015. *Joe Posner*

Three years in, our incredible students and teachers showed they could succeed in spite of systemic failures. Our inaugural class went from reading at an average second-grade level in sixth grade to an eighth-grade level by eighth grade, according to a nationally normed reading test. But these statistics do not tell the full story. Many students made significant gains, while others made little growth at all. Not every student grew how he or she could.

The fact that so many did illuminates the capacity of these children and how much potential each would bring to our world if we created a more level playing field. Current school segregation patterns point to wealthy white students who initially receive middling scores ending up **far better in life** than the top 10 percent of poor black students. That outcome, of course, does not remotely reflect the ability I have witnessed over and over again in needy, homeless, or previously illiterate students whose short lives have already been disrupted in multiple ways.

Segregation is not only a moral issue; it is also an economic one, because our segregated schools **fail to prepare** students for the new economy.

Last summer, I received emails asking me to sign a petition to convince the District 13 Community Education Council to open a new middle school in District 13. The parents argued the district needed "more middle school seats."

Unison is a middle school in District 13. Unison is under-enrolled. We have plenty of seats available. These parents are not advocating for new seats. They are using politically correct language to advocate for wealthy white seats while attempting to not sound racist.

That said, peers and parents have continually advised me that Unison should become more selective, for the sake of the majority of students who aren't "disruptive." We could create an admissions test, and pass off those who will most significantly hinder our likelihood of success to another school. Fear lies behind these suggestions. Not just **parents' well-documented** fear of racial integration, but a broader fear of a truly equal public system that gives privileged families fewer chances to separate their children from the poor. The neediest, most challenging students are filtered out to pockets of desperation. Few people would openly choose this, but I believe this is where the choice movement has left us.



*Eric Berg*

At Unison, the staffers have dedicated themselves to giving these most vulnerable students a chance. But available data is clear that integration could do a **much better job**.

Neighborhood school districts can effect change too — some schools near Unison are incorporating integration as part of their founding charters. I plan to work with District 13 on similar plans as the neighborhood gentrifies. Every day on my walk to work I pass white neighborhood residents placing their children on school buses to take them out of the neighborhood.

From a wider vantage, policymakers must face the potential power of integration. State leaders need to celebrate diversity and support collaboration between Departments of Housing, Justice, Education, and Urban Development. On the national level, let us not forget Barack Obama's first campaign, during which he gave what might be our generation's **defining speech on race**:

Segregated schools were, and are, inferior schools; we still haven't fixed them, fifty years after Brown v. Board of Education, and the inferior education they provided, then and now, helps explain the pervasive achievement gap between today's black and white students.

Now it's 60 years after *Brown vs. Board,* and New York City is just **dipping its toes** into the possibility of reform. My school represents the ongoing, cavernous gap.

Focusing on only one lever — be it charter schools, pedagogy, teacher training, testing — absent integration is insufficient. Alone, they are politically expedient (and often ineffective) ways to "do something" while we avert our eyes, again, from America's lasting racial wounds as we continue to pass those wounds down to our children.

At Unison, we will continue to try to recruit our way to integration. But the first step is always the hardest. Last year during recruiting time, a young family came through our doors to see what we've built and hear our pitch. The test scores are improving. The curriculum is deep and innovative — not the drill-and-kill stuff you expect near the projects. When the young, white, pigtailed fourth-grader walked into a classroom with her parents, one of our students couldn't keep it in: "I've never seen somebody that looks like that before."



The author with a parent at the Unison School. *Joe Posner*

*Amy Simone Piller is a co-founder of the Urban Assembly Unison School, where she is currently the assistant principal. She has been teaching English and special education for the past nine years.*

## SPECIFICATIONS

**Rupert Green** (hereinafter referred to as Respondent), under File #0693125, is a tenured teacher currently assigned to the School of Cooperative Technical Education, ("Coop Tech"), 79M645, within Manhattan, assigned to John Adams High School, Q480, a satellite site in Queens, within District 79.

During the 2013-2014, 2014-2015 and 2015-2016 school years, Respondent engaged in conduct unbecoming his position, excessive absences, insubordination, harassment, misconduct, derogatory statements, and neglected his duties as follows:

## In Particular:

**SPECIFICATION 1:** . On or about and between January of 2014 to March of 2016, Respondent repeatedly used the Department of Education ("DOE") account for personal emails, including but not limited to, derogatory comments, and/or inappropriate emails to staff members, including but not limited to the following email(s) dated:

    1   January 10, 2014
    2   January 15, 2014
    3   January 17, 2014
    4   January 27, 2014
    5   February 3, 2014
    6   February 5, 2014
    7   February 11, 2014
    8   February 14, 2014
    9   March 24, 2014
    10  April 24, 2014
    11  May 6, 2014
    12  June 4, 2014
    13  June 6, 2014
    14  June 10, 2014
    15  June 11, 2014
    16  June 12, 2014
    17  June 14, 2014
    18  June 18, 2014
    19  June 20, 2014
    20  June 25, 2014
    21  June 26, 2014
    22  December 12, 2014

