UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————— x

DR. RUPERT GREEN,

                Plaintiff      DOCKET NO. 18 Civ. 10817 (AT) (GWG)

  -against-

                                              OBJECTIONS TO THE
                                     REPORT AND RECOMMENDATION
THE DEPARTMENT OF EDUCATION OF      OF MAGISTRATE JUDGE
THE CITY OF NEW YORK; CARMEN FARINA,  GABRIEL W. GORENSTEIN
Former Chancellor, sued Individually and Officially,

                Defendants

———————————————————————————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:_____
DATE FILED: 8-13-19

Pursuant to 28 U.S.C. § 636(b)(l), Rule 72(b) of the Federal Rules of Civil Procedure and Fed. R. Civ. P. 6(a), (b), (d) Plaintiff pro se Rupert Green ("Plaintiff") respectfully submits herein his Objections to the Report and Recommendation("R&R") of Magistrate Judge Gabriel W. Gorenstein as follows:

On p. 2 of the R&R, Gorenstein wrote, "During his tenure at Coop Tech, Green repeatedly used the school's email system to express his concerns regarding his belief that the secretary to the school's principal and a teacher at the school, who were married, "gave favors to each other yet had not . . . requested a waiver from the Conflict of Interest Board," in violation of Chancellor's Regulation C-100, Section IV.

He also used the email system to express his concerns regarding "the underfunding and negligence by the DOE of the CTE vocational programs in NYC."

1

This statement is what the Department argued during the hearing, and is untrue as to "during his tenure….". Plaintiff taught classes dealing with computer technology from 2001 to 2016 at Coop Tech, and it was only a few of the thousands of emails sent out that Plaintiff mentioned the relationship between Secretary Konze and AP Caraballo. Magistrate Gorenstein's statement is misleading and backs up what the Department argued at the 3020-a so that Arbitrator Leah Murphy's ("Murphy") conclusion that Plaintiff violated the Internet Policy of the Department of Education and *would not stop.* Therefore, Murphy gave the penalty of termination, which was, under the circumstances excessive, arbitrary and capricious. Facts matter, and circumstances and timelines matter as well. Arbitrator Leah Murphy at Plaintiff's 3020-a unfairly forbade Plaintiff from getting access to his Department email account with thousands of emails for 15 years to students and staff that were educational, and worthy of note by students and staff., so Plaintiff could be profiled as an abusive email terrorist. During his tenure of 15 years at Coop Tech, he received high ratings, and commendations, and for all of that time his emails contained relevant and material information necessary to enlarge the knowledge of his students in computer technology, as well to educate staff on the greater issue of vocational education. He was never given charges nor a letter to file.

Vocational education in New York City is focused on allegedly "helping" minority kids succeed in getting jobs immediately after high school. The underlying premise is that minority kids cannot – and do not – succeed in academics. Plaintiff cited policies that were highly discriminatory, and he also decried the lack of funding that minority kids receive for the educational programs they are thrown into. This issue is very high profile right now in New York City.

2

Plaintiff spoke out for equality in education, fair student funding, and elevating vocational education to the same level as college-track courses. He also is an African American male teacher, a minority among teachers in New York City, and very needed as a role model for young Black boys. None of these fine qualities mattered after Plaintiff discovered that Caraballo and Secretary Konze were living together and giving each other secret benefits not available to other staff members, such as per session payments and positions. When he broke this news via emails sent to staff – not students - "all hell broke loose", so to speak. He was correct, of course, that Konze and Caraballo did not want their relationship known, because they had never applied for a waiver from the Conflict of Interest Board (COIB). In fact, their relationship violated Department rules. But instead of giving Konze and Caraballo a fine, the Department charged Plaintiff with a myth, saying that he sent emails about a "lesbian" relationship between the female Principal and Konze, and attached to the story that Plaintiff terrorized everyone with this false information. Plaintiff never did this. Plaintiff never neglected his duties, he was always considered an excellent teacher, and the only people who were "disturbed" or "upset" were those individuals who wanted to steal public money from the Department in secret, or assist those who were doing such deeds.

