UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

DR. RUPERT GREEN,

                Plaintiff           DOCKET NO. 18-CV-10817 (AT)(GWG)

   -against-

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK; and THE UNITED
FEDERATION OF TEACHERS,

                Defendants

_____x


# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS



Dr. Rupert Green
Plaintiff Pro Se
205-26 113th Avenue
St. Albans, N.Y. 11412

917-601-6425

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................2

PRELIMINARY STATEMENT.......................................................5

STATEMENT OF FACTS...................................................... ......7

ARGUMENT.............................................................................19

    POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE
        DOCTRINES OF COLLATERAL ESTOPPEL OR RES
        JUDICATA...................................................................19

    POINT II: A PROPER AND LAWFUL DETERMINATION OF
        PROBABLE CAUSE IN 3020-A ARBITRATION MUST
        BE VOTED ON BY THE PEP IN EXECUTIVE
        SESSION....................................................................22

    POINT III: THE FIRST AMENDMENT RETALIATION CLAIM
        IS VALID...................................................................32

    POINT IV: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS
        MUST SURVIVE THE MOTIONS TO DISMISS.....................38

    POINT V: THE UFT COLLABORATES WITH THE NYC
        DEPARTMENT OF EDUCATION TO DENY TENURE LAW
        RIGHTS FOR A FAIR 3020-A HEARING..............................42

    POINT VI: THE COURT SHOULD EXERCISE SUPPLEMENTAL
        JURISDICTION...........................................................46

    POINT VII: THE NEW YORK CIVIL SERVICE LAW §75-B CLAIM
        SHOULD NOT BE DISMISSED........................................46

CONCLUSION.........................................................................47

# TABLE OF AUTHORITIES

Aetna Ins. Co. v. Kennedy, 301 U. S. 389, 393 (1937) ........................................29

Benedict v. Town of Newburgh, 95 F. Supp. 2d 136, 143 (S.D.N.Y. 2000).................36

Breithaupt v. Abram, 352 U.S. 432,435 (1957)...................................................41

Cardinale v NYC Department of Education, Index No. 85165/2017 (March, 2018).......13

Carnley v. Cochran, 369 U. S. 506 (1962)……………………………………………..30

Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d 158, 164………………………………..35

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985]………………… 30

Connick v. Meyers, 461 U.S. 138, 147-148 (1983)…………………………………15

City of Sacramento v. Lewis, 523 U.S. 833, 847  (1998)…………………………………41

Davis v. Goord, 320 F.3d 346, 354 (2d Cir.2003)…………………………………………36

Dwares v. The City of New York, 985 F.2d 94, 100 (2d Cir. 1992)……………………..34

Education Law §2590-h……………………………………………………………….5

Education Law§§§ 3012, 3012- a…………………………………………………….30

Education Law §3020-a(2)(a)…………………………………………………………..11

Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008)………………………………39

Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009)……………………………………37

Faulks v. City of Hartford. 2010 WL 259076.(2010)……………………………………39

Fierro v. New York City Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014)….39

Garcetti v. Ceballos, 547 U.S. 41O (2006)………………………………………15, 32

Gentile v. Nulty. 769 F. Supp. 2d 573, 583 (S.D.N.Y. 2011)………………………………39

Green v. N.Y.C. Bd./Dept. of Educ., Index 102017/2016……………………………………15

Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d
274,654 N.E.2d 95 [1995]……………………………………………………….29

Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981]………..30

Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011)……………………………………………36

Johnson v. Zerbst, 304 U. S. 458, 464 (1938)……………………………………………29

Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001)…………41

Kamholtz v. Yates County, 350 Fed.Appx. 589, 591 (2d Cir.2009)…………………………39

Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999)…………………………………………35

Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003)…………………………37

Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450.....30

Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446..............30

Matter of Schumer v. Holtzman, 60 N.Y. 2d 46,51...............................................27

Matthews v. City of New York, 488 Fed Appx. 532, 533 (2nd Cir. 2012)....................36

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-692 (1978).........36

Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999)............................................37

Mosdos Chofetz Chaim. Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697 (S.D.N.Y. 2011)...................................................................................40

Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014)......................40

New York Civil Service Law§ 75-b...........................................................46

New York State Open Meetings Law Section 105.........................................24

Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968).15

Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999).........................37

Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014 WL 3547374....................................................................................35, 47

Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001)....................37

Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012)...................................................33

Rusk v. New York State Thruway Authority, 2014 WL 3891624, (W.D.N.Y. 2014)...46

Shekhem' El-Bey v. City of New York. 419 F.Supp.2d 546, 552 (S.D.N.Y.2006)............37

Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008).................................35

Sloup v. Loeffler, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. 2008).........................39

Smith v. City of N.Y., No. 15-cv-4493 (RJS).....................................................34

U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003)................................................20

Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013).......40

## PRELIMINARY STATEMENT

Plaintiff Dr. Rupert Green commenced this action to correct an injustice of constitutional proportion when, as a STEM teacher, UFT leader, and proponent of vocational education, he uncovered and reported via emails, telephone calls and complaints the misconduct occurring within his public school the "Coop Tech" staff, and then he was charged with nine Specifications of misconduct. Even though Plaintiff by all accounts is a stellar teacher, as a Black man he did not have the right to speak on issues of public concern in the political arena created by the Defendants. Black teachers in general and Black male teachers specifically have been targets for 3020-a charges, retaliation and harassment by white Supervisors at the NYC DOE for many years. (The Gulino Litigation, 96-CV-8414).

The United Federation of Teachers ("UFT"; "Defendant") and the New York City Department of Education ("NYCDOE"; "Defendant") have colluded together in order to prioritize politics over tenure rights. Neither the UFT nor the Department assisted Plaintiff at any time. A public education agency and the teacher's union are partners in a game of secrets and deals that leave Black male teachers without their lawful rights.

The gravamen of these charges, which were brought to a compulsory hearing known as 3020-a arbitration, basically attacked Plaintiff for a portion of the emails he sent over 15 years about the education issues he believed important, as well as for his reporting of the improper relationship of two of Coop Tech's employees. Plaintiff's complaints pale in comparison to the harassment and abuse perpetrated by teachers Francesco Portelos and Seung Yong Ok, both charged with 3020-a internet policy abuse (see NYC DOE Internet Policy, EX. C) and neither man was fired. Francesco Portelos is white and Seong Yong Ok

is Asian. (See Declaration, EXHIBITS N, O). Mr. Portelos filed a PERB complaint for receiving unsatisfactory ratings in retaliation for his whistleblowing after he finished his 3020-a, and he won his case in 2017. PERB then demanded that the NYC DOE post Portelos' win on the retaliation claim, in every school. The NYC DOE did not do this, so Portelos had to go to Court to get a ruling to force the Department to post the Notice. Portelos won a ruling, and the NYC DOE was forced to post the Notice. See "Judge Slaps DOE for Burying Rebuke Of Its Action Against Whistleblower", The Chief Leader, January 10, 2020, https://thechiefleader.com/news/news_of_the_week/judge-slaps-doe-for-burying-rebuke-of-its-action-against/article_12ef81fe-33c7-11ea-b842-c7649eba41f7.html.

The NYC DOE retaliates against any employee who cites wrong-doing by an agency administrator, but internet charges do not lead to termination unless the teacher is Black. Plaintiff, a tenured Black teacher with a stellar teaching record, is in this protected class of employees. Arbitrator Leah Murphy was a partner in punishing Plaintiff, a Black male. She would not permit the Department to give Plaintiff access to his "good" and "educational" emails even though these emails were sent during the charged period, and the content of these emails had relevant and material information to show that Plaintiff was not an arrogant miscreant, as Arbitrator Leah Murphy believed (or was told to believe). See EX. B. Murphy also ignored the fact that Plaintiff, after being told by Principal Widlund that a few white staff members were getting unhappy that they were receiving his emails, put his philosophical and political thoughts into a Dropbox, so all staff could decide on their own whether or not they wanted to read them. If not, they simply put the Dropbox entry into trash, and that was it. Their choice. Most of the Black staff members believed that Plaintiff's emails were not harassing in any way. Murphy did not see the race war that was boiling at

COOP TECH. She was pre-disposed not to see it. See EX. K.

Thus the 3020-a Specifications were not the 'real' charges.

Plaintiff was blowing the whistle on the lack of funding and resources for minority students in District 79 vocational education and the non-Black staff did not want to read about these issues. Additionally, Plaintiff knew that a teacher and the Secretary to the Principal were living together and the Secretary, Alicia Konzie, was giving per session time and money to her boyfriend/husband when others at the school were not getting these jobs. They did not get clearance from the Conflicts of Interest Board (COIB).

Teacher Lin Fernandez was angry at Plaintiff for complaining about a dance he performed at graduation, so he made up that Plaintiff was alleging a relationship between the Secretary to the Principal, a woman, and the Principal herself, also a woman, in order to upset just about everyone at the school, who all knew this was a lie. (EX. B, emails pp. 13-14).

But SCI went forward with substantiating the lie because they never interviewed Plaintiff. See EX. D. This lie became the standard statement for the witnesses interviewed by the Special Commissioner of Investigations so-called "investigator", and 3020-a Arbitrator Leah Murphy found Plaintiff guilty of the false allegation, and terminated him. Teachers with computer misuse and charges who are not Black do not meet the same fate at 3020-a. See EX. N, O.

Plaintiff also cited the fact that there is an error of law in the charging process for tenured teachers such as himself, a fact that no Department or United Federation of Teachers Representative wants to acknowledge, but Judge Desmond Green in Richmond County Supreme Court did, in March 2018 in the case of Rosalie Cardinale. See Declaration, EXHIBITS M, I., G.  Both the UFT and the NYC DOE refuse to support any alternate

explanation to the omission of a vote on Probable Cause other than that this was bargained away. See NYSUT letter, EX. D, which Plaintiff first saw last month. Indeed, this Court also glossed over the wrongful procedure and the law.

Plaintiff argues that he submits this opposition to Defendants' motion to dismiss/for summary judgment, in order to explain that there are numerous triable issues of material fact regarding his claims of retaliation, denial of freedom to speak, and violation of tenure rights by the Defendants' claims that warrant a trial before a jury in this case.