23  December 15, 2014
24  January 13, 2015
25  January 15, 2015
26  January16,2015
27  January 22, 2015
28  February 3, 2015
29  February 5, 2015
30  February 6, 2015
31  February 10, 2015
32  February 12, 2015
33  March 4, 2015
34  March 6, 2015
35  March 9, 2015
36  March 13, 2015
37  March 16, 2015
38  March 18, 2015
39  March 19, 2015
40  April 16, 2015
41  April 23, 2015
42  April 24, 2015
43  May 6, 2015
44  May 8, 2015
45  May 11 , 2015
46  May 12, 2015
47  May 19, 2015
48  May 20, 2015
49  May 22, 2015
50  May 24, 2015
51  May 28, 2015
52  May 29, 2015
53  May 31, 2015
54  June 2, 2015
55  June 3, 2015
56  June 4, 2015
57  June 11, 2015
58  June 14, 2015
59  June 15, 2015
60  June 18, 2015
61  June 23, 2015
62  June 25, 2015
63  August 3, 2015
64  August 12, 2015
65  September 15, 2015
66  September 22, 2015
67  September 29, 2015
68  September 30, 2015

2

```
69  October 9, 2015
70  October 15, 2015
71  October 16, 2015
72  October 23, 2015
73  October 25, 2015
74 /October 26, 2015
75  October 28, 2015
76  October 30, 2015
77  November 2, 2015
78  November 4, 2015
79  November 5, 2015
80  November 6, 2015
81  November 16, 2015
82  November 17, 2015
83  November 18, 2015
84  November 19, 2015
85  November 22, 2015
86  November 20, 2015
87  November 25, 2015
88  December 1, 2015
89  December 2, 2015
90  December 7, 2015
91  December 8, 2015
92  December 9, 2015
93  December 11, 2015
94  December 15, 2015
95  December 16, 2015
96  December 17, 2015
97  December 23, 2015
98  January 7, 2016
99  January 15, 2016
100       January 19, 2016
101       January 20, 2016
102       January 27, 2016
103       January 28, 2016
104       January29,2016
105       February 3, 2016
106       February 4, 2016
107       February 9, 2016
108       February 12, 2016
109       February 24, 2016
110       February 25, 2016
111       March 7, 2016
112       March8,2016
113       March10,2016
114       March 11, 2016
```

3

| 115 | March 15, 2016 |
| 116 | March 23, 2016 |

**SPECIFICATION 2:**      On or about and between January of 2014 to March of 2016, Respondent engaged in misconduct specified in Specification 1 above during school time, and/or during his instructional period(s), and/or on weekend(s), and/or on early morning hour(s), and/or late at night.

**SPECIFICATION 3:**      On or about and in April of 2015 through June of 2015, Respondent failed to adhere to Principal John Widlund's March 20, 2015 email directing staff members to refrain from sending unprofessional, and/or hurtful, and/or intimidating emails to other staff members.

**SPECIFICATION 4:**      On or about and in between August of 2015 to March of 2016, Respondent failed to adhere to Principal Anda McGowan, and/or Assistant Principal Audrey Mangan, and/or administrations' September 8, 2015 staff meeting, directing staff members to use the DOE email address for DOE use only, and/or to send professional and/or appropriate emails using the DOE account, and/or to refrain from sending personal emails on the DOE account and/or comply with the Staff Handbook and/or policies.

**SPECIFICATION 5:**      On or about and in February of 2016 and March of 2016, Respondent sent an inappropriate, and/or derogatory, and/or personal email to staff members after a February 9, 2016 disciplinary meeting with Principal Corey Prober directing and/or instructing him to stop sending such emails.

**SPECIFICATION 6:**      On or about and between January of 2014 to March of 2016, by engaging in the act(s) described in Specification 1:

1. Neglected his duties.
2. Caused staff members to feel uncomfortable and/or upset.

**SPECIFICATION 7:**      During the 2014-2015 school year, Respondent was absent from work on approximately twelve (12) occasions on the following dates:

| **DAY** | **DATE** |
| --- | --- |
| 1) Tuesday | September 16, 2014 |
| 2) Thursday | September 18, 2014 |
| 3) Monday | September 29, 2014* |
| 4) Wednesday | October 1, 2014 |
| 5) Friday | October 10, 2014* |
| 6) Thursday | November 6, 2014 |
| 7) Friday | December 5, 2014* |
| 8) Tuesday | December 9, 2014 |