In his Supreme Court Article 75, his work was described as follows:

"Petitioner respectfully suggests that the Hearing Officer's findings were arbitrary and capricious because they were based on the subjective opinions of the Department's witnesses at arbitration who stated that they felt offended by Petitioner's email messages. However, a review of those emails showed that while the Petitioner corresponded on a wide variety of topics over his 15-year employment, his emails were all related to Department-related purposes, i.e., educational instruction and the operation of his school. Petitioner also relayed complaints through his email based on his own observations as well as on behalf of his colleagues, notably including complaints of racial discrimination. A review of the testimony presented at the Hearing shows that many of the Department's witnesses who testified that they felt the Petitioner's emails were inappropriate were merely offended by his attempts to facilitate a productive discussion among his colleagues on sensitive issues such as race and gender.

3

In the alternative, even if the charges against the Petitioner are taken as completely true, they merely allege that Petitioner occasionally sent rude and/or irrelevant emails to his colleagues, and that no formal disciplinary action was taken by the Department in regards to this conduct prior to the underlying proceedings. At no point was it alleged that the students of the school were affected in any way by Petitioner's actions. For the Department to immediately terminate Petitioner on this basis is indeed shockingly excessive. Moreover, the penalty of termination is disproportionate when considered in light of other more egregious instances in which DOE teachers have not been terminated, even when their misconduct was directed towards students, including cases where teachers physically assaulted students or engaged in sexual activity with students. If the Court declines to vacate the Hearing Officer's decision upholding the charged misconduct, then it is respectfully suggested that the Court must vacate the Hearing Officer's award of termination and remand the case to the Department for the imposition of a less severe penalty." (Verified Amended Petition, Memorandum of Law, Index No. 102017/2016)

Plaintiff's emails were sent in a dropbox, and he unsubscribed anyone who told him to take him/her off of his list after being told that he had to stop sending anything about vocational education. He complied.

But Arbitrator Murphy was focused on termination, and did not consider remediation or progressive discipline. In making a leap from seeing Plaintiff as an excellent teacher, to a permanent miscreant whose fingerprints are flagged as a criminal, Murphy exceeded her already non-existent authority (as cited by Plaintiff in his Motion To Dismiss, and his AFFIDAVIT) to give Plaintiff a penalty of termination. He had a First Amendment right to speak out on issues of discrimination against minority students because his statements were not related to his job, which was teaching children how to work with computers. He was speaking as a public citizen on matters of public concern. His statements were true and timely. Judge Engeron ignored his arguments.

Plaintiff showed that he was discriminated against at his 3020-a by submitting to the Court the case of Francesco Portelos, also a STEM teacher. Portelos was charged with 38 Specifications of harassment of the administration and staff at his school in Staten Island and sending harassing emails. (See Opinion and Award, Declaration, Docket #22, #23, EXHIBIT F).

4

Portelos created, for instance, the school website and refused to allow the Principal on it, and many other bad deeds. Portelos, a white teacher, was given a fine of $10,000 because, his Arbitrator Felice Busto wrote in her decision, he is "a good teacher". (p. 136). Plaintiff is as well, but Plaintiff is Black, and was terminated for deed that were not as evil, malicious and destructive as those of Portelos.

For these reasons Plaintiff put into his complaint state law claims for intentional and negligent infliction of emotional distress, harassment, and tortious interference with contract, as well as a claim alleging that defendants violated N.Y. Civ. Serv. Law § 75-b(1)(b). (Gorenstein, p. 3). He spoke out as a public citizen on a matter of public concern.

On p. 3, Gorenstein writes, "Murphy denied Green's motion to dismiss. "This is true, but there are two arguments made by Plaintiff in his Complaint that Gorenstein neglected to mention in his R&R, and that Plaintiff objects to in Magistrate Gorenstein's conclusions. Plaintiff argues that Murphy did not have Subject Matter Jurisdiction, and argues that the decision of Judge Desmond Green in the case of Rosalie Cardinale is not irrational. Point 2 is the argument made by Plaintiff in the Motion To Dismiss For Lack of Subject Matter Jurisdiction, and here, that he complained about the pre-trial errors of procedural due process as well as the errors made during the 3020-a. Magistrate Gorenstein and all the other decision which have denied the lack of subject matter jurisdiction and procedural errors made in the New York City charging process only mention case law which deals with what Plaintiff's rights are AFTER the hearing begins. Judge Green in the vacating of the termination of Rosalie Cardinale finally addressed the issue appropriately, in that his ruling cited the errors of procedure BEFORE the hearing began. No Motion, Petition or other argument on the issue of the omission of the vote on probable cause has submitted this argument, and no Judge or Arbitrator has addressed these points in their decisions.