STATEMENT OF FACTS

Plaintiff clearly has a triable retaliation cause of action based on the fact that he had an absolutely clean and satisfactory performance record for more than 15 years of teaching until he was forced into a 3020-a hearing after investigators from SCI found him guilty of harassing staff – white staff – and allegedly complaining about the improper appointment of Principal Corey Prober and a secret relationship between the Secretary to the Principal and Principal Anda McGowan, which was false. SCI found him guilty of the false allegation, as did Arbitrator Murphy, who ignored Plaintiff's testimony that the allegation was false. This false claim was validated by SCI due to the fact that NYSUT Attorney Andrew Stoll never permitted Plaintiff to be interviewed by the investigator in his 3020-a charges, but Plaintiff was not notified of Stoll's actions. Had a proper investigation been done, the claim of a lesbian affair would have been unsubstantiated. (See Declaration, EXHIBITS B, D, K). NYSUT and the UFT secretly denied Plaintiff the right to be interviewed by the investigators. Plaintiff was not told beforehand that NYSUT Attorney Andrew Stoll told SCI that Plaintiff refused to be interviewed, resulting in the subsequent termination of Plaintiff on the basis of a false accusation. Plaintiff had the facts on a secret liaison between

Secretary Alicia Konzie and teacher Mr. Carlos Caraballos and was retaliated against by the administration. Plaintiff felt it was his duty as a private citizen to report on matters of public concern, and also complained about the unlawful sharing of benefits by the couple - the husband-wife team of Alicia Konzie, Secretary to the Principal, and Carlos Caraballos, teacher - who gave favors to each other yet had not requested a waiver from the Conflict of Interest Board (COIB) and were violating Chancellor's Regulations C-110, Section IV.  Teacher Lin Fernandez deliberately and maliciously called SCI to investigate the false lesbian relationship claim after Plaintiff complained about improper actions of Mr. Fernandez at graduation exercises. (See Declaration EXHIBIT B, pp. 13-14). All the sustained 3020-a charges (Specifications 1-7) were based upon retaliation for Plaintiff exercising his first amendment rights. See EXHIBIT N, Portelos' PERB Notice; see also the Gulino Litigation where 8300+ Black and Latino teachers were forced to take the LAST test before obtaining a license to teach:

"The Court also found that as a result, the DOE had violated Title VII by requiring plaintiffs to pass the LAST in order to receive a teaching license. The plaintiffs' complaint in this case is not based on a theory of intentional discrimination. Rather, the plaintiffs have alleged, and the Court found, that the DOE was liable for making employment decisions based on the state's exam under a "disparate impact" theory of discrimination."

After a stellar career working with both staff and students to enrich the lives and minds of his students, (See Declaration, EXHIBIT E, John Widlund's recommendation for Plaintiff in 2013)  suddenly Plaintiff was served 3020-a charges on or about April 22, 2016. (Declaration, EXHIBITS G, H, I, J, K). Corey Prober, not the Panel For Educational Policy ("PEP", the New York City School Board) mysteriously "found" probable cause, and the

Department's Delegation Memo does not give him the right to determine probable cause. (See Declaration, EXHIBIT G, and the Delegation Memo submitted by the NYC DOE in opposition to Plaintiff's Motion To Dismiss For Lack of Subject Matter Jurisdiction). Thus Prober became the accuser, found probable cause for the charges, and came to the hearing as a witness and testified about the charges. Prober had too many roles in this matter. He did not like Plaintiff because of the complaint Plaintiff made to Jacklyn Vargo, at the Office of Special Investigations about Prober being appointed without the proper procedure, a C-30. See Declaration, EXHIBIT B.

Plaintiff filed for a hearing at the UFT and when he spoke with a NYSUT Attorney, he was told he should resign. Until he met with Corey Prober to discuss the SCI Final Report, he did not know that the NYSUT Attorney appointed to represent him, Mr. Andrew Stoll, told SCI that he, Plaintiff, would not meet with the investigators. See EX. D, letters to SCI on December 4, 2015 and February 25 2016. Mr. Stoll never told Plaintiff that he spoke with SCI and told them he would not bring in Plaintiff for an interview. This makes no sense. Of course Plaintiff wanted to speak to the SCI investigators. He did not want to take a 5th Amendment right to be silent, because he did nothing wrong. See the NYC DOE Internet Policy, Declaration EXHIBIT C. Mr. Stoll denied him his rights without notice.

Plaintiff then hired Attorney Jonathan Behrins and Ms. Betsy Combier to assist at his 3020-a arbitration. Attorney Behrins informed him that the charging procedures were unlawful. Plaintiff notarized an Affidavit on May 2, 2016, saying that he did not waive his right to an Arbitration based upon the prevailing law, Education Law 3020-a(2)(a). See Declaration, EXHIBIT A. Attorney Behrins submitted a Motion To Dismiss For Lack of Subject Matter Jurisdiction to Arbitrator Murphy on May 16, 2016. See Declaration, EXHIBIT I .After

more than 5 days, Plaintiff's hearing began. Attorney Behrins requested an adjournment so that the EEOC could finish their investigation of Plaintiff's Complaint sent to them about what he saw happening at COOP TECH. (See Declaration, EXHIBIT F) but Arbitrator Murphy denied this application, saying that she needed to finish the hearing and quickly, according to the calendar days she had arranged with the Department and the UFT. (See video, https://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html).

Plaintiff's 3020-a hearing started in May 2016, at the same time that he received a letter from the United States Department of Education Office of Civil Rights telling him that they would be investigating his complaint. (Declaration, EXHIBIT F). The Arbitrator, Attorney Leah Murphy, was clearly biased against this outspoken African American male teacher and UFT leader. She fired Plaintiff in a decision dated December 9, 2016 for no legitimate reason, thus denying him any credit for his 15 years of excellent service to the Department and children of New York City, ignoring his right to speak as a private citizen on a matter of public concern pursuant to the First and Fourteenth Amendment of the U.S. Constitution, and doing all this damage without proper procedures finding probable cause pursuant to Education Law §3020-a(2)(a).

Throughout her decision (Declaration EXHIBIT K) Murphy, who is white, was malicious and insulting to Plaintiff, and showed that she was not a neutral arbitrator in this case. For example on p. 117:

"Rational ideas on how to best address racial divisions in the school were not available to Respondent, who proved himself unable to see beyond his own agenda…. The Respondent's extensive presentation of his and his witnesses' grievances against the Department - some that date back to 2001- self-identified him as chronically suspicious and conspiratorial.."

Arbitrary Murphy clearly did not like Plaintiff from the first day of the hearing, and this is

another strike against the validity of her termination of Plaintiff. See Principe v N.Y.C.

Dep't of Educ., Principe v. N.Y.C. Dep't of Educ., 2014 N.Y. Slip Op. 30088 (N.Y. Sup. Ct.

2014) wherein Judge Alice Schlesinger cited the extreme decision to terminate teacher/Dean

Peter Principe must be vacated and a lesser penalty given, after the Arbitrator showed bias

against Mr. Principe.

At the same time that Plaintiff started his 3020-a, in May 2016 a video and statement by

Defendant former Chancellor Carmen Farina with a transcript was posted online on a blog

called NYC Rubber Room Reporter. The article,

**"The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE**
**Partnership of Harm For Charged DOE Employees**
https://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html

was created May 28, 2016 by Betsy Combier, Editor of the blog and also part of Plaintiff's team

helping him at his 3020-a hearing. Former Chancellor Carmen Farina states openly that the

arbitrators and attorneys for NYSUT and the Department of Education are "her army", that speed

should be the most important criteria, not rights, and that she is the person who was the chief

administrator/boss of these teacher discipline hearings. She signed the Delegation Memo in 2014

that supposedly delegated the finding of probable cause from her to anyone she picked, but no

probable cause was mentioned (EX. G)

Plaintiff appealed the decision of Murphy to the New York State Supreme Court in

Manhattan, and Judge Engoron did not address any of the federal questions presented here,

except for the Motion on probable cause, where he simply adopted the Department's

argument. No Constitutional issues of free speech, public concern, racism, discrimination,

disparate treatment or staff misconduct were discussed at the Court. Judge Engoron denied

the Article 75 without addressing the First or Fourteenth Amendments nor the facts upon

which Plaintiff's emails were based, namely violations of the Conflict of Interest Board (COIB) and misallocation of public funds, the lack of resources going to vocational education, and discrimination. And, the so-called "harm" to staff as a result of his actions was never more than a baseless claim and no proof was given.

Plaintiff disagrees with the NYC DOE and prior denials of the Motion he submitted for lack of subject matter jurisdiction because nowhere in Education Law 2590-f nor any Delegation Memos is the phrase "probable cause" mentioned. (EX.G) Preferring/initiating charges is not the same as determining probable cause.

Additionally, a point that will be discussed further below, Education Law §3020-a(2)(a) **does apply to New York City:** The Delegation Memo has no mention of probable cause, and the delegation was never changed to give in clear language the authority to determine probable cause as per the instructions in Garzilli v Mills (Matter of Garzilli v. Mills, 250 A.D.2d 131 (N.Y. App. Div. 1998) . (*Emphasis added*) Therefore the Chancellor cannot delegate a vote in Executive Session because he/she was never given the authority to vote on any issue (PEP Bylaws, EX. J) or delegate the determination of probable cause. This Court and other Courts have ruled that Respondents brought to 3020-a do get all the due process they are owed, namely to testify, bring witnesses and receive proper Notice. These rights, however, address what happens after the hearing started. The issue of whether or not the 3020-a arbitration properly determines probable cause is a jurisdiction problem which occurs BEFORE the hearing and due process rights at the hearing, begin.

On March 29, 2018, Richmond County Judge Desmond Green ruled in the case of Rosalie Cardinale v New York City Department of Education (Index No. 85165/2017) that the lack of proper procedures in filing the charges pursuant to Education Law §3020-a(2)(a) did,

13

indeed, deny Ms. Cardinale her Constitutional rights to due process, and he vacated her termination. (See Declaration, EXHIBIT M). Defendants do not mention the Cardinale decision in their Motion To Dismiss, and therefore cannot oppose Plaintiff's claim to a lack of due process for him at his 3020-a hearing and a lack of subject matter jurisdiction for Arbitrator Murphy.

Plaintiff filed the Complaint reviewed herein to address his Constitutional right to speak on matters of education, segregation, and wrongdoing within the Department, as well as the denial of his rights by the Defendants pursuant to the decision of Judge Green in the Cardinale case.