4

|    |           |                    |
|----|-----------|--------------------|
| 9) | Wednesday | January 21, 2015   |
| 10)| Friday    | February 6, 2015*  |
| 11)| Friday    | April 17, 2015*    |
| 12)| Thursday  | April 30, 2015     |

**SPECIFICATION 8:**  During the 2015-2016 school year, Respondent was absent from work on approximately eleven (11) occasions on the following dates:

| **DAY** | **DATE** |
|---------|----------|
| 1) Wednesday | November 4, 2015 |
| 2) Tuesday | November 24, 2015 |
| 3) Wednesday | November 25, 2015* |
| 4) Monday | February 1, 2016* |
| 5) Tuesday | March 1, 2016 |
| 6) Monday | April 4, 2016* |
| 7) Tuesday | April 12, 2016 |
| 8) Wednesday | April 13, 2016 |
| 9) Thursday | April 14, 2016 |
| 10) Friday | April 15, 2016* |
| 11) Monday | April 18, 2016* |

**SPECIFICATION 9:**  On or about and in April of 2016, Respondent failed to follow the procedure of informing District 79's Central Office HR Director Janis Dizon and/or Associate Director Charlette Carwile White and/or her staff that he was not going to work that day.

## The foregoing constitutes:

- Just cause for discipline under Education Law §3020-a;
- Neglect of duty;
- Conduct unbecoming Respondent's position or conduct prejudicial to the good order, efficiency, or discipline of the service;
- A violation of the by-laws, rules and regulations of the Chancellor, Department, School and/or District;
- Misconduct;
- Insubordination;
- Excessive Absences;
- Harassment;
- Substantial cause that renders Respondent unfit to perform his obligations properly to the service; and
- Just cause for termination.

TRANSCRIPT OF CARMEN FARINA'S SPEECH ON 3020-A
FEBRUARY 24, 2015

Transcribed by the Department of Education
Obtained via the Freedom of Information request of Betsy Combier, Editor of NYC
Rubber Room Reporter and posted with the video on her blog:

**The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE Partnership
of Harm For Charged DOE Employees,** May 28 2016

Welcome.[CARMEN FARINA]

>> You're like a cast of thousands. I didn't even know I had this Army. So this is really  good.
I would say thank you for  coming.
I know many of you who have traveled distances to be here today, and I appreciate
your  coming.
I think you're, first of all, seeing something very unique. You're seeing two of us sitting next to
each other.
We're actually smiling at each  other.
All because we really have one mission, and one mission is to make  sure that there is the best
teacher in every single classroom in every school in our  city.
Many of you are parents and  grandparents.
What I want to tell you is that I take very seriously about any classroom that I would not put my
grandchild in, I would not put anybody else's children  in.
By the same token, there are many teachers who can have an angry  parent or an angry this or
an angry that bring up charges that may not be correct, but we cannot have people in  limbo.
We cannot have people who should be working, not working, and people who shouldn't be
working,  working.
And I am asking you to really rethink the whole process of the work that you do.
First of all, we want to make sure you're looking at evidence that matters.
Having been a principal who would spend 40 percent of a given year writing people  up.
I understand how much time it took  me.
If I forgot to cross a T, I literally hired a retired principal to  just read my paperwork because it
was so cumbersome, and as onerous as some of the charges were, if my T wasn't crossed and
my dot, we should not be looking at our work in that kind of  detail.
We should be looking at what is the problem and how serious is it and what do we do as the
next  steps?
  Do I want to make sure that you're looking at evidence that's relevant to the  case.
, that that's your focus, your  lens.
When I visit a school, I know there are at least three things I want to look for in every single
school, and I am focused on  that.
Principals try to divert me and say look at this, look at that, I want to go back to the three things
that I want to look  at.
So what are the things you need to do to decide your case and focus on those.
Also, I don't know why we need five witnesses when three will  do.
The reality is, if something is substantiated and one person says it, another person says it, and
then a third person says it, I don't understand why we need to have a cast of  thousands.

And I'm really asking you -- and I don't think it's due   process.