Point number 1: Education Law §2590-h does NOT allow the Chancellor to vote on probable cause for any 3020-a hearing, and does NOT allow her to delegate the vote to anyone, at the Panel For Educational Policy or anyone anywhere else. The first paragraph of Ed. Law 2590-h says:

"[Eff. until June 30, 2019, pursuant to L.2002, c. 91, § 34 .   See, also, opening par. below.]
The office of chancellor of the city district is hereby continued. Such chancellor shall serve at the pleasure of and be employed by the mayor of the city of New York by contract.   The length of such contract shall not exceed by more than two years the term of office of the mayor authorizing such contract.   The chancellor shall receive a salary to be fixed by the mayor within the budgetary allocation therefor.  **He or she shall exercise all his or her powers and duties in a manner not inconsistent with the city-wide educational policies of the city board.**
The chancellor shall have the following powers and duties as the superintendent of schools and chief executive officer for the city district, which the chancellor shall exercise to promote an equal educational opportunity for all students in the schools of the city district, promote fiscal and educational equity, increase student achievement and school performance and encourage local school-based innovation, including the power and duty to:
Clauses (19), (38) and (38a)(emphasis added)

The updated Law, Effective June 30, 2019 has the same no-vote mandate:

**"He or she shall exercise all his or her powers and duties in a manner not inconsistent with the policies of the city board." (emphasis added)**

The Preamble of the Bylaws of the New York City School Board (Panel For Educational Policy, "PEP") which Plaintiff already submitted to this Court (Docket #22, #23), also prohibits the Chancellor from a vote:

"The members of the Panel for Educational Policy are appointed according to law as follows: one member is appointed by each Borough President and eight members are appointed by the Mayor. Each Borough President's appointee shall be a resident of the borough for which the borough president appointing him or her was elected and shall be the parent of a child attending a public school within the City School District. Each mayoral appointee shall be a resident of the city and two mayoral appointees shall be parents of a child attending a public school within the City School District. The parent members shall be eligible to continue to serve on the City Board for two years following the conclusion of their child's attendance at the public school. **The Chancellor shall serve as a non-voting ex-officio member of the Panel for educational Policy.** The Panel shall also include two non-voting student advisory members selected by the Chancellor's High School Advisory Council. All members serve at the pleasure of the official who appointed them."
(emphasis added)

6

Nowhere, in any statute that Plaintiff has read in any Motion To Dismiss from the Department offered in his matter is there any statement that says the Chancellor has a vote on the school board, and can delegate this vote; nor is there any clause in any statute that gives the Chancellor the right to determine probable cause with or without an Executive Session, and/or delegate this finding of probable cause to a Superintendent or anyone else, including a principal.

On pp. 10-11 of his R&R Magistrate Gorenstein wrote:

"Numerous state courts have interpreted these sections of the law as giving the Chancellor the authority to delegate the process of preferring charges against tenured teachers to the District Superintendent, who in turn may delegate that authority to local school principals. ......
We discuss these arguments only to the extent necessary to dispose of this motion."

Magistrate Gorenstein is correct, all the Petitions and Complaints heard in the Courts and at 3020-a arbitration citing the charging process of Ed. Law §3020-a(2)(a) have been denied in the same manner as seen in Gorenstein's R&R, by obfuscating the Laws and writing decisions with defective conclusions.

On pp. 8-10 Magistrate Gorenstein cites the very same false information that Plaintiff here, and Plaintiffs and Petitioners in all other cases up to the correct decision of Judge Green in the case of Rosalie Cardinale have objected to: The Chancellor cannot determine probable cause or delegate this determination to anyone. The Chancellor can delegate to the Superintendent any other duties and responsibilities, but not the determination of probable cause.

Shockingly, Magistrate Gorenstein uses the Education laws to obfuscate the issue of the delegation of authority to determine problem code in the discipline process. His goal seems to be to make his conclusion that Plaintiff is simply, wrong, and dismiss the Complaint without any rational basis.