Plaintiff knew that his information was not going to be received with great happiness, but he was speaking as a private citizen on a matter of public concern and he believed that he had the protection of the U.S. Constitution behind him.

A well-known 3020-a arbitration decision on sending emails and disrupting a school was made two years before Arbitrator Murphy made her decision in Plaintiff's 3020-a. The charges brought against STEM teacher Francesco Portelos were decided on April 30, 2014 by Arbitrator Felice Busto, and her decision is attached in EX. N. Arbitrator Busto cited the First Amendment rights of Mr. Portelos many times, and does not rule on any Constitutional protections Portelos had, but rather wrote that Portelos was a private citizen speaking and sending emails as a matter of public concern. (See Opinion and Award, pp. 28, 30, 31, 44, 55, 95-99, 103, 104).

Busto wrote:

"He defends his speech  at the CEC regarding the video  on the grounds that it was a matter of public concern….. The Department maintains that  his speech was disruptive to the Department's operations and  outweighs  any  right  to First Amendment protection under the

balancing test in <u>Pickering v. the Board of Education of Township High School</u>, 391 U.S. 589 (1968).

In <u>Pickering</u> and its progeny, the U.S. Supreme Court articulated a two-part balancing standard to determine whether speech by a public employee is accorded constitutional protection. The first question is whether the employee spoke as a citizen about a matter of public concern rather than as a function of his employment duties. Whether speech addresses a matter of public concern depends upon the "content, form, and context of a given statement." <u>Connick v. Meyers</u>, 461 U.S. 138, 147-148 (1983).

If an employee speaks as a citizen with respect to a matter of public concern, the inquiry turns to whether the government's interest as the employer outweighs any First Amendment protection afforded to the speech. See <u>Pickering</u>, supra, 391 U.S. 598 (1968); <u>Garcetti v. Ceballos,</u> 547 U.S. 41O (2006). In other words, "[t]o be protected, the speech must be on a matter of public concern and the employee's interest of expressing [himself] on this matter must not be outweighed by any injury the speech could cause to the 'interest of the state, as an employer, in promoting the efficiency of the public services it performs, through its employees'." <u>Connick v. Meyers</u>, 461 U.S. 138(1983)…..There is no bright line in applying this two-prong standard and each case turns on its facts."( Busto, pp. 96-99)

Portelos was fined $10,000 and sent back to teaching. Mr. Portelos is white.

Seung Yong Ok is a teacher of Asian nationality. His charges of internet misuse and violation of the Department's Internet Policy are arguably more harsh than the charges made against Plaintiff, yet Ok 's 3020-a Opinion and Award punished him with a $500 fine. Plaintiff cites these two cases out of many where the 3020-a arbitrators gave extremely harsh penalties for internet misconduct to Black teachers, but not to Respondents who are white or Asian. This is disparate treatment.

Plaintiff is a black man, a Union member and leader as well as a senior teacher, but he was fired, condemned, given a "no hire" problem code on his file, and forever banned from teaching for sending information and opinions backed by facts in a Dropbox with no malicious intent.

By all accounts, Plaintiff was an excellent teacher and students benefitted from his service.

In the case presented here, the administrators at the Department retaliated against Plaintiff, removed him from his teaching, blocked his NYC DOE emails, and charged him with nine (9) Specifications (EXHIBIT K). In Specification 1, there are 114 emails, all allegedly

"offensive" and "harmful", sent from January 10, 2014 to March 23, 2016. Plaintiff received charges on or about April 22, 2016. His 3020-a compulsory arbitration hearing began on May 16, 2016, and ended with Murphy's decision to terminate Plaintiff on December 9, 2016.

Shockingly, at the start of the hearing, Arbitrator Leah Murphy, Esq. would not give Plaintiff access to all of his emails which, Plaintiff argued, would show the good work he was doing as the STEM Director. She also did not see any value to Plaintiff's remedy for putting his opinions into a dropbox which, Plaintiff testified, anyone with an issue could trash, and not read. (Opinion and Award, p. 122). She omitted from her decision any comments about how people could decide not to read the emails and Plaintiff did not force anyone to read them.

Murphy terminated Plaintiff for his alleged "arrogant and oppositional refusal" to stop sending the emails even though he placed the so-called "thoughts on education" emails in a separate dropbox. The issues of First Amendment rights, NYC vocational education, racism, disparate treatment and the Fourteenth Amendment were never litigated or even discussed. Indeed, Murphy had no authority to rule on any of these issues.

Plaintiff felt it was his duty as a private citizen to report on matters of public concern, namely the unlawful sharing of benefits by the couple - the husband-wife team of Alicia Konzie, Secretary to the Principal, and Carlos Caraballos, teacher - who gave favors to each other yet had not requested a waiver from the Conflict of Interest Board (COIB) and were violating Chancellor's Regulations C-110, Section IV.

Plaintiff was also keenly aware of his "outsider" status as an African-American male teacher at the Department in a vocational high school filled with mostly minority kids who could not, or

did not, succeed in a regular degree-based high school, and were over-age and under-credited. (Second Amended Verified Petition, pp. 3-4). He knew that the Department of Education had a very negative view of minority children and staff, particularly men of color of all ages. Plaintiff, an African American male, taught computer technology at Coop Tech, an alternative site attached to John Adams High School in Queens.

In finding that Petitioner's emails were inappropriate and offensive, the Hearing Officer wrongfully credited the subjective opinions of some Coop Tech staff members who testified that they took offense to Petitioner's emails without providing a reasonable, legitimate basis for offense.

Before the hearing started, Plaintiff submitted an AFFIDAVIT stating that he never waived his right to a hearing that complied with Education Law §3020-a(2)(a) which requires the school board – which in New York City is the Panel For Educational Policy (PEP) – to hold a vote on probable cause in an Executive Session before he is served any charges. See Declaration EXHIBIT J  for the Bylaws of the Panel For Educational Policy. The vote by the PEP never took place. Plaintiff followed up on his AFFIDAVIT (EX. A) with a Motion To Dismiss For Lack of Subject Matter Jurisdiction (EX. I). Arbitrator Murphy denied the Motion saying that the Chancellor had been given all the duties and responsibilities of the school board (PEP) and she, former Chancellor Carmen Farina, could delegate the determination of probable cause to Superintendents.  Plaintiff was never given any notice that Ed. Law §2590-h rather than §3020-a(2)(a) was controlling his hearing, and he never waived his right to have a hearing in compliance with the Education Law 3020-a(2)(a) which was clearly cited in his charging papers. (EX. G)

Another point Plaintiff wants the Court to take Notice of is that the PEP Bylaws (EX.J) do

not give the Chancellor the right to vote on any issue, therefore he/she never can grab this authority and then delegate it to anyone. Also, the Delegation Memo signed by Carmen Farina does not mention probable cause. EX. G. Delegation is mentioned, but only of those duties and responsibilities outside of determining probable cause.

Declaration EXHIBIT H is an AFFIDAVIT written by non-attorney Betsy Combier, who has researched the finding of probable cause in NYC 3020-a hearings. She and Attorney Jonathan Behrins filed the Article 75 Petition for Rosalie Cardinale in Richmond County Supreme Court that vacated the decision of Cardinale's arbitrator Michael Lendino on the issue of the vote on probable cause. See Declaration, EXHIBIT M, decision of Judge Desmond Green in the case of Rosalie Cardinale.

Plaintiff has lived all his life as a Black man and he knows that racism and discrimination exists in New York City, especially evident at the NYC DOE. Even former Chancellor saw it. See the Declaration, EXHIBIT L, where Ms. Farina wrote "Getting More Men of Color To Teach Our Children Will Lift Our Communities". The Gulino Litigation certified class is more than 8300 Black and Latino teachers who, the Court has ruled have been subjected to disparate treatment, The new Chancellor, Richard Carranza, has spoken very often about NYC schools and the "Toxic Whiteness" he sees everywhere. Several white Superintedents are suing Carranza for reverse discrimination (See NYC Rubber Room Reporter, "NYC Chancellor Richard Carranza and His "Toxic Whiteness" Social Justice" https://nycrubberroomreporter.blogspot.com/2019/10/nyc-chancellor-richard-carranza-and-his_31.html) .

The DOE and UFT target black male teachers who speak out while teaching, and terminate each of these teachers at 3020-a, where the procedures used to charge teachers are without support in the Education Law and deny certain Constitutional rights without just cause.

Black male senior teachers are almost always terminated at 3020-a. Two examples of non-Black teachers who blew the whistle at their schools via emails and were not terminated are; Francesco Portelos (given fine of $10,000 for horrific acts of email abuse and harassment of staff; SED #22,380, Arbitrator's Award dated April 30, 2014; Portelos' NOTICE of retaliation by the NYC DOE as per the ruling at PERB, EXHIBIT N) Seong-Yong **OK** (Asian, given a $500 fine and must take professional development; SED #32,199, Opinion and Award dated August 30 2018, EXHIBIT O).

ARGUMENT

POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE<br>DOCTRINES OF COLLATERAL ESTOPPEL OR RES<br>JUDICATA

Defendants argue that Plaintiff's claims presented to this Court are barred by Collateral Estoppel and Res Judicata. They further argue that Plaintiff's claims must be dismissed. This argument fails due to the fact that none of Plaintiff's claims to First Amendment speech, due process pursuant to the Cardinale decision, or protection under the Fourteenth Amendment have been litigated or even discussed by Murphy, Engoron, or Defendants in any prior forum in the termination of Plaintiff.

Lawshelf defines Res Judicata as: "the doctrine of res judicata bars claims that have either been litigated or that could have been litigated from being litigated again".

Collateral Estoppel means that any issues that have been litigated cannot be litigated again. The doctrines of res judicata and collateral estoppel often come into play when a subsequent case, similar to a case already adjudicated, is filed. The rationale behind the doctrines is that an issue or cause of action fully litigated should not be litigated again. Res judicata is often referred to as "claim preclusion". Collateral estoppel is often referred to as "issue preclusion".

Res judicata is raised when a party thinks that a particular claim was already, or could have been, litigated and therefore, should not be litigated again. When addressing a res judicata argument, a court will usually look at three factors. First, the court will consider whether there was previous litigation in which identical claims were raised, or in which identical claims could have been raised. The second factor to be considered is that the parties must be the same parties as those who litigated the original action. The third factor is that the original action must have received final judgment on the merits.