It's just a matter of how much longer can this drag out. I'm looking at how much sooner can we get this  done?
   Is there's a 30-day rule for most things, and I think to the degree that we can do it, I suggest we do   it.
The other thing is that I think it's really important also to ensure that, if there's anything that's standing in the way, at least from my perspective as a chancellor, and you need me to fix it, I'm more than happy to fix it.
So for example, you need a witness, you need them to be there at 4:00, you need someone to come from the school, to a degree that I can say  to a principal make sure this person is released when this person has  to be there, I'll do that because my thing is to get this thing done  as quickly as possible so that everyone's rights are protected, and  most importantly, the child who sits in a   classroom.
And if it means I have to send someone to convince the parent for a child to be a witness in the case, I'm happy to do that as well, but I also feel that sometimes we wait so long to hear a case, that my  memory certainly isn't what it used to be, we can't expect a kid to be able to do  that.
So the quicker we do things, the more concentrateded we are on getting the case settled, the better we'll have a public school  system.
And both Michael and I are convinced the only way to have a public school system is we hold everyone to the highest  level.
I do not want to see some teachers who are getting by on slightly ineffective.
I only want highly effective teachers in every one of our schools.  To that, I am committed, and I am committed, along with Michael, to make sure the 30-20 process is fair, equitable, and   reasonable.
I do not understand why some cases are dragging along as far as they are.
Again, I'll be very  personal.
I remember having a teacher for six months on suspension, going back  to the hearing, having the teacher allowed to pick, in those days,  what kind of hearing she wanted, and then coming back to the classroom and actually doing very serious to a child because of the   process.
We cannot have that. You're on,  Michael.

[MICHAEL MULGREW]
>> Thank you very much, Carmen, and thank you all for coming. It's lovely weather that we're having  here.
I just found out that we now have the coldest February in the history of New York  City.
So thank you all for coming  out.
I met with some of you years ago, and I want to first thank you for the amazing service that you supply  us.
These are not easy issues, and we have taken a system that used to   be
-- take a lot longer, and we have really shortened  it.
And what you're hearing from myself and the chancellor today is we're looking to even try to make it  faster.
Fairness is the key to all of  this.

The legal processes, I understand at times, can become somewhat of an impediment in terms of efficiency and speed, but what you're hearing  us say here today is this is what we would  like.

And if there is something going on that we should know about, if there is someone on either side, an attorney from either staff doing something that drags out a case, not doing things properly, not using the full hearing day, we need to know about that because we will be looking, because we do believe it is important that, if there is any sort of allegation, we want it to take as little time as possible because I do know from being a teacher, from a chapter leader, people that would be completely exonerated but were never correct because they were out of the classroom for so long and the astigmatism that was tied to that.

So we know it's in everyone's interest to have the most efficient, effective, speediest process as long as we can also ensure fairness, which is a difficult job that we're asking to you do.

But I know that we have shortened the timelines greatly from where we were at five and six years ago, and I can't thank you enough for that, but we're looking now to say, as Carmen said, if there's two witnesses saying the same thing, we don't want ten.

And the things that you know better than I do about what else in the process, but more importantly, if you feel there's something not going right, please let us know because we want to know if people aren't doing what we have directed them to do, which is to make it efficient, effective, fair, and speedy.

Because that is the way that we feel will better serve the students of this city.

So I can't thank you all enough for what you already have done.

I speak very proudly around this state about what we have done here in New York City, and you all know the scrutiny that it is under, and I love that I can produce actual facts to refute a lot of the rhetoric that's out there, and that has a lot to do with your work.

So I can't thank you enough for that, but at the same time, we believe that we can do it even better.

So at this point, questions?

## [COURTENAYE JACKSON-CHASE, ADAM ROSS, AUDIENCE]

>> Sure.

>> I get a lot of questions when I speak to principals and teachers and whatever. Not one question? Okay.
Yes?

>> Remember the last time we were here?

>> Why are we here?

>> Because we want to make sure that everybody understands that we want this process to be done quickly.

You are in charge of the process when it gets to your level.
And if there are people -- if there is something that could be done to make it faster, we'd like to hear it, and if there is a party on either side that you believe is wasting time, we need to know about it.

>> And I would say also very clearly that for too long, that the head of the education department and the unions were almost expected to be fighting each other and that this group would say, well, we can't do this because, and we can't do this because.
We wanted to be clear here today that we're giving the same message to everyone from both of us, and I think that's really important, and it's certainly something that people outside the

organization say,  well, you can't do it because of the union, or you can't do it because of the  chancellor.
We're united on this  one.
There is absolutely no disagreement between the two of us on only the best people need to be in these  positions.
So we wanted to say it, and we wanted to say it out loud, and we'll probably be repeating it a  lot.

>> And an agreement that was signed  --
>> 2010.

>> That would be five,  2010.
It said that the chancellor and the union president can bring the panels in to discuss this with them, and we just wanted to make it clear exactly what our expectations are at this  point.

>> How do the pro ses get in the  transcripts?

>> We have an agreement, as part of the 2010 agreement, that the transcripts are not necessary before you issue a decision or before you do a  closing.
So the pro ses should be getting the transcripts, but it should not be impeding the speed of the   process.

>> That's not my question. How do we get  them?
It's on teach.
Do the pro ses have access to   Teach?

>> The pro se, I don't know the answer to that.  I can find out the answer to   that.

>> Come on up if you have the answer. [ No microphone  ].

>> I would say for the more technical questions for the lawyers that do the work, you can feel free to stand up like Laura just   did.