Most importantly, the intention of the New York State legislature is clear. There can be no total control of the discipline process by the Chancellor. The determination of probable cause cited in

Education Law §3020-a(2)(a) and served in the charges received by Plaintiff on is sacrosanct. The references to Ed.Law §2590-h as superseding Ed. Law §3020-a(2)(a) remains impermissible.

Point number 2: Plaintiff submitted a notarized AFFIDAVIT more than 5 days before his 3020-a began, as the law requires. In his AFFIDAVIT he swore to the fact that he never waived his rights to Education Law 3020-a(2)(a), where probable cause was determined by a vote at an Executive Session of the PEP with a majority of the members voting yes, if there was probable cause for the charges, or no if there was not. At the same time, more than 5 days before the pre-hearing in his case, he submitted a Motion To Dismiss For Lack of Subject Matter Jurisdiction wherein he repeated again that he never waived his rights to due process in the charging process as cited in Education Law 3020-a(2)(a), and he knew that his Union never waived his Constitutional Rights to the charging procedures, either. Therefore, the Arbitrator had no Subject Matter Jurisdiction to proceed with the hearing. Murphy never mentioned the AFFIDAVIT, and never dismissed it. Magistrate Gorenstein never mentioned the AFFIDAVIT either. However, as the charging procedures cited in Ed. Law 3020-a(2)(a) are sacrosanct but the Department never submitted a written waiver of the Plaintiff's right to the procedures cited therein, the rule of law remains the vote on probable cause by the PEP members in an Executive Session. Yet this vote never occurred. See Declaration documents #A, C, D, E, J, M in the docket at #22 and #23.

Education Law §3020-a (3)(c)(iv) states:

" Any pre-hearing motion or application relative to the sufficiency of the charges, application or amendment thereof, or any preliminary matters shall be made upon written notice to the hearing officer and the adverse party no less than five days prior to the date of the pre-hearing conference. Any pre-hearing motions or applications not made as provided for herein shall be deemed waived except for good cause as determined by the hearing officer."

Thus, the only actions Arbitrator Leah Murphy could have taken at the pre-hearing would have been to put the hearing on hold until the charges were properly submitted to the PEP for a vote in an Executive Session; or, dismiss the charges as a product of a defective charging process. Instead, Murphy dismissed the Motion To Dismiss For Lack of Subject Matter Jurisdiction. Murphy actually had no authority to take any action whatsoever, including dismissing the Motion submitted by the Plaintiff.

On p. 6 Gorenstein cites the Standard of Review Under Fed. R. Civ. P. 12(b)(6)

"To survive such a motion, a complaint must contain sufficient factual matter, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). As the Supreme Court noted in Iqbal,
[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

And,

"[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Federal Rule of Civil Procedure 8(a)(2) because it has merely
"alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'"

Plaintiff argues here that he has offered more than adequate proof in the law governing this Court as well as his claims to show he is entitled to the relief requested, namely his right to employment with the Department as a teacher in good standing.

Magistrate Gorenstein also states: "A pro se litigant is "'entitled to special solicitude'" and his pleadings should be read "'to raise the strongest arguments that they suggest.'" (citations omitted).

9

Plaintiff argues he has met the Standard to have his Complaint move forward to trial.

On p.8 Magistrate Gorenstein described the process whereby the Arbitrators are chosen for each hearing, and dismisses Plaintiff's claim that since he was not permitted to choose his arbitrator that his right to do so under Ed. Law § 3020-a(3)(a) and §§ 3020-a(3)(b)(ii)-(iii) his right to choose was denied to him, to his detriment.

Plaintiff does not object to Magistrate Gorenstein's conclusion that Plaintiff's claims are not barred by res judicata nor collateral estoppel. (R&R, pp. 13-14)

Plaintiff also does not object to Magistrate Gorenstein's view of Plaintiff's Complaint as including, on p. 14, the following:

> (1) a First Amendment retaliation claim, see Compl. ¶ 35; (2) a Fourteenth Amendment procedural due process claim regarding the manner in which his section 3020-a hearing was conducted, see id. ¶¶ 35, 48-52; (3) an Equal Protection Claim under the Fourteenth Amendment based on the fact that teachers in New York City are subject to different termination procedures than teachers in other parts of New York State, see id. ¶ 44; and (4) a due process "stigma plus" claim based on Green's claims of reputational harm, see id. ¶¶ 10, 19.4

This conclusion by Magistrate Gorenstein is not objected to.