Final judgment does not occur when the case is settled by the parties on their own, or where the judge decides a motion or makes some other determination that does not resolve the case based on the facts and evidence of the case. This means that the final judgment must concern the actual facts giving rise to the claim. Dismissal of a case because the court does not have subject matter jurisdiction, because the service of process was improper, because the venue was improper or because a necessary party has not been joined, for example, are not judgments on the merits. Grants of these types of motions to dismiss really have nothing to do with the facts, except that the litigation is precluded by a technicality. As such, subsequent litigation as to whether the defendant is liable would not be barred.

Collateral estoppel arises when the claim (cause of action) at the bar has not been litigated, but the exact issue that is now before the court has been raised and litigated in an earlier action or proceeding. Collateral estoppel is a bit different than res judicata, although the rationale is the same – it is a tool to prevent re-litigation of issues already litigated. See U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003):

"The collateral estoppel doctrine provides that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'

The requirements that must be satisfied before the doctrine of collateral estoppel is applied are similar to those for res judicata, but there are differences. First, the issues in the first and second litigation must be identical and must have been before a court. Second, the issue must have been actually litigated. Third, a final judgment must have been rendered, ultimately deciding the issue in question.

The first factor is that the issues in the previous and subsequent litigation must be identical. Using the transaction or occurrence test would be too broad for collateral estoppel in most cases. Rather, the court will require that the issues be identical or very similar. When considering the doctrine of collateral estoppel, it is important to note that the subject matter of the subsequent litigation does not need to be the same as the subject matter of the previous litigation for the doctrine to apply. As long as the issue was already litigated, collateral estoppel can apply.

The second factor is whether the issue was actually litigated during the first case. Unlike with res judicata, if the issue could have been raised, but wasn't, the defendant will not be collaterally estopped from raising the issue in subsequent litigation.

The third factor is that the issue must have necessarily been decided on the merits. There are two requirements for this factor. First, the issue must be implicated in the judgment. If an issue is raised in the previous litigation, but the issue is not decided or has no connection to the judgment, then the issue cannot be the target of collateral estoppel. Along these lines is a jury's finding that is not one of the reasons for the judgment. For example, if the plaintiff brought a

negligence action with a two count complaint, with both counts sounding in negligence, but the jury simply finds that the defendant was negligent, the doctrine of collateral estoppel probably cannot be invoked, since it is not clear which issue was the subject of the final adjudication. Second, like res judicata, the issue must have been decided on the merits and not based on a technicality.

It must be noted that 3020-a Arbitration is not a Court, there is no Judge or jury, and rules of evidence, hearsay and other laws are relaxed to the point of being almost nonexistent. Arbitrator Murphy was chosen for Plaintiff's case by the Department of Education, thus there was no wheel to turn for the appointment. Plaintiff had no say in choosing the arbitrator and was not given his due process because Murphy did not have subject matter jurisdiction to decide any issue brought to her attention in the Specifications, and certainly not the Constitutional issues raised here.

Defendants argue in their Motion that:

> "Not only *could* Plaintiff have previously raised his claims regarding Section 3020-a procedures, due process, the arbitrator who presided over his evidentiary hearing, the arbitrator's decision, as well as allegations of retaliation and a desire for "whistleblower" status, these claims indeed were raised, and therefore he is precluded from relitigating those issues in the instant action. *See Saunders,* 2010 U.S. Dist. LEXIS 71500 at *41- 42."

(Motion Memorandum, p. 6)

This statement is blatantly false.

POINT II: A PROPER AND LAWFUL DETERMINATION OF
PROBABLE CAUSE IN 3020-A ARBITRATION MUST
BE VOTED ON BY THE PEP IN EXECUTIVE SESSION

Also astonishingly false is any finality as to the subject matter jurisdiction question of Murphy,

brought to this lawsuit pursuant to the March 29, 2018 decision in Cardinale by Richmond

County Judge Desmond Green.

In the papers with the title "Notice of Determination of Probable Cause on Education Law

§3020-a Charges" served on Plaintiff (EX G), the date of the Executive Session is missing and

there is no information on a vote by the employing board on probable cause. An Executive

Session is mandated by law and cannot be omitted by fiat of the Chancellor, or by any other law,

rule or agreement. At no time did Plaintiff waive his rights to the process (EX. A) as stated in the

charging papers to determine probable cause on his 3020-a charges, with an Executive Session

held by the Panel For Educational Policy ("PEP") before being served the charges. (EX. J,

Preamble). Here, there was no Executive Session and the Defendants did not comply with

Education Law 3020-a.

Education Law §2590-f(t) states:

 "(t) **notwithstanding any provisions of law to the contrary**, to exercise all of the duties and
responsibilities of the employing board as set forth in section three thousand twenty-a of this
chapter pursuant to a delegation of the chancellor under section twenty-five hundred ninety-h of
this article……"

Education Law §2590-h states:

"The office of chancellor of the city district is hereby continued. Such chancellor shall serve at
the pleasure of and be employed by the mayor of the city of New York by contract. The length of
such contract shall not exceed by more than two years the term of office of the mayor
authorizing such contract. The chancellor shall receive a salary to be fixed by the mayor within

the budgetary allocation therefor. **He or she shall exercise all his or her powers and duties in a manner not inconsistent with the city-wide educational policies of the city board. ..."**

Thus all the talk about the Chancellor taking all the duties of the employing board is not true, at least for a vote on probable cause in an Executive Session. The intent of the NY State legislature was clear: keep a third eye on these procedures, and keep the Chancellor from managing the entire process of teacher discipline by him/herself. This is the point that Defendants want this Court to ignore, but Judge Green in the Cardinale case did notice this defect in the Department's omission of a date for an Executive Session in Plaintiff's charging papers. (EX M) The Defendants' Motion To Dismiss must be denied.

Additionally, even if the NYC Chancellor could be given all the duties of the PEP, she/he would still have to hold an Executive Session, and meet with at least one other person as part of an open public meeting. (New York State Open Meetings Law Section 105). This is the key to the failure of the Defendants' Motion To Dismiss presented here. Education Law §3020-a(2)(a), the Tenure Law, protects educators by giving the determination of probable cause to a group rather than to a single person. If a principal signs off on the determination of probable cause, then charges a teacher in his/her school, then testifies at the hearing on the charges for which he/she found probable cause and created, Plaintiff argues that there is no tenure protections given to him. This is, indeed, what happened here to Plaintiff at his 3020-a. The obvious reason why the UFT and the Department want to squash this issue is to deter/stop/silence all the charged educators in the past 17 years who have received extreme decisions from arbitrators at 3020-a arbitration without the proper procedures, from filing suit against both the UFT and the DOE for secretly changing – but not correctly, only politically -the procedures mandated in tenure law 3020-a(2)(a).

24

What all the decisions which have denied the validity of the Cardinale ruling in EX. M have

ignored, including this Court, is the fact that the Delegation of authority to determine probable

cause in Education Law 3020-a arbitration from the PEP (school board in NYC) to the

Chancellor, then to the Superintendents and then to principals in New York City is legally

defective. The New York State legislature never put out any law that based the finding of

probable cause specifically on  this delegation from the Chancellor. It just did not happen. Thus,

the delegation of powers from the school board to the Chancellor and then down the line  is

limited to all powers _except_ the determination of probable cause for 3020-a arbitration.

(emphasis added). A review of the Delegation Memo submitted in this matter at the 3020-a

proves that there is no mention of "probable cause".(EX. G)

The case of Garzilli v Mills  (250 A.D.2d 131 (N.Y. App. Div. 1998) cited below in relevant

parts, gives factual support to Plaintiff's arguments:

"Petitioner is a tenured teacher employed by Community School District No. 12 (hereinafter
CSD 12) which is one of 32 community school districts within the jurisdiction of respondent
Board of Education, City School District of the City of New York (hereinafter the City Board).
Respondent Board of Education for CSD 12 (hereinafter the CSD 12 Board), like the other 31
community school boards, consists of nine elected  members and has the power and the duty to
establish educational policies and objectives not inconsistent with those established by the City
Board (see, Education Law § 2590-e).
In November 1997, respondent Superintendent of CSD 12 (hereinafter the Superintendent) found
that probable cause existed and preferred disciplinary charges against petitioner pursuant
to Education Law § 3020-a; the charges brought against petitioner included six specifications
alleging excessive lateness and absences. Petitioner thereafter requested a hearing on the charges
and further requested that respondent State Commissioner of Education (hereinafter the
Commissioner) not proceed with the charges because the CSD 12 Board did not conduct a
probable cause vote as required by Education Law § 3020-a. When the Commissioner informed
petitioner that he would not intervene, she commenced this CPLR article 78 proceeding seeking
to prohibit respondents from pursuing the charges; preliminary relief in the form of an injunction
was initially granted pending a final determination on the merits. Supreme Court, in a well-
reasoned decision, found that, under the relevant provisions of law existing at that time, the
Superintendent did not have the authority to make determinations of probable cause and granted
the petition......
Moving next to the merits, while there is no question that the Legislature intended the relevant
provisions of chapter 385 to be effective as of December 31, 1996 and that they apply to all cases

currently pending, we nonetheless conclude that chapter 385 falls short of curing the jurisdictionally defective finding of probable cause made in this case. Clearly, at the time of her finding, the Superintendent did not have the authority to act as the employing board under the Education Law or by virtue of any delegation by the Chancellor, the City Board or the CSD 12 Board. Although the curative provisions of chapter 385 are retroactive, the new legislation does not give superintendents the authority they needed in November 1997 to initiate disciplinary charges against tenured teachers. Moreover, while chapter 385 could have retroactively authorized community superintendents to act in place of the "employing board", it gave such power instead to the Chancellor, with the authority to delegate such power to the community superintendents (see, L 1998, ch 385, § 5). Consequently, the enactment of chapter 385, despite its retroactive effect, did not cure the Superintendent's lack of authority. It then became necessary for the Chancellor to, retroactive to December 31, 1996, delegate to all community superintendents "the authority to exercise all of the duties and responsibilities of the employing board as set forth in § 3020-a Educ. of the Education Law * * * including, but not limited to, determining whether probable cause exists to bring disciplinary proceedings against a tenured teacher".