>> She spoke.
They have access to the   Teach.

>> Well, I would assume, since there are no questions, that everyone gets the  message.
Again, I just want to be clear that, if there's anything that is actually keeping you from doing the job, all you need to do is let us know because I am determined on this issue -- many others, but this  one in particular -- that we will get to June with as many cases  closed as possible so principals can be assured that teachers they do not want back in the building, or teachers that can be cleared so they can be back in the building, we can be on their rosters at the end of June.

>> So there's no need to have transcripts before a closing argument, is that  correct?
                                That the arbitrators should all know  that.

>> Yes, that's  correct.

4

>> Okay.
Well, thank you.

>> Thank you for coming.

>> We can go through a couple of more technical things.
So what I was going to just say is that to Michael and Carmen's point about making the process be as efficient as possible and still fair, there are a group of things that the DOE and NYSUT and Courtney and I have agreed to over the years to help make the process run as efficiently as possible without compromising the hearing.
One of them relates to the holding of pre-hearing conferences, which should not be done on hearing days.
We should be using hearing days for hearings.
We shouldn't be using them for settlement discussions either. Parties are free to discuss settlement whenever they want.
Courtney and I actively encourage people to settle, but hearing days should be used for hearings.
The pre-hearing conferences should be used to the maximum extent possible to premark exhibits, stipulate the facts, stipulate to admissibility of documents, where those things are not in dispute. And discovery should be provided prior to the pre-hearing conference to the extent that that's required by our agreements.
We have agreements about what things are supposed to be provided on what timeline, and we have asked that the -- all of the attorneys abide by those provisions.

>> I think the other thing that we want to talk about, I know that there are more cases that are handled by private counsel, and we're going to be doing another orientation.

But I know that it's hard when you have lawyers who may not be used to kind of the groove of things, and they're balancing cases in courtrooms and also trying to manage within this system.
Please let us know how we can be helpful to help better integrate them into the system so they get caught up to speed because I know at times it can be a nightmare for everyone to juggle the scheduling that has to happen, and we want to help get you to the place where the rules for timelines can apply to everybody.
So we do know.
We are aware that that's been a problem.
We're working on it on our end, but I welcome -- even though that can be seen as a more technical issue, you obviously talked to the managers that you usually interface with and the lawyers, but you can also reach out to us so that we can help manage them a lot.

>> Absolutely.
But what I would say is, regardless of who the attorney is, whether it's pro se, whether it's an NYCIT attorney representing the respondent, another attorney representing the respondent -- all of the cases should be held to the same timelines, the same 60 days for doing the hearing, the same efficiency requirements, the same everything else.
To that end, one of the other things we have agreed is to the use of full hearing days to the maximum extent possible.
That may require either or both parties to have multiple witnesses ready to go in the day, and that is something that we expect both sides of the case to be ready to do.

5

That's something that's written in our agreement and that we believe is an important part of making sure that the full hearing day is  used.

>> I will add, particularly for the DOE, since we have the burden and we also have the school-based witnesses, as Carmen said, we are committed to making sure that we can work to make things easier to get the witnesses here.
Again, everyone here knows that it's a hard juggle to manage what we do down here and what goes on in schools, but I welcome your feedback on that point, and we're committed to making that even more seamless.  I know we've made some improvements over the last few years, but we're going to keep working on it.

>> One of the things that we hear a lot about, Courtney and I do, is about the length of particular testimony and who is allowed to testify to what.
My way of summing this up has been that grandma is not a relevant witness.
We are asking the hearing officers to actively control the hearings, to make firm -- rather than -- we know there's a tradition in labor arbitration to sort of take everything for whatever it's worth and sort it out later.

That is not what I think is the best way to be doing  business.
We think the hearing officer should be ruling on relevancy, ruling on redundancy, ruling on cumulative, ruling on whatever it is, hearsay, whatever it is, to make sure that we're not spending an inordinate amount of time on the testimony of witnesses who don't have anything relevant to testify to or anything additionally relevant to testify to.
One of the other things we've looked at in terms of the process is the use of rebuttal witnesses.
We have pretty clearly written out that rebuttal is supposed to be used only for purposes of refuting a fact that an opposing party attempted to establish on its case and not just for further bolstering the case that one side or the other put on on its direct case, and we would ask all of you to please think about whether or not, in the cases that come up for you, whether or not rebuttal is being used for what is truly a rebuttal purpose and not simply to bolster the direct case.
We talked about the private counsel cases.
The only other thing I would add about that is that even when attorneys change in the middle of a hearing, we totally understand that hearing officers, and obviously the UFT and the DOE, all want to make sure that everyone has their constitutional due process and right to counsel and all of the other  stuff.
But it also is not true that those changes in counsel should do anything more than the most minimal derailing of the speed of the case.
The only other thing that I have on my list of things that I wanted to highlight for everyone was decisions and that we've asked the hearing officers to -- not only have we asked, but it's in the law that the decisions be issued within 30  days.
That means, look, I have read a lot of 3020 decisions, and many of them are comprehensive, and I know how much hard work and deliberation goes into all of those decisions, and certainly we want decision that's are thoughtful and review all of the evidence and stand up to review on appeal.
But we also need that to be balanced with the notion that we need the decisions to be issued as timely as possible because we want the people who should be back at work to be back at work, and we want the people who should be disciplined or terminated to be disciplined or terminated.