Plaintiff objects to Magistrate Gorenstein's dismissal of Plaintiff's claims as to municipal liability and former Chancellor Carmen Farina's official liability in creating the harm cited in Plaintiff's Complaint. (R&R, pp. 15-19)

Magistrate Gorenstein cites Monell v Department of Social Services, 436 U.S. 658 (1978), for the argument that a municipality may be treated as a "person" for the purpose of § 1983 claims "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." (citations omitted). Gorenstein wrote: "To prevail on a Monell claim, a plaintiff must show "(1) actions taken under color of law; (2) deprivation of a constitutional or

10

statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury…..the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."

He continues to discuss how a single incident cannot prove a Monell liability, and says that there must be "proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Where did Magistrate Gorenstein see that Plaintiff wrote this happened only to him? Plaintiff argues this is a pattern and practice of the Department for 17 years.

To establish the existence of a policy, the plaintiff must allege one of the following:

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a "custom or usage."

Plaintiff argues that he has shown that the omission of a vote in an Executive Session by the PEP in the charging papers for §3020-a arbitration in New York City is a policy followed by the New York City Department of Education endorsed by the City of New York, this omission harmed him and denied him the proper determination of probable cause pursuant to Ed. Law §3020-a(2)(a) ("the tenure law"), and this policy has been so widespread throughout the past 17 years of the 3020-a hearings in New York as to constitute a "custom".

Plaintiff does not object to Magistrate Gorenstein's statement that

"We accept that Green has alleged that there was a municipal custom or policy of using the procedures to conduct the 3020-a hearing that he asserts violate procedural due process and the Equal Protection clause. See Compl. ¶¶ 35, 44, 48-52. While less clear, we will assume arguendo that he properly alleges there was a municipal policy of keeping a list of employees who have been charged with infractions or who "spoke out about wrongdoing by administrators," the basis for his "stigma plus" claim" (R&R, p. 16).

11

However, Plaintiff does object to the statements that follow, on p. 17:

"As to all other federal claims, however, there are no allegations of an unconstitutional City policy or practice. Instead, the allegations are that DOE singled Green out for mistreatment. Accordingly, all claims against DOE and FarinÞa in her official caapcity — other than the due process, Equal Protection (as to the New York City/non-New York City distinction), and "stigma plus" claims — must be dismissed."

Former Chancellor Carmen Farina was, as were her predecessors, an integral part in the claim that she could delegate her duties and responsibilities given to her by the school board. The Department wrongly extended this authority to the determination of probable cause. This policy, which Plaintiff argues never existed, has terminated hundreds, if not thousands of teachers over the past 17 years, including the Plaintiff, since Mayor Bloomberg took control over the Department of Education. Plaintiff was never a class of one in this procedural lawlessness. On p.18 Magistrate Gorenstein is correct that Plaintiff argues his due process rights were denied to him because his principal allegedly "found" probable cause, then came into his 3020-a hearing and testified to Plaintiff's misconduct, already "found" by him (Prober) to be valid. Plaintiff also argued that his procedural due process rights were violated because charges against him were brought by his principal rather than by a vote of the Executive Session of the school board as contemplated in N.Y. Educ. Law § 3020-a. Compl. ¶ 28. He also agrees with Gorenstein that he was improperly prevented from participating in the selection of the arbitrator for his 3020-a hearing.

However, Magistrate Gorenstein again obfuscates the procedures which Plaintiff is complaining against, and writes on p. 19:

"Under the Due Process Clause of the Fourteenth Amendment, before a tenured public employee can be terminated, the "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present

12

employer's evidence, and an opportunity to present his side of the story," Cleveland Bd. of Educ., 470 U.S. at 546." Magistrate Gorenstein then showed his real purpose in writing his Report, to dismiss Plaintiff's due process arguments on the merits.