Notably, in 1996, the year before the commencement of the disciplinary charges against petitioner, the Legislature made sweeping changes to the Education Law by enacting chapter 720 of the Laws of 1996 (hereinafter chapter 720), drastically altering the school governance system within the City of New York. Chapter 720 removed certain executive and administrative powers from the community school boards, transferring them to the community superintendents. Education Law § 2590-f (1) (c) (as amended by L 1996, ch 720, § 5) specifically granted community superintendents the authority "to appoint, define the duties of, assign, promote and discharge all employees". Significantly, however, this section did not address the issue of who or which body determines whether there is probable cause to support formal disciplinary charges brought pursuant to Education Law § 3020-a, which, inter alia, provides statutory due process for tenured teachers........

We agree with Supreme Court's observation that "a proper determination of probable cause is an essential jurisdictional predicate to disciplinary charges" and analogous to the proper designation of a Hearing Officer (see, e.g., Matter of Wiggins v. Board of Educ., 60 N.Y.2d 385, 387; Matter of Perez v. New York State Dept. of Labor, 244 A.D.2d 844).

Respondents did not dispute that prior to March 31, 1997, the effective date of chapter 720, the "employing board" was either the school board of each of the community districts or the City Board, and not the community superintendents; however, they contended that the chapter 720 changes removed all executive and administrative powers from the community school boards and that the community superintendents, as the replacements of the "employing boards", became the sole entities within the system to which the Legislature had granted the power to make probable cause determinations.

Supreme Court disagreed, finding that the CSD 12 Board remained "the employing board" in this case and, thus the only entity authorized to make determinations of probable cause. The court found that although the Legislature, in enacting chapter 720, amended numerous subdivisions of Education Law § 2590-j, it did not amend subdivision (7) of section 2590-j, which states, in relevant part, that:

"Each community board shall have authority and responsibility with regard to trials of charges against any members of the teaching or supervisory service staffs of the schools within its jurisdiction as follows:

26

"(a) No such employee who has served the full and appropriate probationary period prescribed by, or in accordance with law, shall be found guilty of any charges except after a hearing as provided by [Education Law § 3020-a]."

Supreme Court properly concluded that, as it was within the province of the Legislature to amend Education Law § 3020-a and/or section 2590-j, in the absence of such changes the community school boards continued to have "the sole power and duty to make determinations of probable cause" and that "[n]o such authority [was] granted to community superintendents" under the 1996 amendments to the Education Law. Respondents then appealed. The Commissioner, taking no position in the proceedings, has not appealed.

After respondents' appeal of Supreme Court's judgment was fully submitted and argued before this Court, the Governor signed into law chapter 385 of the Laws of 1998 (hereinafter chapter 385) on July 14, 1998. Of relevance here is section 3 of chapter 385 which amends Education Law § 2590-f, which is entitled "Powers and duties of community superintendents", by adding a new paragraph (s) to subdivision (1) stating as follows: "(s) notwithstanding any provisions of law to the contrary, to exercise all of the duties and responsibilities of the employing board as set forth in section three thousand twenty-a of this chapter pursuant to a delegation of the chancellor under section twenty-five hundred ninety-h of this article".

Section 5 of chapter 385 amends Education Law § 2590-h, which is entitled "Powers and duties of chancellor", by adding a new subdivision (38) which states as follows: "38. to exercise all of the duties and responsibilities of the employing board as set forth in section three thousand twenty-a of this chapter with respect to any member of the teaching or supervisory staff of schools under the jurisdiction of the community boards. The chancellor shall exercise all such duties and responsibilities for all community districts or may delegate the exercise of all such duties and the responsibilities to all of the community superintendents of the city district."

Further, section 6 of chapter 385 amends subdivision (7) of Education Law § 2590-j, which is entitled "Appointment and removal of persons in the teaching and supervisory service", in three relevant ways: first, it deletes the initial provisions that "Each community board shall have authority and responsibility with regard to trials of charges against any members of the teaching or supervisory service staffs of the schools within its jurisdiction as follows"; second, it amends paragraph (a) to read as follows: "(a) No member of the teaching or supervisory staff of schools who has served the full and appropriate probationary period prescribed by, or in accordance with law, shall be found guilty of any charges except after a hearing as provided by section three thousand twenty-a of this chapter;" and third, it amends paragraph (d) by removing the provision requiring that any charges against a tenured member of the teaching or supervisory staff of schools be filed with the community board. Finally, section 8 of chapter 385 provides as follows: "This act shall take effect immediately; provided, however, that sections three * * * five, [and] six * * * of this act shall be deemed to have been in full force and effect on and after December 31, 1996 for all purposes, including but not limited to any pending legal proceedings and actions." On August 18, 1998, in response to the new legislation, the Chancellor delegated in writing his duties and responsibilities as "employing board" to the superintendents of the community school districts and in that document he states that said delegation "shall be deemed to be in full force and effect on or after December 31, 1996". Both sides have now submitted supplemental briefs.

Initially, we conclude that prohibition is the appropriate procedural remedy for the assertion of petitioner's claim (see, Matter of Pirro v. Angiolillo, 89 N.Y.2d 351, 355). Prohibition is available "to prevent * * * a body or officer * * * from proceeding or threatening to proceed

without or in excess of its jurisdiction" (Matter of Schumer v. Holtzman, 60 N.Y.2d 46, 51). Furthermore, petitioner had shown a clear right to the relief sought (see, Matter of Town of Huntington v. New York State Div. of Human Rights, 82 N.Y.2d 783) as the Superintendent at the time of her determination of probable cause did not have the authority to do so. Notably, chapter 385 is a clear acknowledgment of the infirmities in chapter 720 as found by Supreme Court.

Moving next to the merits, while there is no question that the Legislature intended the relevant provisions of chapter 385 to be effective as of December 31, 1996 and that they apply to all cases currently pending, we nonetheless conclude that chapter 385 falls short of curing the jurisdictionally defective finding of probable cause made in this case. Clearly, at the time of her finding, the Superintendent did not have the authority to act as the employing board under the Education Law or by virtue of any delegation by the Chancellor, the City Board or the CSD 12 Board. Although the curative provisions of chapter 385 are retroactive, the new legislation does not give superintendents the authority they needed in November 1997 to initiate disciplinary charges against tenured teachers. Moreover, while chapter 385 could have retroactively authorized community superintendents to act in place of the "employing board", it gave such power instead to the Chancellor, with the authority to delegate such power to the community superintendents (see, L 1998, ch 385, § 5). Consequently, the enactment of chapter 385, despite its retroactive effect, did not cure the Superintendent's lack of authority. **It then became necessary for the Chancellor to, retroactive to December 31, 1996, delegate to all community superintendents "the authority to exercise all of the duties and responsibilities of the employing board as set forth in § 3020-a Educ. of the Education Law * * * including, but not limited to, determining whether probable cause exists to bring disciplinary proceedings against a tenured teacher".**

We agree with Supreme Court's observation that "a proper determination of probable cause is an essential jurisdictional predicate to disciplinary charges" and analogous to the proper designation of a Hearing Officer (see, e.g., Matter of Wiggins v. Board of Educ., 60 N.Y.2d 385, 387; Matter of Perez v. New York State Dept. of Labor, 244 A.D.2d 844). Generally, the same canons of construction are applicable to legislation and administrative regulations; consequently, where retroactive application is specifically stated, administrative regulations as well as statutes can be given retroactive effect (see, Matter of Cortland-Clinton, Inc. v. New York State Dept. of Health, 59 A.D.2d 228; 2 N.Y. Jur 2d, Administrative Law, § 188, at 246). However, a retroactive statute may not be used to make lawful an administrative act which was unlawful when taken (see, Lane v. Johnson, 283 N.Y. 244, 253-254; Olds v. City of Jamestown, 280 N.Y. 281, 285; Matter of London v. Wagner, 22 Misc.2d 360, 363, affd 13 A.D.2d 479, affd 11 N.Y.2d 762). Moreover, we find no precedent which permits the use of a retroactive delegation of authority to cure an administrative act which was unauthorized at the time it was taken (see, Matter of Wiggins v. Board of Educ., supra; Matter of Perez v. New York State Dept. of Labor, supra)."

The State Legislature did not create a law that specifically gave the Chancellor the authority to

**determine 'whether probable cause exists to bring disciplinary proceedings against a**

tenured teacher'. At no time has the Department presented such language in a Delegation memo.

Therefore, the authority to determine probable cause remains with the employing board, the PEP. Plaintiff argues that Arbitrator Leah Murphy never had subject matter jurisdiction to terminate him at the compulsory 3020-a arbitration hearing because of procedural violations of law which impair his tenure rights to due process as cited in Education Law 3020-a. In those proceedings, which are compulsory, no Arbitrator can deny or dismiss Plaintiff's notarized Affidavit which clearly states his opposition to the procedural errors upon which his case was charged. Arbitrator Murphy chose to ignore Plaintiff's AFFIDAVIT, and Defendants have never addressed it. Therefore, Plaintiff's objection to being charged under Education Law 2590-h(19) and (38) is still standing as undisputed grounds for his Complaint herein.

Therefore, the Arbitrator had no subject matter jurisdiction to proceed with the case against Plaintiff. She should have immediately withdrawn all charges. Alternatively, the Arbitrator should have adjourned the hearing until there had been a vote in an Executive Session by the school board and a proper determination of probable cause. Murphy did not do that although Attorney Behrins requested she consider this option.

Plaintiff argued that the hearing could not proceed due to the unwaived procedural defect cited in his Affidavit. (see, Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d 274,654 N.E.2d 95 [1995]). Upon information and belief the Department placed Arbitrators on the 3020-a panels without explaining the procedural defect, however this does not cure the problem of subject matter jurisdiction. Arbitrators cannot grab subject matter jurisdiction out of thin air.

Fraudulent concealment of a secret waiver of the rights of tenured employees to the tenure law

Education Law 3020-a(2)(a) by the NYC Department of Education cannot be sanctioned.

The United States Supreme Court has defined waiver as "an intentional relinquishment or

abandonment of a known right or privilege." Johnson v. Zerbst, 304 U. S. 458, 464 (1938).

Courts should "indulge every reasonable presumption against waiver,  Aetna Ins. Co. v.