6

And it's to no one's benefit for someone to be waiting, reassigned, doing administrative work for a period of time while we wait for a decision.
Some of that is necessary. I totally understand that.
But we'd like to minimize that as much as possible. Anything I left out on our list?
                                           Is.
>> No.

Yes, sir?

>> If you don't want us to have a pre-hearing conference on a hearing day, what do you suggest we do with the rest of the day?

>> I think the pre-hearing conferences should not be held on hearing days.
They could be held either on other days of the month. They could be held before a regular hearing starts.
They could be held after a regular hearing starts. After it concludes.
They can be held on a lunch break.
They can be held on another day, like I said.
But they shouldn't be held in lieu of using a hearing day for a hearing.

>> In lieu of is your problem?

>> Yes. Okay.

>> There a hand in the back?

>> Yes.
I heard earlier about the position before they close.
What is your position about a pro se or a private counsel insisting I need to look at the transcript before I close or I need to look at the transcript before seeing a referee.
I guess the question is twofold.
Do I need the transcript before closing?
                              And what is your position on reading briefs?

>> We trust you to use your discretion. I'm sorry, I can't see you now.
We trust you to use your discretion to manage the process. I was a prosecutor for many years.
We would have trials where someone's liberty was actually at risk. We were never permitted to actually get transcripts.
For those of you who are trial lawyers on the criminal side, you know what I'm talking about.
The judge would just say, you were just here. You heard all theevidence.
Let's go.
I understand that these hearings don't happen on consecutive dates, but they do happen closely enough in time where we're saying if you really -- some cases might be complex.
We understand that.
But for ones that are not, you can hold firm.
You'll have us to support you to say, I don't believe that that's necessary or warranted here in this case and your request is denied.

>> Right, exactly.

7

In a lot of these cases, you'll have -- I forgot what -- I'm blanking on the word.
You won't have final transcripts, but you'll have the -- what's the word I'm looking  for?
Is the tentative   transcripts.

>> What's a tentative   transcript?

>> There are -- well, I will talk to -- Courtney and I can talk to the transcription services about
whether or not there's a way to get the transcripts to you even if they're not certified and final, as
fast as possible.
Let's put it that  way.

>> What about  briefs?
Do you have a position on reading briefs? Do you allow it?
Do you not?

>> Again, I would never think -- I would never want to manage the process.
That's why we have  you.
I respect your discretion on what you think is necessary in order to have a full and fair hearing
on a   case.

>> Absolutely.
I think, if you were to say, given the case, no, I as a hearing  officer don't need a brief, that that
is not something that inherently either one of us think there's a problem  with.
There may be occasions where you think it's appropriate to have a brief, but if you don't think it's
appropriate to have written briefing, there's nothing that we would say says to you you have   to.

>> We'll support you on that. [ No microphone  ].

>> But the point is you want these cases to hold up in court, and you have lawyers insisting,
again, a pro se, saying I want to file a  brief.

>> Then you can say  no.

>> You're telling me to just say   no.

>> I understand, but you know on appeal, as long as the facts are there, it's clear that a person
acting pro se really did follow and really did  understand.
I'm not saying, if I were in your shoes, I wouldn't have   some


trepidation  too.
The first few cases where you say no, yeah, you're going to wait and see if they take an appeal
and what  happens.
But we're saying do what's right and what's best and what's prudent for each case.
If you do not need all the extra, do not do it. If it's not appropriate, don't do  it.
Again, you'll have our  support.

>> Nina, did you have a  question?

8

>> No.
Just with the transcript, I just wanted to clear that  up.
As far as the practice, it's determined case by case if it's relevant. If you have a minor witness or a minor witness who doesn't have important testimony, the parties could agree that the transcript is  not necessary, it's limited  testimony.
However, if there are some days of hearing where you'll have a transcript, I think certainly the need for a transcript, they should have that and should not waste time to wait for the hearings to move forward by not having a transcript for all of our  cases.
I think it works out just that  way.

>> Yes, sir?
[ No microphone  ].

>> It is essentially unfair that the transcripts from the DOE are open, but the testimony of our witnesses aren't available by transcript.
Is there a way to make sure that maybe that's a fair   process?