Plaintiff continues to object to the improper determination of probable cause as seen in the charging documents where the Notice of the Determination of Probable Cause Pursuant to Education Law 3020-a cites the procedures available to all tenured teachers brought to 3020-a hearings, except in New York City where the vote is simply ignored, missing. (Docket #23, EXHIBIT E). This gives Principals who "find" probable cause the right to tell an Arbitrator that the tenured charged educator is guilty of the misconduct/incompetency, and the Arbitrators have to agree. The bar against bias is lowered, and the neutrality of the Arbitrator is destroyed. They must give advantage to the Department. Thus, any principal who does not like an employee for some or any reason, can "find" probable cause for baseless claims against the employee, who is then charged. This is unfair, and denies all charged employees a fair hearing. Judge Green in Richmond County agrees, and Plaintiff agrees with him. The remedy is simply to provide the PEP with the charges and have the Executive Session and a vote on probable cause. Not to do so makes no sense.

Plaintiff objects to Magistrate Gorenstein's dismissal of his Equal Protection claim. (R&R, p. 20). He wrote,

"we will uphold forms of state action under the Equal Protection Clause so long as the classification at issue bears some rational relationship to a legitimate state interest. On the other hand, where a suspect class or fundamental right is at issue in the classification, we apply a more searching form of scrutiny. . ."

Suspect classification refers to a class of individuals that have been historically subject to discrimination. Plaintiff, an African American senior teacher and male, is in that class. He objects to Magistrate Gorenstein's finding that there was a legitimate governmental purpose in

14

treating New York City teachers the way that the Department did, without a proper vote in an Executive Session of the PEP. (R&R p. 22-23). On this point, it is important to make note of the fact that Assistant Principals and Principals charged with 3020-s misconduct or incompetency in New York City ARE permitted to choose the arbitrator in the manner cited in the law.

Plaintiff combines the errors of lawful procedure with his tenured employment and the fact that he is a Black male teaching in a white-dominated education world, and his termination shows discrimination and violations of law, including Equal Protection under the Fourteenth Amendment.

Plaintiff objects to Magistrate Gorenstein's dismissal of his claim to harm from the "Stigma Plus" discrimination caused by the "Problem Code" on his fingerprints and personnel file.

On pp. 24-25 of the R&R Magistrate Gorenstein wrote:

"Thus, to plead a "stigma plus" claim, a plaintiff must allege "(1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.'" Velez, 401 F.3d at 87 (quoting Doe v. Dep't of Pub. Safety ex rel. Lee, 271 F.3d 38, 47 (2d Cir. 2001)). In addition, "[t]he defamatory statement must be sufficiently public to create or threaten a stigma." Id.

Here, the allegations of the complaint do not show that any allegedly false statement about Green was published to anyone outside of the DOE....

Indeed, as far as can be determined from the complaint, the lists and codes referred to are entirely internal to the DOE. The absence of any claim that these lists and codes are communicated to potential employers is fatal to Green's "stigma plus" claim."

(R&R pp. 24-25)

The statements made by his accusers and the Arbitrator in the Opinion and Award issued by Leah Murphy at the close of Plaintiff's 3020-a hearing are public record. Any reporter or member of the press can get this defamatory document, as can any member of the public who files a Freedom of Information request.

15

Additionally, all principals may access Plaintiff's status as terminated and on the "Problem Code" list simply by clicking into the Galaxy program open to all Principals. Finally, Plaintiff must fill out an application form for any position he applies for, and must check off the box "terminated". How does he explain that he was exercising his rights to the First Amendment as a tenured educator, with the extreme damage caused by his placement on the "Problem Code" as detailed in Murphy's decision? The answer is, he is forever blocked from using his teaching license in New York City because of the false charges and the stigma plus harm he has received.

The Office of Personnel Investigations tell anyone who goes to them to try to get off this list that they will "never" be removed. This makes no sense.

He has met the lawful standard to claim damages due to a Stigma Plus cause of action.

Plaintiff objects to Magistrate Gorenstein's dismissal of his State Law claims based upon the arguments presented by the Defendants in this action. The continuing wrong enacted by Defendants as detailed in his Complaint and here have never been addressed nor has Plaintiff received any kind of relief. As a matter of justice, he asks that these damages to his life and career be remedied by this Court.

Plaintiff believes that he has made a valid claim to a cause of action for denial of his Due Process rights under the Fourth Amendment. He will submit the Objections, and also will submit an Amended Complaint to your Honor on or before August 31, 2019.

Dated: August 12, 2019

_____
Rupert Green