Kennedy, 301 U. S. 389, 393 (1937), and they should "not presume acquiescence 526*526 in the

loss of fundamental rights," Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U. S. 292, 307

(1937). In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be

an allegation and evidence which show, that an accused was offered counsel but intelligently and

understandably rejected the offer. Anything less is not waiver." Id., at 516. Additionally, a

waiver of a teacher's tenure rights must be knowingly and freely given (Matter of Gould v. Bd. of

Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446; Matter of Abramovich v. Bd. of Educ. of

the Three Villages CSD No. 1, 46 NY2d 450).

Tenured teachers have a property and liberty right to their jobs, and therefore when there is any

penalty that reduces the benefits of these rights, there must be Just Cause. Plaintiff argues here

that there was no Just Cause to proceed with the 3020-a arbitration.

Judge Desmond Green in the Richmond County Supreme Court  ruled on March 29, 2018 in

the case of Rosalie Cardinale that:

"New York State created the public school tenure system guaranteeing continued
employment to tenured teachers by statute and therefore created a property right in a tenured
teacher's continued employment. *(See Education Law§§§ 3012, 3012- a, 3020, Holt v. Board
of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981], Matter of Abromvich v.
Board of Educ. of Cent. School Dist. No. I of Towns of Brookhaven & Smithtown,* 46 NY2d
450 [1979]). Where a property right in continued employment exists, such as New York's
tenure system, the recipient of such a right may not be deprived without due process. *See
Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 [1985].

30

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement ... " *Education Law* § 3020.

The statutory procedural process afforded to teachers with tenure under *Education Law* §3020-a requires:
The filing of charges "in writing and filed with the clerk or secretary for the school district or employing board during the period between the actual opening and closing of the school year for which the employed is normally required to serve. *Education Law§*3020-a(l)

"Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against the employee pursuant to this section." *Education Law* § 3020-a(2).

Where an employing board determines probable cause exists for discipline the tenured teacher shall receive: "a written statement specifying (i) the charges in detail, (ii) the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and (iii) the employee's rights under this section, shall be immediately forwarded to the accused employee " *Id.*

Green summarized his conclusion that there was a procedural error of law:

"Hearing Officer Lendino conducted the *Education Law* § 3020-a hearing based on unproven assumptions that the delegations of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred in compliance with the relevant statutory authority."

It is clear that a decision of an Arbitrator who proceeds without getting a signed waiver from the charged employee shows bias against the employee and an excess of authority that is not sanctioned by any statutory authority.

The legislative intent is to provide pedagogues protection from vindictive principals who may want to remove senior teachers from their positions for random, arbitrary or capricious reasons. Thus, Education Law 3020-a(2)(a) is an important part of the efforts of legislators to maintain a check and balance of power in NY State governance and policy. Prohibition is the appropriate

31

procedural remedy for the assertion of Plaintiff's claim where prohibition is available "to prevent a body or officer from proceeding or threatening to proceed without or in excess of its jurisdiction." See: Matter of Schumer v. Holtzman, 60 N.Y. 2d 46, 51.

This Court's previous ruling in denying the validity of Cardinale is defective for the reasons cited above, that there is no valid Delegation document, and a secret waiver of rights of member teachers by the UFT and the DOE cannot be supported. The procedures as they now stand to charge tenured UFT members deny these member valuable tenure rights to a protected property and liberty interest.

Constitutional claims are sufficient to support jurisdiction over pendent state law claims when the constitutional claim are not wholly insubstantial or obviously frivolous. *Moore v. Cnty. of Suffolk,* 851 F. Supp. 2d 447, 458 (E.D.N.Y. 2012).  Plaintiff's constitutional causes of action are clearly sufficiently alleged within the Amended Complaint to allow for continued survival of the state law claims.

The Motions To Dismiss presented here by Defendants cannot be granted.


POINT III: THE FIRST AMENDMENT RETALIATION CLAIM
IS VALID

In order to prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that he engaged in speech protected by the First Amendment, that he suffered an adverse employment action, and that a causal connection between the two existed, "in that the speech was a substantial or motivating factor for the adverse employment action." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d. Cir.

2005). In determining whether a public employee has engaged in constitutionally protected speech, the court must determine "whether the employee spoke as a citizen on a matter of public concern." *Woodlock v. Orange Ulster B.O.C.E.S.*, 281 F. App'x 66, 68 (2d. Cir. 2008)(quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). The inquiry into whether an individual was speaking as a citizen "is a practical one." Garcetti, 547 U.S. at 424-25. Speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423. Plaintiff's speech did not concern issues for which "there is no relevant citizen analogue," but rather was motivated by his concerns as a member of the community, and by information available to the public. *See Massaro v. New York City Dep't of Educ.*, 2012 U.S. App. LEXIS 10911 (2d. Cir. 2012) Neither was Plaintiff's speech "part and parcel" of his official duties as a teacher, as a teacher's duties clearly do not encompass reporting on budgetary irregularities, illicit relationships, or philosophical differences with staff. *See Matthews v. Lynch*, 2012 U.S. LEXIS 10463 (2d. Cir. 2012); *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). Plaintiff was not speaking generally as an advocate for his students, nor as an employee as part of his duties but as a citizen concerned about budgetary irregularities and potential misconduct affecting not just his classroom or school, but instead had a "broader public purpose." *See Ruotolo v City of New York*, 514 F.3d at 189 (quoting *Lewis v. Cohen*, 165 F.3d 154, 163-164 (2d Cir. 1999). Based on the above, sufficient facts exist under the applicable case law to withstand Defendants' motion for summary judgment, as Plaintiff has a triable First Amendment claim. Furthermore, there is no real dispute that Plaintiff was subject to multiple adverse actions, including attempts to end his employment through the Section 3020-a disciplinary process. See *Jeter v. NYCDOE*, 06 CV 3687 (E.D.N.Y. 2012) (denying summary judgment on Title VII and Section 1981

retaliation claim against tenured teacher brought up on retaliatory 3020- a charges).

Defendants argue that Plaintiffs First Amendment Retaliation claim is legally insufficient. A municipal entity, such as Defendant DOE, can only be liable under § 1983 if the alleged unconstitutional action was the result of an official policy, practice or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-692 (1978). "The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. The City of New York*, 985 F.2d 94, 100 (2d Cir. 1992). Further, a plaintiff cannot use a single instance of a constitutional violation, including his own isolated experience, to prove a *Monell* violation. *Smith v. City of N.Y.*, No. 15-cv-4493 (RJS), 2016 U.S. Dist. LEXIS 118281, at *15-17 (S.D.N.Y. Sep. 1, 2016)."

Yet any review of teacher discipline hearings for the past 18 years clearly shows that the NYC Department of Education, former and current Chancellors, and the Teacher Tenure Unit in Albany inside the New York State Education Department, guide and manage 3020-a arbitration hearings for New York City and New York State. Former Chancellor Carmen Farina described the procedures she has in place for the teacher discipline hearings in the video cited above, https://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html). The meeting took place February 24, 2015 at Tweed, Education Department headquarters, and it was mandatory for all participants in 3020-a hearings (except private attorneys)., and included all the NYSUT and NYC DOE Attorneys as well as arbitrators who work on 3020-a in New York City. The video makes clear that what Mrs. Carmen Farina was saying is her policy statement as well as the policy of the NYC Department of Education. Since 2002, there has been deficits to the procedures used in 3020-a arbitration as cited in the Green

decision in the Cardinale case (EX. M), Plaintiff's AFFIDAVIT (EX. A), and his Motion To

Dismiss For Lack of Subject Matter Jurisdiction (EX I).

What is also clear is that the UFT is a partner in this travesty of justice and denial of the rights of

tenure, allowing all the errors of law and procedure cited herein.

Therefore Plaintiff has the necessary and sufficient facts to support his claims that the

Defendants have a policy and practice of speeding up 3020-a hearings at the expense of tenure

rights, and, that the Mayoral control of the NYC DOE obliterated necessary and mandated

procedural due process rights pursuant to law which he did not waive.

The inquiry of whether the employee is speaking pursuant to his official duties is not susceptible

to a bright line rule. Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012). Courts must examine the

nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship

between the two; and consider other contextual factors, including whether the complaint was

conveyed to the public. Ross v. Breslin, 693 F. 3d at 306 (citations omitted).

Whether an employee's speech addresses a matter of public concern is a question of law to be

determined based on the "content, form and context of a given statement, as revealed by the

whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999) citing Connick v. Myers, 461

U.S. 138, 147-48 (1983), n. 7. An "[e]mployee's expression is not a matter of public concern

when it 'cannot be fairly considered as relating to any matter of political, social, or other concern

to the community'." Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008) quoting

Connick, 461 U.S. at 146. However, criminal conduct relating to public education is generally

recognized as a matter of public concern. See Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d

158, 164 (holding, in part that criminal activity in schools is of "social" or "other" concern

to communities); Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014

WL 3547374) *11 (E.D.N.Y.)(denying defendant's motion to dismiss finding that school employee reporting unlawful and illegal inflation of student grades to procure county and state funding constituted speech that touched on a matter of public concern); see also Tucker v. City of New York, _F.Supp.2d_, 2011 WL 2893077, *5 (S.D.N.Y.) (holding that allegations of corruption and misuse of public funds by supervisors and coworkers are matters of public concern); see generally, Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011) (holding that speech pertaining to police misconduct is a matter of public concern).

Plaintiff felt strongly that the segregation and discrimination he observed in COOP TECH as well as throughout the NYC Department of Education was a matter of public concern. He also believed then and now that when employees unfairly and illegally misuse school funds, this is also a matter of public concern. He acted on these beliefs as a private citizen. See also Benedict v. Town of Newburgh, 95 F. Supp. 2d 136, 143 (S.D.N.Y. 2000) (holding that "testifying truthfully is constitutionally protected from retaliation, and that it is a right existing wholly apart from the First Amendment protection of speech generally, and without the need to sow that the testimony relates to a matter of public concern").

Plaintiffs speech in his emails and letter complaints encompassed actions that are not within Plaintiff's primary duties as a STEM teacher. Hence, at this early stage in the case, accepting Plaintiffs averments as true, it cannot be said as a matter of law that citing improper actions of staff who are illegally using school and Department funds were part and parcel of his primary duties.