>> What you're saying is they're being prepared chronologically. So because the DOE goes first, that comes  first.
Sure, we'll certainly look into   that.

>> Yeah, I think that's right,   Chris.
I mean, I'm just -- I just think what Lena said is a fairly good point.
No one size fits all solution in any of these  cases.
But the hearing officers and the attorneys together should be making good faith judgments about what is necessary to do to get the case  done efficiently and fairly and what is not necessary to get the cases done efficiently and fairly and what is just extra, I guess, is the  best way of putting  it.
The fact that it's a pro se counselor, pro se respondent or a nonNYCIT council, doesn't necessarily in my mind alter the analysis so much as what is the nature of the case and what is the nature of the arguments that are being  made?

>> There's a question that came in via -- over  here.

>> We won't forget  you.

>> There's a question that came in from someone who's doing the live streaming, an arbitrator asked the question, when private counsel's involvement in a case leads to scheduling difficulties, it would sometimes be helpful to be able to take the next case out of order.  We have been told that that is not  permitted.
Can there be some flexibility   here?

>> We'll look into  that.

>> Yeah, but I would also say that, in general, our agreements are pretty specific that the scheduling of the attorneys is not ordinarily  a reason, whether it be a private counsel case or otherwise, for a  case not to proceed on the scheduled  day.
[ No microphone  ].

>> I'm looking for the language of the agreement on what we   have.
The actual language of the agreement on transcripts from 2010 is "a party to the hearing or a hearing officer may request an unedited copy of the relevant   transcript.
If a certified transcript is not available when  needed.
The unavailability of a certified transcript shall not excuse  adherence to the timelines for completion of a hearing and issuance of  a  decision.
That's the language of what we've agreed  to.

>> If I ask for it, do I pay for   it?

>> I don't know the answer to   that.

>> Do you guys  know?

>> What's the new agreement that you just signed? Is there anychange?

>> I don't think we have signed a new  agreement.

>> Does anybody know? Hold your point.
Does anybody know if there's a cost associated with what we're calling  a tentative  transcripts?

>> There's a cost for  it.

>> Yes, that's  okay.

>> Unedited was the word I was looking  for.

>> There's a cost for expedited  transcripts.
I'm not really clear if what Adam just referred to would qualify as an expedited.
And there is a new agreement that's in the process of being signed  with the new transcription service, but we'll get some clarity on that and let all the arbitrators know if there will be a cost involved with getting the tentative, unedited  transcript.

>> Thank you.

>> My understanding is we do not, under the new agreement, get copies of transcripts.
Okay rat?

>> I don't know, but lots of people who I trust are nodding their heads in the  audience.
So I'll say yes.

>> I believe that the transcripts are going to be uploaded to   Teach.

>> Yes, that's what I  said.

>> Yes, where you can get  them.

>> Yeah, I know. Thank you.

>> Anybody  else?

Well, now I guess you get to   eat.

>> Now you can really   eat.

>> And I think we lose the room at   5:00.
So you have about 15 minutes to mingle and take your   time.

>> Can I just say one other thing,  Courtney?
  On behalf of the UFT, NYSUT, the DOE, we're all very appreciative of attorneys on both sides
and hearing  officers.
As practitioners, we want to say it too.  We know that you all have not an easy  job.
The attorneys have the job of being zealous advocates, the hearing officers have the job of
being neutral  referees.
It is not easy, but you can all -- you all do on a daily basis a vital service and can really deserve
a lot of appreciation for the work you do.


>> Thank you very  much."

## Appendix B

### Complaint on the Improper Appointment of Principal Prober

**Jaclyn Vargo**
Office of the Special Commissioner of Investigation
12/13/15

Dear Commissioner Vargo;

Re: Appointment of Principal with improper/no C-30 at the School of Cooperative Technical Education (Co-Op Tech)

On Friday 12/11/15, teachers at Co-Op Tech informed me that one Corey Prober was introduced as principal of the school, and no proper C-30 was conducted.

Around the end of the last school year, LIS, Nancy Velez informed teachers that John Widlund of Co-Op Tech was removed as principal, and that Anda McGowan would act until a C-30 was held. Being aware of District 79 prior disregard for the C-30 (see Appendix A), teachers sought and received assurance from LIZ Velez that a C-30 would be held. (Co-Op Tech teachers are spread out over multiple sites.)

During the summer (2014) when all teachers and some administrators were off (or out of the country), I was informed that potential administrators were being invited to the school. I showed up and when I inquired regarding the timing of the event, the Deputy Superintendent revealed it was about giving a tour of the [empty] school.

At the beginning of school (2015), I made enquiries regarding the C-30 and the need for participants to be selected as per the Chancellors Regulations. No teachers reveal that they received information, or were invited to participate.