Moreover, since there is no bright line rule relating to what speech constitutes matters within the primary duties of a public employee's duties, discovery needs to occur to learn exactly what was the nature of the Plaintiff's job responsibilities, the nature of the speech and the relationship

between the two before a Court can be decided whether the plaintiff can continue to pursue his

First Amendment retaliation claim. Matthews v. City of New York, 488 Fed Appx. 532, 533

(2nd Cir. 2012) (summary order).

In order to establish a causal connection at the pleading stage, the "allegations must be 'sufficient

to support the inference that the speech played a substantial part in the adverse action.'" Davis v.

Goord, 320 F.3d 346, 354 (2d Cir.2003); see also Shekhem' El-Bey v. City of New York. 419

F.Supp.2d 546, 552 (S.D.N.Y.2006). The Second Circuit has no bright line for how close in time

the adverse employment action must follow the protected activity in order to sustain the

causation element. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F. 3d 158, 167-68 (2nd

Cir. 2006) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999). On a motion to

dismiss, a reasonable inference of a causal connection is all that is required. See Posr v. Court

Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999) ("[T]he plaintiffs pleading need not

clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts

which could reasonably support an inference to that effect."); Rivera v. Cmty. Sch. Dist. Nine,

145 F.Supp.2d 302,309 (S.D.N.Y.2001). This "can be established either indirectly by means of

circumstantial evidence, for example, by showing that the protected activity was followed by

adverse treatment in employment, or directly by evidence of retaliatory animus." Morris v.

Lindau, 196 F.3d 102, 110 (2d Cir.1999). A court must "exercise its judgment about the

permissible inferences that can be drawn from temporal proximity in the context of [each]

particular case [ ]," Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009). Where a plaintiff asserts

enough direct evidence of retaliatory animus to create a triable question of fact on the issue of a

causal connection as here, a longer lapse between the protected speech and the adverse

employment action does not necessarily "conclusively establish lack of causation." See Mandel

v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003).

Here, Plaintiff's speech is directly related to his charges and his termination.

### POINT IV: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS MUST SURVIVE THE MOTIONS TO DISMISS

Plaintiff has sufficiently alleged an Equal Protection cause of action.  In EX. N, the Opinion and Award in 2014 of Arbitrator Felice Busto in the case of the emails and computer shenanigans of Francesco Portelos, Busto found that Mr. Portelos had committed serious misconduct, but was an excellent teacher and deserved to go back to his teaching. Portelos is white. Similarly, Seung Yong Ok, EX. O, an Asian man, was charged with internet policy abuse and misconduct, and given a $500 fine.  Plaintiff, for being charged with much less serious acts of sending emails on the lack of resources in vocational education, the widespread discrimination, segregation, and improper – even unlawful – acts of a few staff members at COOP TECH, was fired. Plaintiff is black. Clearly Plaintiff was treated differently with malicious retaliatory animus than similarly situated other District employees, including those who committed the illegal acts reported by Plaintiff, with the express illegal intent to punish whistleblowers. Thus, Plaintiff has successfully alleged belonging to a class that consists of more than one individual. The Gulino Litigation, filed to assist 8300+ Black and Latino teachers who were forced to take the LAST test before they could get a license, will cost the NYC DOE millions of dollars in Settlement money. Current Chancellor Rich Carranza talks all the time about the NYC DOE's "toxic whiteness". The Equal Protection Clause requires only that the classification drawn by the statute be rationally related to a legitimate state interest.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a

direction that all persons similarly situated  should be treated alike. Plyler v. Doe, 457 U.S. 202,

216 (1982).Section 5 of the Amendment empowers Congress to enforce this mandate, but absent

controlling congressional direction, the courts have themselves devised standards

for determining the validity of state legislation or other official action that is challenged as

denying equal protection.  The general rule is that legislation is presumed to be valid and will be

sustained if the classification drawn by the statute is rationally related to a legitimate state

interest. Here, although Plaintiff is using his particular circumstances to prove his arguments that

he was treated unfairly by the administration of COOP TECH and the NYC DOE, Plaintiff says

here that he is not arguing that he is a class of one. Indeed, he is arguing exactly the opposite,

that Black male teachers at the Department are treated unfairly.

Additionally, Plaintiff has successfully alleged an equal protection cause of action under a

selective enforcement theory of liability. The courts within the Second Circuit are divided

whether such a selective enforcement is permitted in the wake of the United States Supreme

Court in Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008), (held that "class of one"

claims no longer exist in a public employment setting); Gentile v. Nulty. 769 F. Supp. 2d 573,

583 (S.D.N.Y. 2011); citing Kamholtz v. Yates County, 350 Fed.Appx. 589, 591 (2d Cir.2009),

Faulks v. City of Hartford. 2010 WL 259076, at *7 (D.Conn. 2010), Sloup v. Loeffler, 2008 WL

3978208, at *14 n. 18 (E.D.N.Y. 2008).

The elements of a selective enforcement cause of action are "(1) that [s]he was treated differently

from others similarly situated, and (2) that such differential treatment was based on

impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injure a person." Fierro v. New York City

Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014), appeal dismissed (Apr. 9, 2014).

quoting Gentile, 769 F.Supp.2d at 578.

It is without a doubt that the Plaintiff has successfully alleged the necessary elements of a

selective enforcement of the Education Law processes behind teacher discipline outcomes for

Black men. With regard to the first element, similarly situated individuals, a plaintiff need not

provide evidence of similarly situated individuals at the motion to dismiss stage, so long as the

facts as alleged to permit a jury to conclude that they are similarly situated. Vaher v. Town of

Orangetown, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013), citing Mosdos Chofetz Chaim.

Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697 (S.D.N.Y. 2011).

As to the second element of the selective enforcement cause of action, it is without a doubt that

Plaintiff has successfully alleged that the differing treatment by the Defendants was in order to

punish the Plaintiff for exercising his First Amendment rights as a whistleblower and was done

maliciously and with the bad faith intent to harm him. Thus, it is clear that Plaintiff has

successfully alleged a selective enforcement cause of action that must survive as a matter of law.

Plaintiff has also sufficiently alleged a Due Process cause of action, as he, a tenured teacher, has

a constitutionally protected property interest in his employment. Plaintiff also has a

constitutional property interest in his educational licenses, which were effectively taken away

through the Defendants' campaign to blacklist the Plaintiff in the field of public education.

Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014). In Mudge, the plaintiff, a

substitute teacher, alleged termination of at-will employment in connection with a calculated

effort to prevent the plaintiff from obtaining employment and using his licenses when the

defendants, including investigators from the State Education Department were spreading

untruths to potential employers. Id. The court held that discovery was necessary to ascertain the

Defendants' exact roles to establish whether the defendants were low level government officials

and whether the actions alleged were random or specifically designed to deprive the plaintiff of his constitutional rights. Id.

In the instant action, Plaintiff has clearly alleged that the Defendants have engaged in a systematic campaign to blacklist him with the intention of preventing him from finding employment in the field of education. The inability to find work within the field of public education also implicates the loss of his constitutional property right in his educational licenses. Thus, Plaintiff's due process property claims must survive as a matter of law. The stigma plus argument is based upon Plaintiff's discussion of his current jobs with prospective employers, but also in the fact that NYC press and media obtain all cases decided at 3020-a arbitration inside a press only media link. Plaintiff's name was sent out on this media list, and all media reporters can do a story on him if they so choose. The decisions of Arbitrators are not confidential and can be obtained through Freedom of Information requests.

In order to successfully allege a claim for a substantive due process violation, it must be alleged that the government action being challenged was "arbitrary, conscience shocking, or oppressive in a constitutional sense. Substantive due process does not protect against government action that is incorrect or ill-advised. While there is no clear standard for what actions are deemed conscience shocking,  it has been held that it stems from actions that are "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Such acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001), citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 847  (1998), Breithaupt v. Abram, 352 U.S. 432,435 (1957).

The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a substantive due process claim. The very idea that a person's livelihood through tenure, which is supposed to be determined through a fair evaluation of an educator's job performance, is denied in open and blatant retaliation for reporting illegalities and improprieties within public education absolutely offends the notations of fair play and shocks the conscience. There is no reasonable interpretation of the actions alleged within the Complaint that would result in the malicious targeting of a whistleblower as being merely "incorrect or ill advised." Even if such a definition is up for debate, it is inapplicable in a motion to dismiss stage and a simple reading of the Complaint amply demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of action to continue through to discovery as a matter of law.

POINT V: THE UFT COLLABORATES WITH THE NYC
DEPARTMENT OF EDUCATION TO DENY TENURE LAW
RIGHTS FOR A FAIR 3020-A HEARING

In EXHIBIT D Robert Reilly, General Counsel for New York State United Teachers ("NYSUT") writes that the issues raised by Cardinale are not germane to Ms. McKenzie's 3020-a case. His statement is the official stand on the issue of the determination of probable cause as cited in the Cardinale case (EX. M), and Plaintiff just became aware of this letter a few weeks ago. This letter, as opposed to the previously submitted letter by a NYSUT Attorney, Keith Gross, is written by the General Counsel of NYSUT and must be the official policy statement for all NYSUT Attorneys. His statement makes no sense. Both Respondents had the same errors of law in their charging papers, the same lack of a vote for probable cause, and the same rights denied to them.

Plaintiff's arguments are exactly the same, and therefore he adopts the statement made by Attorney Reilly as the same one he would get should he write a letter as well to Mr. Reilly.

The facts are clear that the UFT is playing along with the NYC DOE to get along. This is, and was, the political mandate of the UFT when Mayor Michael Bloomberg took control over the NYC school system in 2002, namely to remove tenured teachers from the Department.

In an essay with the title "The New York City Teachers' Union Contract: Shackling Principals' Leadership. Civic Report Number 6.
Manhattan Inst., New York, NY. Center for Civic Innovation. 1999-06-00:
"several recent studies suggest that teacher unionization  has not had an altogether benign influence on public education. Studies of the Boston and Milwaukee school systems and a review of teacher contracts in Michigan reveal significant ways in which collective bargaining has tied the hands of administrators, impeded reform, and made it more difficult to restore accountability for educational achievement (p. 6) ..... Among the features of these contracts that cause concern are excessively rigid work rules that deprive schools of the necessary autonomy and flexibility to carry out their educational missions, and numerous obstacles in the form of due process requirements that make it difficult to terminate incompetent teachers." (p. 7)

The essay continues,
"Although this report concerns the contract, in some instances the operation of the contract can only be understood within a broader context, including the policies of the Board and state education law. In part this is because the contract is not the sole device by which the UFT presses its agenda. The union has considerable political influence with the Board and the state legislature. Full appreciation of contract language at times requires knowing how specific provisions of the bargaining agreement are complemented or qualified by directives and circulars issued by the board and by acts of the legislature.