On Friday 12/11/15, I learned from unofficial sources that Corey Prober was introduced to Co-Op staff (at 96 St.) as principal. I have no email from the school about the appointment. In addition, I have no empirical or primary evidence that a proper C-30 conducted. Also, educators at the other sites revealed they had no knowledge of same.

However, secondary sources revealed that three individuals based at CoOp Tech main site constituted the C-30, and they did not send Mr. Proper as a top candidate.

Irrespective, the process mandated by Chancellor Regulation (C-30) was not adhered to, and the history of the District engaging in flaunting of the Chancellor's Reg to advance nepotism, racism, and the denial of equal opportunity dictate an investigation and the conduction of a true C-30. That was done on the previous occasions when I reported fraudulent procedures and ask that a proper C-30 be conducted.

Because of the frequency of the occurrence (likened to a criminal enterprise) and the fact that Blacks are being discriminated and denied equal opportunity by the District, I will also seek state and federal probes.

Dr. Rupert Green

Appendix A:

My 2011 complaint re D 79 appointment of three administrators without C-30.

**The principal stated** ''I am in contact with the district and it will happen. No one is appointed and C-30s will take place. Thank you for the information.''

Is the principal being misled?  The proceeding lists Ms. Jernee as an AP for Coop Tech and no C-30 was conducted?

The proceeding lists the individuals whom we have been told are APs.  Two AP positions were advertised for Coop Tech.  One for Ms. Viscovich and another for Ms. Jernee's whom we were informed were Aps.  We were also informed that Ms. Carolyn Peterson was an AP at Coop Tech, but according to the DOE, she is not.  For her to be listed as AP IA, the school/district should have informed the DOE that she was to wit: "Hiring Managers must notify their designated HR contact of all interim acting assignments prior to the commencement of service.  A Commencement of Interim Acting Service Form, signed by the employee and the Hiring Manager must be signed **prior** to the start date and submitted to DHR.  See Toolkit B.1 for the Commencement of Interim Acting Service Form."  Such requirements also go for Ms. Viscovich.  She is not listed as an APIA for Coop Tech.

Since neither is listed as an AP IAs for Coop Tech, there are question regarding their legitimacy.  The AP positions must be advertised and a C-30s conducted.  Contact your union and the principal for an explanation.

**Contact**
Alias
MViscovich
E-mail
MViscovich@schools.nyc.gov
Office
ALTERNATIVE SCHOOLS AND ADULT & CONTINUING ED.
Phone
(917) 521-3632
**Information**
Job title
Dir. of Literacy Initiatives/Suspensions & Corrections
Department
30
Company
NYCDOE
**Organization**
Shares same manager:
Viscovich Melissa , Dir. of Literacy Initiatives/Suspensions & Corrections

## Jernee Nicole (18K500)

**Contact**
Alias
NJernee
E-mail
NJernee@schools.nyc.gov
Office
SCHOOL OF CO-OP TECH. ED.
Phone
(718) 290-8618
**Information**
Job title
Assistant Principal
Company
NYCDOE

## Peterson Carolyn (79X695)

**Contact**
Alias
CPeters12
E-mail
CPeters12@schools.nyc.gov
Office
Passages Academy - Bklyn Site
Phone
(718) 495-8160
Fax
(718) 742-9510
**Information**
Job title
Assistant principal
Department
Alternative
Company
NYCDOE
**Organization**
Shares same manager:
Peterson Carolyn (79X695), Assistant principal
**Availability**
Mon 12/19/2011
Show only working hours

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------)(
DR. RUPERT GREEN,                                    DOCKET NO. 18-CV-10817 (AT)(GWG)

                        Plaintiff,                             AFFIDAVIT OF SERVICE

-against-

THE DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK; CARMEN FARINA, Former Chancellor,
Sued Individually and Officially,

                        Defendants.
------------------------------------------------------------------)(

I, Dr. Rupert Green, am over the age of 18, and on April    2019 I provided service on the

Corporation Counsel at the address listed below in the matter before the United States District

Court with Index number 18-CV-10817 (AT) (GWG). I served a copy of the Opposition To the

Motion To Dismiss  and all EXHIBITs at:

                        Corporation Counsel
                        100 Church Street, Room 2-108
                        New York, NY 10007

Dr. Rupert Green

Signed before me on

April 04 2019                          State of New York
                                       County of New York

Notary Public
Keaara Woods
Commissioner of Deeds, State of New York
No. 2-14257
Qualified in New York County
Certified in Kings County
Commission Expires November 1, 2020
The UPS Store  |82 Nassau St|212.406.9010



Rupert Green
205-26 113 Ave
St. Albers, NY 11411

USDC SDNY

Hon Gabriel Gorenstein
US District Court Magistrate
Southern Dist. of NY
500 Pearl St.
NY NY 10007