On p. 13:
"How The Contract Impedes Dismissal of Poorly Performing Teachers

Although it is a commonplace that teacher contracts have made it very difficult to fire ineffective instructors, the reasons are not as widely appreciated. The process of dismissing a tenured teacher begins with the documentation of professional miscond uct."

Followed by 25+ pages of the same lament: the UFT impedes education of children by making it practically impossible to fire these miscreants.

"........Principals contacted for this research agreed that terminating a teacher's employment is a difficult, time-consuming task. Principals speak of the need to establish an iron-clad case, to provide excessive documentation in anticipation that some of the evidence will be successfully challenged. In the words of one, "I need 15 documented screw-ups, because some will be thrown out." Another principal, describing his efforts to remove an emotionally disturbed teacher from his school, displayed a three-ring binder filled with

letters and other documentation he had prepared for a 3020-a hearing."

When Mayor Bloomberg took control of the school system in 2002, his mantra was to get rid of as many tenured teachers as possible. He rented huge spaces and allowed principals to charge anyone with anything. These rooms were nicknamed "The Rubber Room."

The 3020-a trials went into high speed, but only could make a small dent in the 2,000 educators forced into the rubber rooms, of which by 2007 were 8 in number. In 2010, recognizing the error of having thousands of teachers being paid their full salary doing nothing for anywhere from 2 – 15 years, Bloomberg ended the large spaces and started to hide teachers around New York City in smaller groups.

But the policy of getting the most tenured teachers out quickly, remained. For the UFT it was important to go along with what Bloomberg wanted, so fairness was not a quality that anyone spoke about, only speed.

Bloomberg believed that the procedures cited in Education Law 3020-a(2)(a) with the vote in an Executive Session would hold up the speed he wanted, so the law was ignored rather than changed because the State legislature did not want to be held accountable for destroying the tenure law. Both the UFT and the NYC DOE believed that no one would notice. And no one did, until Judge Green made the decision in the Cardinale matter. Plaintiff's legal team at his 3020-a was the same team who worked on the Cardinale case before Judge Green. Thus Plaintiff had a front seat to the decision (Ex. M) and it's effect on members of the UFT – anger, frustration and disgust.

As discussed above, the Delegation Memo is worthless as lawful delegation of authority to determine probable cause. Yet it is clear in the Reilly letter that the UFT goes along with the denial of Cardinale as an "outlier". Yet, at no time has any UFT representative or NYSUT Attorney presented a valid claim that the Chancellor, then the Superintendent, and then a

principal has the right to determine probable cause, whenever they want. This is exactly what tenure law was supposed to prevent.

The UFT/NYSUT collusion can be seen in the emails/letters of NYST Attorney Andrew Stoll, wherein he told SCI that Plaintiff would not speak with them, but never told Plaintiff. The result was that Plaintiff was found guilty of the false charge of citing an illicit relationship between Konzie and McGowan (two women), when his information was that Konzie and teacher Caraballos (woman and man) were the culprits. Plaintiff could have also persuaded the investigators not to substantiate the charges. He does not know, and will never know what the outcome of his meeting with the investigators would have been, but he did not want to give up this right. He received no notice.

If a suspect will not talk with investigators, and several people cite claims of wrong-doing that are exactly the same (see the statements in SCI's final report, EX. D), the investigators could only find Plaintiff guilty.

Another obvious wrong is the UFT denial of any member in New York choosing his/her arbitrator. Clearly, if a Respondent charged with 3020-a is sitting in a 3020-a arbitration wher the arbitrator is given perks by the NYC DOE and is paid by the New York State Education Department, as is the case here, the arbitrator must be aligned with the guidelines and rules of management as opposed to the employee. The choosing of the arbitrator is mandated by state law, and despite there being some language of not being available in a city over 1 million inhabitants, all Assistant Principals and Principals charged with 3020-a have the right to choose their arbitrator in New York City. This right was taken away only by the UFT in NYC, not the administrators' Union, Council of Supervisors and Administrators ("CSA").

The UFT also removed the right of teachers in an incompetency hearing to have three arbitrators.

Attorney Carol Gerstl's reasoning was that speed is the most important element of a good hearing.

As Plaintiff just became aware of the information contained in the letter by Reilly cited herein, he argues that he has met the statutory timeline to complain about the UFT included in his lawsuit.

The claim that the UFT was not served fails because the proof of service was filed on the docket sheet November 22, 2019. The UFT was served November 14, 2019.

## POINT VI: THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION

The court has the authority to exercise pendent jurisdiction over state law claims that stem from a "common nucleus of operative fact". Moore v.County of Suffolk, 851 F.Supp.2d 447,458 (E.D.N.Y. 2012). Constitutional claims are sufficient to support jurisdiction over pendent state law claims when the constitutional claim are not wholly insubstantial or obviously frivolous. Id. Here, the Plaintiff's constitutional causes of action are sufficiently alleged within the Complaint to allow for continued survival of the state law claims. Since the court has original jurisdiction to hear the federal claims asserted by Plaintiff, it should also exercise its right to supplemental jurisdiction to hear the state claims.

## POINT VII: THE NEW YORK CIVIL SERVICE LAW § 75-B CLAIM SHOULD NOT BE DISMISSED

To state a claim under New York Civil Service Law§ 75-b, the Plaintiff must allege: (1) that he disclosed information to a governmental body regarding what he reasonably believed to be improper governmental action; (2) an adverse personnel action was taken against him; and (3) there is a causal connection between the disclosure and the adverse personnel action.

46

Rusk v. New York State Thruway Authority, 2014 WL 3891624, *6 (W.D.N.Y. 2014). The

Plaintiff acknowledges that a§ 75-b claim may not be asserted against individual defendants,

however, it may nevertheless be asserted against the New York City Department of

Education. Rusk v.

New York State Thruway Authority 2014 WL 3891624, *6 (W.D.N.Y. 2014). The

Amended Complaint more than adequately alleges a cause of action under Civil Service

Law § 75-b. It is alleged that Plaintiff alleged wrong-doing by the Department that

uncovered an illicit relationship, as well as improper procedures used to appoint a principal

and some financial irregularities. All these can be construed as improper governmental

action (not to mention criminal conduct). The Amended Complaint also clearly alleges that

he was terminated from his employment with the Defendants in direct retaliation for his

whistleblowing activities.

Defendants' contention that a violation of a specific law or regulation is simply

incorrect. "New York Civil Service Law§ 75-b, unlike New York Labor Law § 740, does

not require a Plaintiff to allege a violation of a law, rule, or regulation that presents a

danger to public health or safety. Rather, under New York Civil Service Law § 75-

b(2)(a)(ii), the Plaintiff may alternatively allege what he reasonably believes to be true

and which he reasonably believes constitutes an improper government l action."

Ramirez. 2014 WL 3547374 * 8. As Plaintiff has plead all essential elements of a§ 75-b

claim, the Defendant's motion to dismiss should be denied.

CONCLUSION

For the reasons set forth above, Defendants Motion to Dismiss should be denied in all respects and the Court should grant any other, further and different relief that it deems just and appropriate.

_____

Rupert Green

EXHIBIT A

# AFFIDAVIT

STATE OF NEW YORK }

COUNTY OF NEW YORK }

**Rupert Green,** being of full age and duly sworn, deposes and says:

1. My name is Rupert Green, and I reside at 205-26 113 Ave. St Albans NY 11412 in the New York City public

2. I am a tenured teacher in good standing in the New York City public school system.

3. On April   2016 I received charges of alleged misconduct which led to the compulsory arbitration pursuant to Education Law 3020-a addressed herein.

4. The documents included with my charges were titled "NOTICE OF THE DETERMINATION OF PROBABLE CAUSE PURSUANT TO EDUCATION LAW 3020-A" which advised me of the law in these proceedings, and the fact that probable cause must be decided at an Executive Session of the employing board. There was no date.

5. I gave notice to the UFT, immediately upon receipt of the charging papers in this matter, that I requested a hearing, however by agreeing to a hearing pursuant to §3020-a before a Hearing Officer I <u>did not, and do not now,</u> waive my legal rights to:

(1) submit to a Hearing which complies with due process for tenured teachers as stated in New York State Education Law **§**3020 and **§**3020-a;

(2)  object to the process and substance of the manner in which probable cause was allegedly found, by the administration of my school, and not in an Executive Session as required by Education Law 3020-a.

6. Any Executive Session of a school board must be publicly noticed and must take place within a public meeting (Open meetings law Section 105) also noticed to the general public. Section 3020-a(2)(a) specifically refers to an "employing board" meaning a Board of Education, which does not currently exist in any school district within New York City; and this section of law also requires that a vote of the Board of Education is held, and a "majority" must vote in favor of probable cause:

*"Disposition of charges. Upon receipt of the charges, the clerk or secretary of the school district or employing board shall immediately notify said board thereof. Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against an employee pursuant to this section. If such determination is affirmative, a written statement specifying the charges in detail, the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and outlining the employee's rights under this section, shall be immediately forwarded to the accused employee by certified or registered mail, return receipt requested or by personal delivery to the employee."*

7. As there is no Board of Education in New York City at this time, and no "vote" with the mandated specificity as to where, when, by whom and on what information did the mandated vote take place, as well as no mention of the authority of a "school district" to identify probable cause, the charges served on Respondent and the subject matter jurisdiction of the Arbitrator to proceed under 3020-a must be declared null and void.

8. The Department has not complied with the requisite jurisdictional predicates for filing disciplinary charges against Respondent and, as such, the Arbitration proposed is without subject matter jurisdiction to proceed.

9. The procedures memorialized in my above charging papers cite Education Law Sections 3020 and 3020-a, not Education Law Section 2590. The Hearing Officer thus has no jurisdiction to hear the charges attached herein.

Rupert Green

Sworn before me on

2ⁿᵈ day of May   2016

Jonathan B. Behrins
Notary Public, State of New York
No. 02BE6311608
Qualified in Richmond County
Commission Expires September 15, 20__

NOTARY PUBLIC